1

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA
 2                 TALLAHASSEE DIVISION

 3                    IN ADMIRALTY

 4
   AXIS REINSURANCE COMPANY,
 5

 6      Plaintiff,

 7
   v.                        Case No.: 4:08cv168-WS/WCS
 8

 9  JAMES D. HENLEY,

10
        Defendant.
11  _____/

12  DEPOSITION OF:      JAMES D. HENLEY

13
    DATE:              September 18, 2008
14

15  TIME:              10:00 a.m.

16
    PLACE:             Gilchrist County Courthouse
17                     112 South Main Street, Rm. 157B
                       Trenton, Florida  32693
18
    REPORTED BY:       Penny Tobin, Court Reporter
19                     and Notary Public in and
                       for the State of Florida
20

21

22                GAINESVILLE REPORTERS
23             115 Northeast Seventh Avenue
                 Gainesville, Florida 32601
24                   (352) 377-5769
25              www.GainesvilleReporters.com
```

2

```
 1  APPEARANCES:

 2          HAMILTON, MILLER & BIRTHISEL, L.L.P.
            BY:  JULES V. MASSEE, ESQUIRE
 3          100 South Ashley Drive, Suite 1210
            Tampa, Florida  33602
 4
            Attorney for Plaintiff, AXIS REINSURANCE
 5

 6          FOWLER, WHITE, BOGGS, & BANKER, P.A.
            BY:  ERIC THIEL, ESQUIRE
 7          501 East Kennedy Boulevard, Suite 1700
            Tampa, Florida  33602
 8          Telephone:  813-222-1196
            Attorney for Defendant, JAMES D. HENLEY
 9

10

11                    I N D E X

12  Witness        Direct Cross Redirect Recross

13  JAMES D. HENLEY

14    By Mr. Massee    3

15

16                  E X H I B I T S
17  Number                                    Page

18  Plaintiff's Exhibit No. 1                  59

19  Plaintiff's Composite Exhibit No. 2        62

20  Plaintiff's Exhibit No. 3                   6

21  Plaintiff's Exhibit No. 4                  83

22  Plaintiff's Exhibit No. 5                  86

23  Plaintiff's Exhibit No. 6                  91

24  Plaintiff's Exhibit No. 7                  95

25
```

3

```
 1         MR. MASSEE:  I'm Jules Massee.  I represent the
 2  plaintiff, Axis Reinsurance Company.
 3         The defendant and defendant's counsel have
 4  already looked at Plaintiff's Exhibit No. 1 and
 5  Plaintiff's Composite Exhibit No. 2, which
 6  constitute photographs taken by the defendant of the
 7  subject vessel.
 8         MR. THIEL:  My name is Eric Thiel, counsel for
 9  James Henley.
10  THEREUPON:
11                  JAMES D. HENLEY
12  was called as a witness and, having been first duly
13  sworn, was examined and testified as follows:
14               DIRECT EXAMINATION
15  BY MR. MASSEE:
16     Q.   Okay.  Mr. Henley, just a couple of things to
17  cover housekeeping.  Have you been deposed before?
18     A.   Yes, sir.
19     Q.   Okay.  So most of what I tell you then is
20  probably not new to you.  If there's any need for you to
21  take a break or whatever, please just tell me.  The only
22  thing that I ask is that during the break while you're
23  under oath that you don't discuss the subject of your
24  testimony with your attorney.
25         I'm going to be asking you questions.  If you
```

4

```
 1  don't understand the questions, please tell me.  I am not
 2  attempting to trick you or get an answer out of you that
 3  is incorrect.  So 'I don't understand your question' is a
 4  perfectly adequate response.
 5         Mr. Henley, have you taken or are you under the
 6  effect of any alcohol, drugs, medication that would
 7  affect your ability to remember or recall events that
 8  took place on was it January 19th, 2008?
 9     A.   No, sir.
10     Q.   Okay.  And so your memory is, as far as you
11  know, spot on right now?
12     A.   Yes, sir.
13     Q.   Okay.  Can you please state your name and spell
14  your name for the record.
15     A.   I'm James D. Henley, H-e-n-l-e-y.
16     Q.   Okay.  And what is your address, sir?
17     A.   My mailing address is P.O. Box 565,
18  Steinhatchee, Florida, S-t-e-i-n-h-a-t-c-h-e-e, Florida,
19  32359.  My residence is at 1708 King, K-i-n-g Street,
20  Steinhatchee, Florida.
21     Q.   Okay.  And what is your social security number?
22     A.   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.
23     Q.   Okay.  And do you have a Florida driver's
24  license?
25     A.   Yes, sir.
```

1  Q.  Do you know the Florida driver's license
2  number?
3       A.  H -- as in Henley -- 540444542160.
4       Q.  Thank you.  Okay.  And do you hold any
5  professional licenses from the State of Florida?
6       A.  No, sir.
7       Q.  Okay.  Have you ever held professional licenses
8  in the State of Florida?
9       A.  No, sir.
10      Q.  Okay.  Do you understand what I mean when I ask
11 'professional license'?
12      A.  I'm gathering you mean it's as would be issued
13 by the Secretary of State.
14      Q.  Well, I'll ask it a different way.
15          In your fishing business, --
16      A.  Yes, sir.
17      Q.  -- do you have a license from any agency from
18 the State of Florida that enables you to conduct that
19 business?
20      A.  Yes, sir.
21      Q.  Okay.  What kind of license is that?
22      A.  I carry a fishing license.
23      Q.  Okay.
24      A.  And I also have a license to allow up to four
25 people to fish on my vessel.

1  two?
2       A.  (Witness nods head.)
3       Q.  You'll have to -- I'm sorry --
4       A.  As far as I can remember.
5       Q.  Okay.
6       A.  As far as I know.
7       Q.  All right.  And --
8       A.  I guess I didn't -- I -- I don't consider a
9  fishing license a professional license, but that's --
10      Q.  Okay.
11      A.  That's the reason I didn't say so.
12      Q.  Fair enough.
13          And I'm sorry I didn't mention it before, but
14 when you do answer make sure you answer yes or no,
15 because nodding or uh-huh or huh-uh is very difficult for
16 her to take down.
17      A.  I understand.
18      Q.  Okay.  Now, you have a United States Coastguard
19 License?
20      A.  Yes, sir.
21      Q.  Okay.  And how long have you had that license?
22      A.  It's in the second term of five years.  So I've
23 had it for -- one for five, and then it was renewed, and
24 I'm in the second term of -- I'm in the term of the
25 renewal of the issue number two.

1  Q.  Okay.  And those are State licenses?
2       A.  Yes, sir.
3       Q.  Okay.  So the fishing license allows you to
4  fish.
5       A.  Yes, sir.
6       Q.  And then this other license, does it have kind
7  of a name, that kind of license?
8       A.  We call them a -- well, let me get the -- (The
9  witness tenders document to Mr. Massee.)
10          MR. MASSEE:  For the record, Mr. Henley has
11 handed me, it looks like it says a 'State of Florida
12 Recreational License'.  And the number is 009192444.
13 And it says 'Charter License, four or less'.  And it
14 is valid for from March 24, 2008 to March 24, 2009.
15          And there's also a reference to a Coastguard
16 License No. 1163486.
17          Is it possible to get copies of this?
18          COURT REPORTER:  Yes.
19          MR. MASSEE:  And we'll mark that next in order.
20          COURT REPORTER:  That would be Exhibit No. 3.
21          (Thereupon, Plaintiff's Exhibit No. 3 was
22 marked for identification.)
23 BY MR. MASSEE:
24      Q.  And those are the only licenses you have from
25 the State of Florida, your driver's license and those

1  Q.  Okay.  So it's a second issue, United States
2  Coastguard License.  And what type of license is it?
3       A.  Commonly known -- it's an uninspected vessel
4  commonly known as a six-pack.
5       Q.  Okay.  Do you have any endorsements on that
6  license?
7       A.  No, sir.
8       Q.  Okay.  What did you have to do to get that
9  license?
10      A.  I attended a 40-hour class, took a four-part
11 exam, and proved that I had 360 days on the water within
12 5 years of that time that it was issued.
13      Q.  Okay.  And how did you prove that 360 days?
14      A.  It was done by a form issued by the Coastguard.
15 And I went before the Coastguard, provided them a set of
16 fingerprints, took an oath.
17      Q.  Okay.  As far as your 360 days of sea time, did
18 you self-certify that sea time?  Was it time on your own
19 boat?
20      A.  Some.
21      Q.  Okay.  So other people --
22      A.  Yes, sir.
23      Q.  -- also provided you letters of sea service?
24      A.  Yes, sir.  Or they signed off on the form where
25 I was on their vessel.

1    Q.   Okay.  Do you have copies of your application
2 for your license, the Coastguard license?
3    A.   I'm not sure.
4    Q.   Do you remember who the other individuals that
5 signed the form were?
6    A.   I'm not sure.
7    Q.   Okay.  What do you think your Coastguard
8 license entitles you to do?
9    A.   It allows me to take people on my vessel for a
10 fee.
11   Q.   Okay.  And do you know how the Coastguard or
12 the law defines taking a fee for passengers on your
13 vessel?
14   A.   To the best of my knowledge.
15   Q.   Okay.  I'll ask --
16   A.   Okay.  Rephrase.
17   Q.   I'll ask the question again.
18   A.   Okay.
19   Q.   I assume that taking a four-part test you had
20 to study for your license.  There were materials provided
21 about what your license was about.  Is that a correct --
22   A.   Yes, sir.
23   Q.   -- statement?  Anywhere in there did it explain
24 to you what taking a fee --
25   A.   Yes, sir.

1    Q.   -- for -- it did?
2    A.   I'm sorry.  Go ahead.
3    Q.   Did it define what taking passengers for hire
4 was?
5    A.   Yes, sir.
6    Q.   Okay.  And what is your understanding of what
7 that is?
8    A.   Any compensation.
9    Q.   Okay.  And that would be, for example, what
10 compensation?
11   A.   Cash, check, reimbursement of expenses.
12   Q.   Okay.  Have you ever had any actions against
13 your Coastguard license from the U.S. Coastguard?
14        In other words, has the U.S. Coastguard ever
15 warned you, provided a letter of deficiency for your
16 vessel?  Have they ever brought you into a hearing for
17 violations under your license?
18   A.   Before the event of January 19th?
19   Q.   At any time.
20   A.   The only communication I have from the coast
21 guard in that regard is a letter I received after the
22 coast guard visited the vessel when it was sunk.
23   Q.   Okay.  So aside from the sinking incident,
24 you've never received a letter from the Coastguard.  Has
25 the Coastguard ever boarded your vessel?

1    A.   Yes, sir.
2    Q.   Okay.  When was that?
3    A.   I've had boardings within the last year.
4    Q.   Okay.  And was this on the vessel that sank or
5 other vessels or --
6    A.   Other vessels.
7    Q.   Okay.  And since we're talking about that, do
8 you own any other vessels?
9    A.   Yes, sir.
10   Q.   Okay.  What kind of vessels?
11   A.   I own a Carolina Skiff DLV, as in Victor, 258.
12   Q.   Okay.  Any other vessels?
13   A.   Not at this time.
14   Q.   Okay.  Now, in those boardings, why was the
15 Coastguard boarding?
16   A.   Merely a safety inspection.
17   Q.   Okay.  And where do they do that?
18   A.   In -- in the water they pull along side.
19   Q.   Okay.  So is that out at sea or inland or where
20 do these boardings take place?
21   A.   The only time -- when I was boarded the last
22 time was within less than -- less than two miles, between
23 one and two miles of the shoreline, what we call the
24 grass flats, less than -- less than 10 feet of water.
25   Q.   Okay.  And how far offshore is that?

1    A.   Less than two miles.
2    Q.   Okay.  And do you ever make trips outside of
3 that two-mile range?
4    A.   Yes, sir.
5    Q.   Okay.  Do you make trips with passengers for
6 hire?
7    A.   Yes, sir.
8    Q.   Okay.  Out beyond the two mile?
9    A.   Yes, sir.
10   Q.   How far out do you go with passengers for hire?
11   A.   I would have to say within the 9 to 10 mile
12 range.
13   Q.   Okay.  And you do that on the Carolina Skiff?
14   A.   Yes, sir.
15   Q.   How big is a Carolina Skiff?
16   A.   It's 20 -- sir, if I remember, the specs are
17 25.8 feet or 25 feet, 8 inches is where the 258 comes
18 from.
19   Q.   Okay.  What does the Carolina Skiff draw; how
20 much water?
21   A.   One -- one foot and greater.
22   Q.   Okay.  And is that considered an offshore boat?
23   A.   No, sir.
24   Q.   But you take it 9 to 10 miles out?
25   A.   Yes, sir.

13

1    Q.   Okay.  And that's not considered offshore?
2    A.   No, sir.
3    Q.   No.  So what's offshore; how many miles?
4    A.   My rules is 20 miles or greater.
5    Q.   Okay.  Your rules, 20 miles or greater.  And
6    when you say 'your rules', what do you mean by your
7    rules?
8    A.   I don't take passengers beyond the distance I
9    explained to you.  Can I elaborate --
10   Q.   Please.
11   A.   -- a little bit?
12   Q.   Please.
13        MR. THIEL:  Just specify what distance you were
14   just talking about.
15        THE WITNESS:  But in which distance, the 9 to
16   10 miles?
17        MR. THIEL:  I don't know.  You're just --
18   BY THE WITNESS:
19   A.   There are sandbars --
20        MR. THIEL:  Let him just ask him the question,
21   and then just answer whatever he's asking.
22        MR. MASSEE:  Okay.  That's fine.
23   BY MR. MASSEE:
24   Q.   So do you take passengers for hire past 10
25   miles?

14

1    A.   No, sir.
2    Q.   On any vessel?
3    A.   No, sir.
4    Q.   Okay.  But what you were just saying when you
5    say 'your rules', I'm just trying to understand what
6    you're saying.
7         When you say 'your rules', you said that
8    offshore is actually 20 miles or more.  Did I get that
9    right?
10   A.   That's correct.
11   Q.   Okay.
12   A.   I also consider -- probably to revise since I
13   don't -- it's 10 miles.  I want to be specific.  If I
14   went ten-and-a-half, I wouldn't consider that offshore.
15   Q.   Okay.
16   A.   Sorry.
17   Q.   Okay.  And are you aware of any, for instance,
18   Coastguard regulations or definitions in the United
19   States code that say what offshore is versus coastal
20   waters?  Are you aware of the legal definitions for those
21   terms?
22   A.   No, sir.
23   Q.   All right.  I need to ask, because I don't know
24   anything about charter fishing.  So I'm going to ask you
25   about your business.

15

1         Now, you act as a charter captain with your --
2    it's the Carolina Skiff?
3    A.   Yes, sir.
4    Q.   Okay.  And what is your job then as a charter
5    captain?  What do you do?
6    A.   The process is people call, want to go fishing.
7    We arrange a time -- date, time, and place.  I pick them
8    up, and we go fishing.  And then usually in an 8 to 10
9    hour period of time I return them back to a dock.
10   Q.   Okay.  You say people call.  How do they know
11   to call you?
12   A.   It's usually by referral.
13   Q.   And do you do any other kind of advertising?
14   A.   I have cards as you have from me and I have a
15   website.
16   Q.   Okay.  And what is that website?  Do you have a
17   web address?
18   A.   Yes, sir.  It's stated on the card, it's
19   www.salt -- s-a-l-t, w-a-t-e-r-f-i-s-h-n -- as in now --
20   .com.
21   Q.   And about what percentage of your business
22   would you say is generated from the website?
23   A.   Little to none.
24   Q.   Okay.  Little to none.  So you're saying that
25   most of your business is generated through referrals?

16

1    A.   Yes, sir.
2    Q.   Referrals from who?
3    A.   I get referrals from other captains.
4    Q.   Okay.  Like who?  Do you know their name?
5    A.   Yes, sir.  I get referrals from Captain Steve
6    Kroll, K-r-o-l-l, Captain Mark Lord, L-o-r-d, Captain
7    Dave Jenkins, J-e-n-k-i-n-s, Captain Bob Erbman,
8    E-r-b-m-a-n.  And I've received referrals from Captain
9    Brian Smith.  He runs a charter service called Big Bend
10   Charters, and Captain Paul Cronk, C-r-o-n-k.
11   Q.   Okay.  So let's talk about Brian Smith and this
12   charter referral service, Big Bend Charters.  Where is he
13   located?
14   A.   He's not a charter referral service.
15   Q.   Oh, okay.
16   A.   He is a charter captain.
17   Q.   Okay.
18   A.   All those captains are located in Steinhatchee,
19   Florida.
20   Q.   Okay.  And how many other charter boats would
21   you say there are in Steinhatchee other than yours?
22   A.   20 to 30.
23   Q.   And do you pay these captains any money for
24   their referrals?
25   A.   No, sir.

17

1    Q.   And do they do the same kind of fishing you do?
2    A.   Some do.
3    Q.   Okay. All right. How long have you been
4  operating under the website -- strike that.
5         The website saltwaterfishn.com, how long have
6  you -- well, first of all, let me ask this. Do you own
7  that website?
8    A.   Yes, sir.
9    Q.   Okay. And it's registered to your name?
10   A.   Yes, sir.
11   Q.   Okay. And what individual or entity,
12 corporation, company is the web host for that site?
13   A.   Yahoo.
14   Q.   Okay. Do you have an account with Yahoo?
15   A.   Define 'account'.
16   Q.   Do you pay them money for that web hosting
17 service?
18   A.   Yes, sir.
19   Q.   Okay. Do you know the account number?
20   A.   No, sir.
21   Q.   Okay. Do you keep records about that account?
22   A.   No, sir.
23   Q.   Okay. Who is responsible for the content on
24 the web pages? Who makes the edits? Who makes the
25 changes, if there are any?

18

1    A.   A lady by the name of Marcy McMenamin,
2  M-c-M-e-n-a-m-i-n.
3    Q.   And --
4    A.   And all changes then are looked at by me. I
5  have the final say-so before they're posted.
6    Q.   Okay. And Marcy McMenamin works for Yahoo?
7    A.   No, sir.
8    Q.   Okay. So Marcy McMenamin, who is she? How is
9  she working on your website?
10   A.   She's a lady friend of mine.
11   Q.   Okay. So she's a friend. What is her address?
12   A.   The same as mine.
13   Q.   Okay. Okay. And is the computer that she does
14 the web pages on in your house?
15   A.   Yes, sir.
16   Q.   And let me ask now the question I was asking
17 before so ham-handedly. How long has the website,
18 saltwaterfishn.com been up and running?
19   A.   I don't know a specific date. I would have to
20 tell you less than five years.
21   Q.   All right. Can you give me an idea of how much
22 less?
23   A.   I want to say three --
24   Q.   Okay. So --
25   A.   -- years --

19

1    Q.   -- three years.
2    A.   -- it's been up.
3    Q.   Okay. Three years from today?
4    A.   That's close.
5    Q.   Have you made changes to the website during
6  those three years?
7    A.   Yes, sir.
8    Q.   Changes in content?
9    A.   Yes, sir.
10   Q.   What kind of changes?
11   A.   We made fee changes. We make changes
12 describing responsibility of the customer in regard to
13 the charter. We post pictures and have a photo album on
14 there of people who are on the vessel who catch fish, of
15 them and their catch.
16   Q.   Do you keep a record of the passengers who come
17 on your boat to go fishing?
18   A.   Yes, sir.
19   Q.   Okay. Where do you keep that record?
20   A.   At my house.
21   Q.   And what kind of information do you keep on
22 your passengers in that record or in those records?
23   A.   Name, address, phone number, e-mail address,
24 date of the charter, number of passengers, whether those
25 passengers are children and female, separated from the

20

1  total number, the place to pick up, time to pick up, any
2  other special requests that the customer may have for the
3  charter.
4    Q.   So now you currently have those records at your
5  house?
6    A.   For 2008.
7    Q.   Okay. But you don't keep them for --
8    A.   I did not keep them before 2008.
9    Q.   Okay. Why did you start keeping them in 2008?
10   A.   Well, I started increasing the number of
11 charters. I wanted to contact those people from time to
12 time, particularly those that have children on board or
13 minors, cause --
14   Q.   Okay. But you didn't keep any records of any
15 of your passengers before the calendar year 2008?
16   A.   What record I had was marked on a calendar,
17 which was on that vessel --
18   Q.   Okay.
19   A.   -- as a part of my logs.
20   Q.   Okay. So your calendar for your charter-hire
21 passengers was located on the vessel that sank?
22   A.   Yes, sir.
23   Q.   And all your records for all of the passengers
24 that you took on fishing charters sank with the vessel;
25 is that --

1  A.  As --
2  Q.  -- correct?
3  A.  -- far as I know.  I do not have them.
4  Q.  Now, the only vessel that you used for
5  charters, though, was the Carolina Skiff, right?
6  A.  That's correct at that time.
7  Q.  Okay.  And so why was your list of all your
8  passengers in your charter calendar on the other boat?
9  A.  I carry -- I carry those records with me most
10 of the time in a bag or a folder even on the vessel I
11 carry that I work with today.
12 Q.  Okay.  So when you say 'a calendar', can you
13 describe the calendar to me?  I mean what --
14 A.  I have a page with a month on it and box.
15 Q.  Okay.  And it was like each day was one page;
16 is that --
17 A.  No.  Each day was a block --
18 Q.  Okay.
19 A.  -- on that page.  There was a month to a page,
20 if I remember correctly.  And it basically -- at that
21 time, all I kept was a name and a time.
22 Q.  Okay.
23 A.  I kept no other record of --
24 Q.  So you didn't use the calendar as like a log
25 book for your trips --

1  A.  No, sir.
2  Q.  -- or anything like that?
3  A.  No, sir.
4  Q.  But you carried that calendar with you?
5  A.  Yes, sir.  That calendar or any calendar I
6  have, those records is not always with me, but it is with
7  me most of the time on a vessel.
8  Q.  Okay.  But now you keep separate records that
9  are kept at your house?
10 A.  They are also on a calendar, but then there are
11 separate sheets made for each trip with more information.
12 Q.  Okay.  And the separate sheets were the ones
13 that you described to me before that has people's names,
14 addresses, e-mails, whether they're women and minors; is
15 that --
16 A.  Yes, sir.
17 Q.  Are we talking about the same sheet?
18 A.  Yes, sir.
19 Q.  Okay.  Do you have a record of whether anyone
20 is a repeat passenger, someone you've taken out before?
21 A.  Only from being able to go through the sheets
22 that are a part of the calendar, to go back and look
23 through them.
24 Q.  Okay.  So do these records that you have of
25 your passengers on those sheets that we were just talking

1  about with that information, it doesn't say anywhere that
2  you take them out on a previous charter or anything like
3  that?
4  A.  No, sir.
5  Q.  Okay.  Do you do mailings to those folks to
6  promote your business, the folks that are listed on the
7  sheet?
8  A.  Mailings I do.
9  Q.  Or e-mails.
10 A.  Or thank-you notes, thank-you e-mails, thank
11 you notes, nothing in the marketing sense to future
12 charters.
13 Q.  Okay.  And that correspondence, do you keep
14 that correspondence?  Keep a record of it?
15 A.  No, sir.
16 Q.  How long have you been in Florida?
17 A.  February 12, 2004.
18 Q.  Okay.  And that's when you changed your
19 residency from where?
20 A.  Georgia.
21 Q.  Okay.  And what were you doing in Georgia
22 before you moved down to Florida for a living?
23 A.  I was a certified public accountant.
24 Q.  So were you still in Georgia when you got your
25 Coastguard license?

1  A.  Yes, sir.
2  Q.  Okay.  So you were working as a certified
3  public accountant, but then you also got your Coastguard
4  license?
5  A.  Yes, sir.
6  Q.  And when did you start your charter fishing
7  business -- which I might ask, your charter fishing
8  business, is it a corporation?  Is it a business entity
9  or is it just you operating as yourself?
10 A.  It's just me.
11 Q.  Okay.  And so when did you start your charter
12 fishing business?
13 A.  Approximately two years after I came to
14 Florida.
15 Q.  Okay.  So about 2006?
16 A.  Yes, sir.
17 Q.  Okay.  And what vessels did you own in 2006?
18 A.  I had a Tracker V16 and a Carolina Skiff DLX24.
19 Q.  Okay.  And those vessels were owned by you?
20 A.  Yes, sir.
21 Q.  Okay.  Did you use them both for charter
22 fishing?
23 A.  No, sir.
24 Q.  Which one did you use for charter fishing?
25 A.  Carolina Skiff.

```
1      Q.  And this is obviously a different Carolina
2  Skiff than the one you currently own?
3      A.  Correct.
4      Q.  The Carolina Skiff that you currently own is
5  the same Carolina Skiff that you owned in January of this
6  year of 2008?
7      A.  Yes, sir.
8      Q.  Okay.  And do you insure that vessel with
9  any --
10      A.  No, sir.
11      Q.  -- insurance company?  Okay.  So you carry no
12  insurance on the Carolina Skiff, --
13      A.  No, sir.
14      Q.  -- which you use for charter fishing for hire?
15      A.  Correct.
16      Q.  Okay.  Let's talk about the vessel that sank.
17  Who owns the vessel that sank?
18          Well, first of all, the vessel that sank, what
19  kind of a boat is it?
20      A.  It's a Fountain 34 foot center console.
21      Q.  Okay.  And who owns that vessel?
22      A.  Elizabeth Henley, H-e-n-l-e-y, and Ron Gay,
23  G-a-y.
24      Q.  Okay.  So you don't own the boat, --
25      A.  That's correct.
```

```
1  it and we won't waste our time.
2      A.  All right.
3      Q.  Let's ask a different question.  How long was
4  the 34 foot Fountain in your possession?  How long did
5  you have it and use it?  From when to when?
6      A.  Summer of 2007.
7      Q.  Okay.  And that was in --
8      A.  Can I refer?
9          MR. THIEL:  If you need to correct that
10  answer, --
11          MR. MASSEE:  Yeah.
12          MR. THIEL:  -- go ahead and do it.
13          MR. MASSEE:  Yeah.
14  BY THE WITNESS:
15      A.  That vessel was put on the market, and the
16  insurance was required for that vessel to be on the
17  market in a brokerage situation in March --
18      Q.  Okay.
19      A.  -- of 2008.  And that vessel was then in my
20  possession at that time, but not -- your question was
21  'for use by me', and it was not available to me for use.
22  It was parked on a lot for sale.
23      Q.  Okay.  I'm just going to follow up on what
24  you're saying, because I'm not a hundred percent sure I
25  understand.
```

```
1      Q.  -- the 34 foot Fountain?
2      A.  That's correct.
3      Q.  Now, Elizabeth Henley is related to you?
4      A.  Yes, sir.
5      Q.  And how is she related to you?
6      A.  She's my daughter.
7      Q.  And how old is your daughter, Elizabeth?
8      A.  22.
9      Q.  Did she go to college?
10      A.  Yes, sir.
11      Q.  What was her degree in?
12      A.  Management.
13      Q.  And at 22 when did she graduate?
14      A.  2000 -- sir, I want to say 2007.
15      Q.  But recently.
16      A.  Yes, sir.
17      Q.  And when did she purchase the 34 foot Fountain?
18      A.  I don't know an exact date.
19      Q.  If I were to show you something, might that
20  help you --
21      A.  Sure.
22      Q.  -- remember?
23      A.  Yes, sir.
24      Q.  Okay.  We'll get back to that.  I'm just going
25  to make a note, because then if we take a break I'll find
```

```
1          Okay.  You do not own the 34 foot Fountain.
2      A.  That's correct.
3      Q.  Okay.  And at some point before 2007, Elizabeth
4  Henley and Ronald Gay purchased the 34 foot Fountain.
5      A.  That's correct.
6      Q.  Okay.  Where was the boat kept after it was
7  purchased?
8      A.  It was kept in Georgia.
9      Q.  Okay.  Where in Georgia?
10      A.  In Brunswick, Georgia.
11      Q.  Do you own property in Brunswick, Georgia?
12      A.  I did at that time.
13      Q.  Okay.  Was it kept on your property?
14      A.  Yes, sir.
15      Q.  Okay.  Do you remember the address?
16      A.  No, sir.
17      Q.  Okay.  Now, it was on your property, but you
18  just said that it wasn't available for your use.  What
19  does that mean?
20      A.  Are we discussing -- rephrase.  Are we
21  discussing in 2008 or previous to that date?
22      Q.  Maybe I ought to rephrase the --
23      A.  Or 2007.
24      Q.  -- question again.
25      A.  I'm confused.
```

1    MR. THIEL: If you don't understand, just ask
2  him to rephrase.
3    THE WITNESS: Yeah. I'm confused.
4    MR. MASSEE: Just tell me to make it -- that's
5  my job and I should try and make it clearer, because
6  it doesn't help anybody if we all talk --
7    THE WITNESS: Please clarify the dates.
8    MR. MASSEE: Okay.
9  BY MR. MASSEE:
10   Q.  To the best of your knowledge, immediately
11 after the vessel was purchased, was it kept on your
12 property in Brunswick, Georgia?
13   A.  Yes, sir.
14   Q.  And was it used at any time while it was
15 kept at your property in Brunswick, Georgia?
16   A.  Yes, sir.
17   Q.  Okay. Who used the boat?
18   A.  Elizabeth and I.
19   Q.  Okay. So you did use the boat in 2007?
20   A.  I was on the vessel.
21   Q.  Okay. But when you say 'when you were on the
22 vessel', how much were you on the vessel?
23   A.  I was only on the vessel when Elizabeth was on
24 the vessel.
25   Q.  Okay. So how often was Elizabeth on the

1  vessel, in 2007? We're talking when it was in Georgia.
2  For example, was it every day?
3    A.  Seldom.
4    Q.  Okay. Who is Ronald Gay?
5    A.  He is a friend of mine and Elizabeth's.
6    Q.  Okay. So did Ronald Gay ever use the boat?
7    A.  No, sir.
8    Q.  Do you know how much he paid for the boat?
9    A.  Zero.
10   Q.  Okay. He didn't pay anything for the boat?
11   A.  Correct.
12   Q.  But he has title/ownership of the boat.
13   A.  Correct.
14   Q.  And how much did Elizabeth pay for the boat?
15   A.  Including financing, approximately a hundred
16 and sixty-five thousand is the number that rings a bell
17 in my head. But I don't have exact numbers, including
18 financing.
19   Q.  Okay. Just so I'm clear, we have two owners of
20 this boat, Ronald Gay and Elizabeth Henley. Ronald Gay,
21 to the best of your knowledge, didn't pay any money at
22 all for the boat.
23   A.  Correct.
24   Q.  Elizabeth paid, to the best of your knowledge,
25 $165,000 for the boat.

1    A.  Including financing.
2    Q.  Okay. Including financing, okay. What do you
3  mean by that?
4    A.  There was a lot there. There was a lien on the
5  boat.
6    Q.  Okay. There was a lien on the boat.
7    A.  Yes, sir.
8    Q.  Okay. Do you mean a mortgage on the boat?
9    A.  That's correct.
10   Q.  Okay. Who holds the mortgage?
11   A.  Bank of America.
12   Q.  Okay. And they loaned money to Elizabeth
13 Henley to purchase the boat?
14   A.  They loaned money to Elizabeth and Ron Gay.
15   Q.  Okay. Did Ron Gay sign on as a surety for
16 Elizabeth Henley? Did he guarantee that the money would
17 be paid back if she couldn't; do you know?
18   A.  The best of my recollection is that they are
19 'co' on that note.
20   Q.  Okay. But as far as you know --
21   A.  The note is in both of their names.
22   Q.  Okay. Do you know how much then Elizabeth paid
23 for the boat as like, for instance, a down payment
24 portion? I mean it wasn't all bought on credit, was it?
25   A.  No, sir.

1    Q.  So do you know how much she paid?
2    A.  Something in, if I remember right, in the
3  $20/$30,000 range.
4    Q.  And Elizabeth paid that out of her own account,
5  the $30,000?
6    A.  Rephrase.
7    Q.  Okay. Who signed the check for $30,000 that
8  was paid to the previous owner of the 34 foot Fountain
9  when it was purchased?
10   A.  She did.
11   Q.  Okay. And it was drawn on her bank account?
12   A.  Yes, sir, to the best of my recollection.
13   Q.  Okay. So the boat was kept on your property in
14 Georgia. When did the boat come to Florida?
15   A.  Near the time that I moved to Florida.
16   Q.  Is it accurate to say that the boat came with
17 you to Florida when you came in 2004?
18   A.  Within a year.
19   Q.  Okay. I'm sorry. To try and clarify this, you
20 came to Florida in 2004.
21   A.  Correct.
22   Q.  And the boat came with you from Georgia to
23 Florida around that same time.
24   A.  Within a year.
25   Q.  Okay. So between 2004 and 2005.

33

1    A.   To the best of my recollection.
2    Q.   So the boat was purchased before 2004.
3    A.   That's a document you're going to have to show
4  me.
5    Q.   We need to --
6    A.   I believe it to be correct; --
7    Q.   Okay.
8    A.   -- that that is true.
9    Q.   Okay.  So the boat was kept on your property in
10  Georgia, but then within a year of your moving to
11  Florida, it was kept in Florida?
12   A.   To the best of my recollection.
13   Q.   Okay.  Was it kept on your property in Florida?
14   A.   No, sir.
15   Q.   Okay.  Where was it kept?
16   A.   In a vacant lot near my property.
17   Q.   Okay.  So you kept it on a trailer?
18   A.   Yes, sir.
19   Q.   Okay.  When did you start keeping it in the
20  water?
21   A.   It was the only place in the water to fish.
22   Q.   Okay.  Let me ask the question a different way.
23       Did you customarily keep it on a trailer in a
24  vacant lot, and then just bring it down when you were
25  going fishing?

34

1    A.   Correct.
2    Q.   Or did you keep it at the dock?
3    A.   It was kept on the trailer and put in when it
4  was going fishing.
5    Q.   Okay.
6    A.   Or to be run as a maintenance, i.e., out the
7  channel and back.
8    Q.   Okay.  Just so I understand what you're saying,
9  sometimes you would run the boat just to run the
10  engines --
11   A.   That's correct.
12   Q.   -- there and back again?
13   A.   That's correct.
14   Q.   Okay.  How often would you do that?
15   A.   Every other month would be the outside of that;
16  sometimes once a month.
17   Q.   Okay.  So how much would you say you used the
18  Fountain?
19       Let's do it this way.  How many trips per year
20  from when the boat came down to Florida to January of
21  this year, how many times would you say you used that
22  boat?
23   A.   Define used.
24   Q.   Okay.  Put it in the water and ran it either on
25  maintenance runs or for other purposes.

35

1    A.   Approximately six to eight times a year.
2    Q.   Okay.  So six to eight times per year --
3    A.   As an average.
4    Q.   -- as an average, okay.  So you might do a
5  little more one year, a little less another year?
6    A.   Yes, sir.
7    Q.   Okay.  And you use that boat -- I'm not talking
8  about maintenance runs now.  I'm saying when you used the
9  boat for other purposes, what did you use the boat for?
10   A.   To fish.
11   Q.   Okay.  And when you went fishing, did you go by
12  yourself?  Did you take other people with you?
13   A.   I never fish by myself.
14   Q.   Okay.  So do you remember some folks that you
15  took on the Fountain with you fishing?
16   A.   Mr. Albert Hulen, H-u-l-e-n, his son-in-law,
17  his grandson, and his great-grandson, who's a minor.
18   Q.   Okay.  And that's it?  Those are the only
19  people you ever took fishing on the Fountain?
20   A.   Elizabeth and I fished on it.  And she had a
21  friend named Jim that came with her one time and fished
22  on it.
23   Q.   Okay.
24   A.   I'm sorry.  That's the best -- that's -- there
25  was Mr. Gibson fished on it, a gentleman by the name of

36

1  David Webb fished on it with me.  And I believe he
2  brought a friend with him.
3    Q.   Can you spell Gibson?
4    A.   No, sir.
5    Q.   Okay.  Fair enough.  Mr. Gibson, do you know
6  his first name?
7    A.   Ron.
8    Q.   Okay.  And how do you know Ron Gibson?
9    A.   He was a friend of a friend.
10   Q.   Okay, a friend of a friend.  And where did you
11  meet Mr. Gibson?
12   A.   On the dock --
13   Q.   Okay.  So you met him --
14   A.   -- on January 19th.
15   Q.   -- for the very first time on January 19th?
16   A.   Yes, sir.
17   Q.   Okay.  Who was the friend that you had in
18  common with Mr. Gibson?
19   A.   Vickie and David Webb.
20   Q.   Okay.  When you say Vickie and David Webb, are
21  they a couple or --
22   A.   Yes, sir.
23   Q.   Okay.  So they're married?
24   A.   Yes, sir.
25   Q.   Okay.  Okay.  And David Webb, you said, was

37

1  another person you've gone fishing with on the Fountain.
2      A.  Yes, sir.
3      Q.  So since we're talking about the 19th, now, you
4  went fishing with Mr. Gibson on the 19th --
5      A.  Yes, sir.
6      Q.  -- on the 34 foot Fountain?
7      A.  Yes, sir.
8      Q.  Okay.  When did you make arrangements with
9  Mr. Gibson for that trip?
10     A.  I never spoke to Mr. Gibson before that trip is
11 my recollection.
12     Q.  Okay.  So how did he know to come down to your
13 dock?
14     A.  Through discussions with Vickie and David Webb.
15 And he did not come to my dock.
16     Q.  Okay.  Do you know where David Webb lives?
17     A.  Steinhatchee, Florida.
18     Q.  Okay.  Do you have a phone number for them?
19     A.  No, sir.
20     Q.  Okay.  Do you have an address for them?
21     A.  Not in my possession of either of those.
22     Q.  Okay.  Okay.  It's not in your possession here?
23     A.  Here.
24     Q.  Okay.  So if I were to ask for that information
25 you would be able to provide it?

38

1      A.  I'd be able to provide that to --
2      Q.  Okay.
3      A.  -- counsel.
4      Q.  Okay.  All right.  So let me get this straight.
5  Please describe as best as you can recall how this trip
6  was arranged.
7          So --
8      A.  Vickie Webb was a waitress in a restaurant and
9  a friend of mine.  And she said one day, as she often sat
10 with me at -- in the restaurant as a waitress she would
11 sit down and have social discussions.  'Dave and I have a
12 friend that he works with who he would like to go
13 fishing.'
14         And I said, 'Fine.  One day when I'm going to
15 take the boat either to fish or to run, we'll set that up
16 and he can go with us.'
17         And from there discussions were held, a date
18 was chosen, a time, and I picked up Mr. Gibson on the
19 dock of River Haven Marina.
20     Q.  Say the name again for me.
21     A.  River --
22     Q.  River Haven --
23     A.  -- Haven Marina.
24     Q.  Okay.  So --
25     A.  And his minor son went with us.

39

1      Q.  Okay.  When you say 'discussions took place',
2  were these telephone conversations?
3      A.  To the best of my recollection.
4      Q.  Okay.  And I'm not quite certain.  So it was
5  Vickie or -- okay.  The person that we're talking about
6  that ended up coming on the trip is Ron Gibson; is that
7  correct?
8      A.  That's correct.
9      Q.  Okay.  So David Webb works with Ron Gibson?
10     A.  In some capacity.  I do not know the hierarchy
11 of that relationship.
12     Q.  Okay.  So please describe for me the morning of
13 the 19th.  When you got the boat ready to go, what did
14 you do?  What was your preparation for the trip?
15     A.  The boat had been put in the day before.  It
16 was parked at my dock at my house.  I got on the boat, as
17 I always do, check the engines, make sure they fire.  All
18 fired.  I checked all my switches on the dash.  I checked
19 my electronics to make sure they're working.  And I put
20 ice in the vessel, tackle, and leave the dock.
21     Q.  When you say you checked your switches, what
22 switches did you check?
23     A.  There are switches on the dash that have to do
24 with the pumps, the bilge pumps, lights, horn.  Those are
25 the main ones I remember from that vessel.

40

1      Q.  And when you checked the switches, did
2  everything check out --
3      A.  Yes, sir.
4      Q.  -- okay?
5      A.  All the lights came on.
6      Q.  Did you check the --
7      A.  There's also a live well pump that was checked.
8      Q.  Okay.  So you checked the switches.  Did you
9  ever actually check whether the bilge pumps were running?
10     A.  No, sir.  Only the lights, all the switches, --
11     Q.  Okay.
12     A.  -- lit.
13     Q.  I see.  So you flipped the switch.  The light
14 went on, and that was the extent of your check; is that
15 correct?
16     A.  That's right.
17     Q.  Okay.  So you didn't go down and look to see if
18 the bilge pumps were running, what condition they were
19 in?
20     A.  No, sir.
21     Q.  Okay.  What was the weather forecast that
22 morning?
23     A.  If I remember correctly, two to three foot
24 seas, five to ten knot winds.
25     Q.  Okay.  Were there any storm warnings for that

1  day?

2      A.   No, sir.

3      Q.   And how did you check the weather?

4      A.   I checked the weather via the internet.

5      Q.   Okay.  Was the vessel equipped with a VHF

6  radio?

7      A.   Yes, sir.

8      Q.   Okay.  And did you listen to the weather radio,

9  NOAA weather radio?

10     A.   No, sir.  I used -- via the web is a national

11 weather service which is the same entity that produces

12 that broadcast.

13     Q.   Okay.  But your radio was operational?

14     A.   Yes, sir.

15     Q.   Okay.  And you tested the radio before you

16 left --

17     A.   Yes, sir.

18     Q.   -- the dock?  On what channel?

19     A.   Channel 9.

20     Q.   And how did you test it?

21     A.   I ask -- every day I call the local marina for

22 a radio check --

23     Q.   Okay.

24     A.   -- as I leave the dock.

25     Q.   Which marina?

1      A.   River Haven.

2      Q.   Okay.  So that's that same one that you were

3  picking up Mr. Gibson?

4      A.   Yes, sir.

5      Q.   Okay.  How many people were you expecting to

6  take out on January 19th on the Fountain?

7      A.   Four, including myself.

8      Q.   Okay.  Four, including yourself.  So there's

9  three other people and you.

10     A.   That's correct.

11     Q.   Okay.  And that's how many you were expecting

12 to take out.

13     A.   Yes, sir.

14     Q.   So who came on the boat with you that day on

15 the 19th?

16     A.   Mr. Albert Hulen, H-u-l-e-n, Mr. Gibson, and

17 his son.

18     Q.   Okay.  And how old is Mr. Gibson; do you know?

19     A.   No, sir.

20     Q.   Was his son a minor?

21     A.   Yes, sir.

22     Q.   Okay.  So they come aboard the boat.  What was

23 the weather like when they were boarding the boat?

24     A.   Calm.

25     Q.   Any rain?

1      A.   No, sir.

2      Q.   Was it overcast?

3      A.   Not to my recollection.

4      Q.   And River Haven Marina, where is that located?

5      A.   Steinhatchee, Florida.

6      Q.   Okay.  And is it inland?  Is it a protected

7  area, or is it real close to the --

8      A.   Close to --

9      Q.   -- the beach?

10     A.   -- the mouth of the river to the gulf.

11     Q.   Okay.  Okay.  So at around what time did you

12 leave the dock?

13     A.   If my relex -- if my recollection's correct,

14 8:00.

15     Q.   Okay.  Okay.  And can you describe how far out

16 you went from there?

17     A.   I probably stopped the first stop near 9 to 10

18 miles, and then moved a couple of times at a mile or so

19 during that day.

20     Q.   Okay.  So what's the farthest out you got that

21 day?

22     A.   I would say at the furtherest, 16 miles.

23     Q.   Okay.  So what happened while you were out

24 there?

25     A.   We fished.

1      Q.   Did you catch anything?

2      A.   Yes, sir.

3      Q.   Do you remember what you caught?

4      A.   Black sea bass, pink snapper, commonly known as

5  a pink or a grunt.

6      Q.   So the weather, did it stay calm?  Did it

7  change?  Did it deteriorate?  What happened while you

8  were out there fishing?

9      A.   It was as we expected, two to three foot seas.

10     Q.   Okay.  No rain?

11     A.   No, sir, as I remember.

12     Q.   Now, when you go out there 16 miles, how deep

13 is the water?

14     A.   30 feet.

15     Q.   Okay.  Do you use an anchor when you're

16 fishing?

17     A.   Yes, sir.

18     Q.   Okay.  So were you using an anchor there at

19 that 16 mile spot?

20     A.   Yes, sir.

21     Q.   Okay.  Were there any problems that you guys

22 had out there while you were at anchor?

23     A.   Yes, sir.

24     Q.   Okay.  Can you describe that to me?

25     A.   When we got ready to leave the center engine

1 wouldn't crank. And I noticed water in the stern of the
2 boat. And I said, 'We've lost an engine. It's time to
3 go.'
4           I cranked the starboard and the port engine,
5 began to leave, cut the rope on the anchor, and left.
6     Q.    You cut the rope on your anchor?
7     A.    Yes, sir.
8     Q.    You couldn't pull it up?
9     A.    Didn't want to do that with only two engines.
10 I do not have a winless, w-i-n-l-e-s-s, on that boat, and
11 I didn't want to stay there with two engines trying to
12 get it up with a two to three foot sea.
13    Q.    Is a two to three-foot sea a heavy sea for that
14 boat?
15    A.    No, sir.
16    Q.    But it was a problem.
17    A.    With two engines I was concerned. For safety
18 reasons I didn't want to mess with it. I felt I needed
19 to be on the helm. I reached up, cut the rope, and
20 headed for shore.
21    Q.    Okay. Now, when you said you saw water in the
22 stern, how much water are we talking?
23    A.    Two to three inches.
24    Q.    Two to three inches --
25    A.    In the rear of the stern.

1     Q.    Okay. Is that a lot of water?
2     A.    No, sir. No.
3     Q.    Did water continue to come into the boat?
4     A.    Not to my knowledge.
5     Q.    Okay. Did you try to pump the water out?
6     A.    I turned the bilge pumps on.
7     Q.    And what happened?
8     A.    I stayed on the helm. The boat moved towards
9 shore.
10          As I was on the helm, I asked Mr. Hulen and
11 Mr. Gibson to open the stern hatch to see if it was okay
12 in the hatch inside the bilge. The bilge had water in
13 it, and I asked them to start removing that water with
14 five gallon buckets. We were underway. I didn't see any
15 increase in water. As they began to take five gallon
16 buckets and take that water out, then it began to reduce.
17    Q.    Okay. When you say you opened the hatch to see
18 if there was water in it, how high was the water to the
19 hatch?
20    A.    It wasn't to the top of the hatch, but there
21 was a considerable amount of water in that hatch.
22    Q.    Okay. And let me ask you how deep is the boat?
23 When you open the hatch from the deck, how deep is that?
24    A.    A couple of feet.
25    Q.    So you had a couple of feet of water in the

1 hatch?
2     A.    In the stern.
3     Q.    Okay. Where is the hatch located on the boat?
4     A.    Right in the stern.
5     Q.    Okay. Do you have any idea how big a space is
6 back there underneath the hatch? How big an area that
7 is?
8           MR. THIEL: If you don't know, don't guess.
9     A.    What you have to know is that when that boat's
10 underway, then everything goes to the stern if there's
11 anything in that boat now.
12          As far as the capacity in that stern, no, sir.
13    Q.    Okay. So you're not sure how much water there
14 was in there?
15    A.    No, sir.
16    Q.    Okay. But it was close to the hatch when you
17 opened it?
18    A.    We had water in the hatch, but not over the
19 hatch.
20    Q.    Right. And it was enough water for you to ask
21 your passengers to bail it out with a five gallon
22 buckets?
23    A.    That's correct.
24    Q.    Okay. Now, you said it's time to go. You cut
25 the anchor line. You're heading in for shore. Were you

1 worried that you were going to sink?
2     A.    No, sir.
3     Q.    Did anybody else on the boat express a concern
4 that the boat was going to sink?
5     A.    No, sir.
6     Q.    Okay. So these people were just calmly bailing
7 out the boat?
8     A.    Bailing it out with five gallon buckets. The
9 water level's reducing and we're underway --
10    Q.    Okay.
11    A.    -- with two inches.
12    Q.    So did you call anybody for help?
13    A.    Yes, sir.
14    Q.    Who'd you call for help?
15    A.    TowBoat US Steinhatchee.
16    Q.    Okay. So you called TowBoat US?
17    A.    Yes, sir.
18    Q.    Okay. Why did you call them?
19    A.    Because I had lost an engine, and for safety
20 reasons I wanted them to come and escort.
21
22    Q.    Okay. And who did you talk to over at TowBoat
23 US?
24    A.    Captain Bill Paine.
25    Q.    Okay. Does he run TowBoat US, Steinhatchee?

1    A.    Yes, sir.
2    Q.    Okay.  Does he run that under any other names
3    other than TowBoat US; do you know?
4    A.    Not that vessel, no, sir.
5    Q.    Okay.  When you say 'that vessel', what do you
6    mean?
7    A.    That is a franchise, and that is the name of
8    his franchise.
9    Q.    Okay.  Okay.  So he came out in a boat?
10    A.    He came out in a boat marked TowBoat US.
11    Q.    Okay.  All right.  And so let me get an idea.
12    What time was this that this was happening, that you were
13    calling TowBoat US for an escort?
14    A.    Something in the 1 to 2:00 -- 2:00.
15    Q.    Okay.  In the afternoon?
16    A.    Yes, sir.
17    Q.    Okay.  So what did you tell Captain Bill Paine
18    when you called?
19    A.    I told him I'd lost an engine and I had water
20    in the vessel, we were underway, and asked him to come
21    and be an escort.
22    Q.    Okay.  Did you call the United States
23    Coastguard?
24    A.    No, sir.
25    Q.    Why not?

1    A.    Correct.
2    Q.    -- the dock?  Okay.  And so that was about 3:00
3    then?  What time --
4    A.    That's correct.
5    Q.    Do you know if Captain Paine contacted the US
6    Coastguard?
7    A.    No, sir.
8    Q.    Have you called Captain Paine before --
9    A.    Yes.
10    Q.    -- to do any work for you?
11    A.    Define -- rephrase.
12    Q.    Okay.  Let's ask it a different way.  One, have
13    you ever had any problems with any of your boats before?
14    A.    Yes, sir.
15    Q.    Okay.  What kind of problems?
16    A.    I've had batteries that have gone dead.  I had
17    a fuel system sensor that fouled.  That's an electronic
18    fuel system sensor.
19    Q.    Okay.  And --
20    A.    To the best of my recollection, that's the only
21    times I've ever asked for TowBoat US.
22
23    Q.    Okay.  And how far out were you when you asked
24    for that help for your battery problem and your fuel
25    sensor problem?

1    A.    I thought the vessel -- it's my understanding
2    that the United States Coastguard only responds to
3    vessels in distress.  I did not feel I was in distress.
4    Q.    Okay.  So a vessel with four persons on board
5    taking on water is not a vessel in distress by your
6    standards?
7    A.    I did not feel I was sinking; I was underway.
8    Q.    Did you tell the folks on your boat to put life
9    jackets on?
10    A.    I don't remember.
11    Q.    Okay.  How did you contact Captain Paine?
12    A.    VHF radio.
13    Q.    What channel?
14    A.    Nine.
15    Q.    And he responded right away?
16    A.    Yes, sir.
17    Q.    Okay.  So what time did his boat, the TowBoat
18    US boat, get to your position?
19    A.    To the best of my recollection, in the 30 to 45
20    minute range.
21    Q.    Okay.  And then how long did you proceed under
22    his escort?
23    A.    Probably 30 minutes.
24    Q.    Okay.  So by the time he got to you you were
25    only about a half-an-hour out from --

1    A.    Less than two miles from the shore.
2    Q.    Okay.  And was the problem that you couldn't
3    start your engines with those two issues?
4    A.    One time with the battery issue, and the other
5    time was we were underway in shallow water less than ten
6    feet.  Then the fuel sensor went off.  The alarm went
7    off.  I shut the engine down and called him to come tow
8    me in.
9    Q.    Okay.  And was that on the Fountain?
10    A.    No, sir.
11    Q.    Okay.  Both of those problems were on what
12    boat?
13    A.    On a skiff.
14    Q.    On --
15    A.    Not on the current skiff.
16    Q.    Okay.  This was earlier --
17    A.    Yes, sir.
18    Q.    -- before the current Carolina skiff?
19    A.    That's correct.
20    Q.    -- owned?  Okay.  So when were you operating
21    that other Carolina skiff?  Do you remember when that was
22    that you might have had these problems?
23    A.    I stopped operating that Carolina Skiff, if my
24    recollection is correct, in the spring of 2000 -- it was
25    in 2007.  It was either -- I remember it to be spring or

53

1   early summer.
2       Q.   Okay.  How long have you known Bill Paine?
3       A.   Several years.
4       Q.   Okay.  How would you describe your
5   relationship?  Are you friends?
6       A.   We're good acquaintances.
7       Q.   Okay.  Does he refer you work, --
8       A.   No, sir.
9       Q.   -- charter fishing?
10      A.   No, sir.  He's not in that position.
11           COURT REPORTER:  When you get a pausing point,
12      I'd love to run to the ladies room.
13           MR. MASSEE:  Let's do it now.
14           (Thereupon, a recess was taken.)
15  BY MR. MASSEE:
16      Q.   Okay.  I'm going to show you, Mr. Henley, a
17  document that we actually produced.  It's Plaintiff's
18  26A1008 is the Bates number.  And I'm just going to have
19  you look at that.  Does that help you remember when the
20  34 foot Fountain was first purchased by Elizabeth Henley
21  and Ronald Gay?
22      A.   Yes, sir.
23      Q.   Okay.  And can you tell me what date the vessel
24  was purchased, the 34 foot Fountain?
25      A.   May 21, 2004.

54

1            MR. MASSEE:  Okay.  Thank you.  And I'm not
2       going to take up our time putting this all back
3       together.
4            Can you read back where we were when we took
5       the break, please.
6            (Thereupon, the above-recorded question was
7       read by the court reporter.)
8   BY MR. MASSEE:
9       Q.   Okay.  So we were talking about Captain Paine.
10           Okay.  So on the 19th you got back to the dock
11  around 3:00; is that correct?
12      A.   Correct.
13      Q.   Okay.  And what did you do with your boat all
14  full of water?
15      A.   I stopped and let Mr. Gibson off at the River
16  Haven Marina, proceeded up the river to my house, parked
17  the vessel on my dock, checked the bilge, opened the
18  hatch and checked the bilge, didn't see water, closed the
19  hatch, got the fish out of the boat, cleaned the fish.
20  Mr. Gibson came to my house and picked up the catch.
21      Q.   Okay.  What about Mr. Hulen?
22      A.   He was there.
23      Q.   So did he get off with Mr. Gibson?
24      A.   No, sir.
25      Q.   So he stayed with you?

55

1       A.   Yes, sir.
2       Q.   Okay.  How big is the hatch?
3       A.   Approximately three feet by three feet.
4       Q.   Three feet by three feet.  Was it difficult to
5   put a five gallon bucket in that hatch?
6       A.   No, sir.
7       Q.   Now, we talked about before that you had
8   flipped the switches for the bilge pumps.
9       A.   Yes, sir.
10      Q.   Why weren't the bilge pumps pumping the water
11  out?
12           MR. THIEL:  Objection to form.
13      Q.   Are you aware of any reason why the bilge pumps
14  didn't pump the water out?
15      A.   No, sir.
16      Q.   Were you aware of the fact that one of your
17  bilge pumps was missing?
18      A.   No, sir.
19      Q.   But you didn't go and look before you left; --
20      A.   No.
21      Q.   -- is that correct?
22      A.   No, sir.
23      Q.   Okay.  Now, when you say you looked in the
24  hatch, when you looked in the bilge and there was no
25  water, --

56

1       A.   Correct.
2       Q.   -- you mean bone dry?
3       A.   No, sir.
4       Q.   So there was water?
5       A.   There's always water in a bilge, minor amounts.
6       Q.   Okay.  When you say 'minor', how much is minor?
7       A.   An inch or two.
8       Q.   Okay.  So there was an inch or two of water in
9   the bilge when you looked at it --
10      A.   Yes, sir.
11      Q.   -- after you got back to the dock?
12      A.   Yes, sir.
13      Q.   Okay.  So describe, again.  You got the fish
14  out of the boat.
15      A.   Yes, sir.
16      Q.   What else did you take off of the boat?  I mean
17  you were done for the day, right?
18      A.   Yes, sir.
19      Q.   Okay.  What else did you take off the boat?
20      A.   Nothing that I remember.
21      Q.   Okay.  So you left everything on the boat, --
22      A.   Yes, sir.
23      Q.   -- except for the fish?
24      A.   Yes, sir.
25      Q.   And did Mr. Paine come with you?  Did he escort

1   the boat all the way back to the dock?
2       A.   No, sir.
3       Q.   Explain to me.  There's one thing I'm not
4   understanding.  Okay.  You had your passengers bailing
5   the bilge with five gallon buckets.
6       A.   Yes, sir.
7       Q.   Okay.  At what point did they get all of the
8   water out?
9       A.   Well, they done that in just a few minutes.
10      Q.   Okay.  So it only took a few minutes --
11      A.   Less than 30.
12      Q.   Okay.  Less than 30 minutes to bail the entire
13  boat out.
14      A.   If I had to truly guesstimate that, I would say
15  in the 15 to 20 minute range.
16      Q.   Okay.  All right.  So you're back at the dock.
17  You've taken the fish off.  Then what do you do?
18      A.   Clean the fish.
19      Q.   Okay.  Where did you do that?
20      A.   At my house.
21      Q.   Near the boat, away from the boat?
22      A.   Near the boat.
23      Q.   Outside, inside?
24      A.   Off the boat.  Outside of the boat.
25      Q.   So were you --

1       A.   Outside cleaning the fish.  Yes, --
2       Q.   Okay.
3       A.   -- outdoors.
4       Q.   Okay.  Okay.  So you were on the dock.  Do you
5   clean the fish on the dock?
6       A.   No, sir.  I have a fish cleaning table over
7   next to the dock.
8       Q.   And could you see the boat from there?
9       A.   Yes, sir.
10      Q.   Okay.  And how long did it take you to clean
11  the fish?
12      A.   45 minutes.
13      Q.   Okay.  And so you cleaned the fish, and then
14  what did you do with them?
15      A.   Packed them in Ziploc bags and gave them to
16  Mr. Gibson.
17      Q.   Okay.  So Mr. Gibson came back to your house to
18  pick up the fish that you --
19      A.   Correct.
20      Q.   -- had cleaned.  So about 45 minutes later.
21      A.   Correct.
22      Q.   Then what happened?
23      A.   Mr. Hulen and I and Marcy stood around and
24  talked for -- I'd say for about an hour.  A storm came
25  up.  Marcy and I went upstairs, and Mr. Hulen went home.

1       Q.   Okay.  When you say 'a storm came up', what
2   actually happened?
3       A.   Thunder, lightening, heavy rain.
4       Q.   Okay.  And you left the boat at the dock?
5       A.   That's correct.
6       Q.   Okay.  You didn't take the boat up on the
7   trailer --
8       A.   No, sir.
9       Q.   -- to put it on land?
10      A.   No, sir.
11      Q.   And when you say 'heavy rain', how much rain
12  are you talking?
13      A.   Several inches.
14      Q.   Okay.  Was the boat covered?
15      A.   Only with the T-top.
16      Q.   Okay.  And when you say the 'T-top', we'll go
17  ahead and take out Plaintiff's Exhibit No. 1.  Okay.
18  You'll see that there are two pictures here.
19      A.   Yes, sir.
20      Q.   One appears to be a closeup of the vessel's
21  engines.
22
23      A.   Correct.
24      Q.   And the other is a view of the vessel in its
25  entirety.  Can you describe, looking at this picture, the

1   T-top?
2       A.   The red-covered area.
3       Q.   Okay.  The red-covered area.  And what's that
4   white thing right there?
5       A.   Which one?
6       Q.   There's a white, it looks like a dish.
7       A.   It's a radar.
8       Q.   Okay.  So would you say the red-covered thing
9   right under the radar in this picture is the T-top?
10      A.   Yes, sir.
11      Q.   Okay.  And this picture on top, which shows the
12  engines, is that 225?  What does that mean?
13      A.   It's the horsepower of that engine.
14      Q.   Okay.  So this is a 34 foot Fountain with three
15  225 horsepower engines?
16      A.   Yes, sir.
17      Q.   Is that how you would describe your boat --
18      A.   Yes, sir.
19      Q.   -- or, --
20      A.   Elizabeth's boat.
21      Q.   -- in fact, Elizabeth's boat?  It's not your
22  boat.
23           Okay.  So then what happened after this storm
24  came up?  And around what time was that?
25      A.   In the 4:00 range, 4:30, four to five.

61

1    Q.   Okay.  So the storm came up, and then what
2   happened?
3        A.   I was upstairs.  I heard one of the neighbors
4   holler downstairs that the vessel was sinking, and I ran
5   downstairs.
6        Q.   Okay.  Who hollered?
7        A.   One of my neighbors.
8        Q.   Okay.  Do you remember who that was?
9        A.   The gentleman's first name is Doug; I'm sorry.
10  I don't know his last name.
11       Q.   Okay.  So was the vessel already sunk or did
12  you --
13       A.   Listing --
14       Q.   -- watch it --
15       A.   It was listing/leaning heavy to the port side.
16       Q.   Okay.  And then as you were going down, what
17  happened?
18       A.   It continued to go down.  I didn't feel it was
19  safe to -- it had leaned far enough.  I didn't feel it
20  was safe to get on board of it.
21       Q.   How deep is the water at your dock?
22       A.   Six/eight feet.
23       Q.   Okay.  And the dock is located at the address
24  you gave before, 1708 King Street?
25       A.   Yes, sir.

62

1        Q.   So that house has a dock behind it?
2        A.   That's correct.
3        Q.   Okay.  And that would be the dock that's
4   depicted in the pictures on Plaintiff's Composite Exhibit
5   No. 2?  That's probably a bad picture, but that's your
6   dock behind your house?
7        A.   Yes, sir.
8        Q.   Okay.  And also on Plaintiff's Exhibit No. 1,
9   the lower picture that shows the dock behind your house?
10       A.   Yes, sir.
11       Q.   Okay.  All right.  Now, that 1708 King Street,
12  do you own that property?
13       A.   Yes, sir.
14       Q.   Okay.  So that property's in your name?
15       A.   Yes, sir.
16       Q.   Okay.  Did you take an insurance policy or
17  attempt to take an insurance policy out on the 34 foot
18  Fountain?
19       A.   Yes, sir.
20       Q.   Okay.  How did you procure insurance or attempt
21  to procure insurance for that vessel?
22       A.   Via phone.
23       Q.   Okay.  So you called who?
24       A.   An insurance agency.
25       Q.   Okay.  Like a broker, an insurance broker?  Do

63

1   you know who it is you called?
2        A.   No, sir, not to my recollection.
3        Q.   So you don't remember the name of the agency?
4        A.   I don't remember the name.
5        Q.   Okay.  When you took out insurance on the
6   vessel, did you fill out any application for insurance?
7        A.   Yes, sir.
8        Q.   Okay.  Do you remember how you filled out the
9   application?  Was that done on the phone?
10       A.   I don't recollect
11       Q.   Okay.  Okay.  So you don't remember filling out
12  a form?
13       A.   No, sir.
14       Q.   Okay.  But you remember applying for insurance?
15       A.   Yes, sir.
16       Q.   Okay.  But you just don't remember how you --
17  do you remember what kind of things that you were
18  required to tell the insurance company?
19       A.   Name, address, vessel, --
20       Q.   Okay.
21       A.   -- hull number, engine numbers.
22       Q.   Did you ever tell the insurance company, when
23  you were applying for insurance, that you didn't own the
24  boat?
25       A.   I don't know if I did or not.

64

1        Q.   Okay.  And when you did attempt to purchase
2   insurance, what is your understanding of who was going to
3   get that money if there was a loss on that insurance
4   policy?
5        A.   There was a lienholder on the boat.
6        Q.   Right.  Okay.  When you applied for insurance,
7   did you name that lienholder as an additional insured to
8   yourself?
9        A.   I don't remember that I didn't.
10       Q.   You don't remember who the money was going to
11  be paid to from the insurance proceeds should they be
12  paid?
13       A.   I never had any doubt that it wouldn't be paid
14  to the lienholder first.
15       Q.   Okay.  But you don't remember whether you
16  informed the insurance company about a mortgage on the
17  vessel?
18       A.   Again, I don't know why I wouldn't.  There was
19  never any secret in that regard.
20       Q.   Right.  Okay.  So you took out the insurance on
21  the vessel?
22       A.   Yes, sir.
23       Q.   Okay.  Elizabeth Henley did not take out
24  insurance on the vessel.
25       A.   Correct.

65

1    Q.   Ronald Gay did not take out insurance on the
2    vessel.
3    A.   Correct.
4    Q.   Did Ronald Gay and Elizabeth Henley use the
5    boat while it was in Florida?
6    A.   Elizabeth and I have been on the boat while it
7    was in Florida.
8    Q.   Okay.  How many times?
9    A.   I can't give you a specific.  I can give you a
10   range.
11   Q.   I don't think that's necessary.  More than
12   once?
13   A.   Yes, sir.
14   Q.   Okay.  Does Elizabeth Henley live with you?
15   A.   No, sir.
16   Q.   Okay.  Where does Elizabeth Henley live?
17   A.   Davenport, Florida.
18   Q.   Okay.  Does she visit with you often?
19   A.   Yes, sir.
20   Q.   But you can't recall how many times you've been
21   out on the 34 foot Fountain?
22   A.   Not exactly.
23   Q.   Okay.  Does she ever come and maintain the
24   boat, fix the boat?
25   A.   Yes, sir.

66

1    Q.   Okay.
2    A.   She did during that time.
3    Q.   'That time' meaning what time?
4    A.   When the -- before the vessel sunk.
5    Q.   Okay.  So you're saying that Elizabeth Henley
6    did work on the vessel, repair and maintenance, between
7    2004 and 2008?
8    A.   Define 'maintenance'.
9    Q.   Routine maintenance on a boat; fixing things
10   that are breaking, replacing things that are
11   deteriorating.
12   A.   No, sir.
13   Q.   Cleaning the boat.
14   A.   Yes, sir.
15   Q.   Okay.  So she cleaned it but didn't do any
16   repairs or maintenance.
17   A.   No mechanical.
18   Q.   Nothing mechanical.  Okay.  How often would she
19   come and clean her boat?
20   A.   During that time period more than once.
21   Several.
22   Q.   Okay.  Several times, but you're not sure how
23   many times over a --
24   A.   No, sir.
25   Q.   -- four-year period?

67

1    Q.   Okay.  Did she ever take the boat out herself?
2    A.   Not alone.
3    Q.   Always with you?
4    A.   Yes, sir.
5    Q.   Okay.  When you used the boat, did you tell
6    other people, 'Well, this is my daughter's boat'?
7    A.   Yes, sir.
8    Q.   Okay.  Who did you tell that to?
9    A.   Anyone who looked at it or asked about it.
10   Q.   Okay.  Who is Randy Cole?
11   A.   He's a mechanic in Steinhatchee, Florida.
12   Q.   Okay.  He's a mechanic.  Has he done work on
13   the 34 foot Fountain?
14   A.   Yes, sir.
15   Q.   Okay.  And what kind of work has he done?
16   A.   He services the engines.  He's replaced pumps,
17   bilge pumps.  He -- that's the best of my knowledge.
18   Q.   Okay.  And this is between 2004 and 2008 --
19   A.   Yes, sir.
20   Q.   -- he did work on the boat?
21   A.   Yes, sir.
22   Q.   Okay.  And he did this for money.
23   A.   Yes, sir.
24   Q.   Okay.  And who paid for that?
25   A.   I did.

68

1    Q.   Okay.  And you paid by check?
2    A.   Cash.
3    Q.   Cash.  Sir, how much of your income per year is
4    from fishing?
5    A.   Define 'income'.
6    Q.   What you report to the IRS.
7    A.   Little to none.
8    Q.   Little to none.  Okay.  Can you give me an
9    idea, for instance, how much you made off of fishing last
10   year?
11   A.   None.
12   Q.   You made nothing.  Okay.  So on your IRS tax
13   returns there's no income generated from taking
14   passengers for hire on your Carolina skiff?
15   A.   No, sir.
16   Q.   How many trips would you say you've taken
17   passengers for hire in 2007?  How many trips did you
18   make?
19   A.   Probably 20 to 30.
20   Q.   20 to 30 trips.  And how much do you charge per
21   trip?
22   A.   At that time we -- I charged $350.
23   Q.   Okay, $350.  And so that's money that you
24   collected from passengers?
25   A.   Yes, sir.

1   Q.   And that's not income?

2   A.   Define 'income'.

3   Q.   Okay. Money that you have received for

4   providing goods and/or services, you know, in

5   compensation for those services. That's what I would

6   call income right now for purposes of my question.

7        MR. THIEL: Are you talking about revenue?

8        MR. MASSEE: Okay. Well, that's fine.

9   Q.   Yeah, how about revenues?

10  A.   All right.

11  Q.   Okay. And I understand you're a CPA, so I

12  might ask you what the definition of income is. What's

13  the definition of income?

14  A.   Revenue less expenses.

15  Q.   Okay. So are you operating your charter

16  fishing business at a loss?

17  A.   I would say so.

18  Q.   Okay. When you say 'you would say so', what

19  does that mean? What is --

20  A.   I consider it a hobby.

21  Q.   Okay. You consider it a hobby. So how do you

22  pay your bills? Where does the money come from for

23  paying your bills?

24  A.   From those revenues and from other income I

25  have.

1   Q.   Okay. And what other income sources do you

2   have?

3   A.   I have a revenue that comes from the sale of a

4   company when I was -- before I retired, and I draw

5   disability.

6   Q.   Okay. So you do not see a profit from your

7   charter fishing business?

8   A.   No.

9   Q.   So do you break even or do you end up paying

10  more into your charter fishing business?

11  A.   In 2007 I'd say I paid out of my pocket.

12  Q.   Where was the boat purchased?

13       MR. THIEL: Which boat?

14       MR. MASSEE: Good question. Thank you.

15  Q.   Where was the 34 foot Fountain purchased?

16  A.   The initial negotiation for the boat was done

17  at Fountain Boats in Chocowinity, North Carolina, across

18  the Pamilico Sound from --

19  Q.   Okay. So the boat's in North Carolina. Did

20  you find the 34 foot?

21  A.   (Witness shakes head.)

22  Q.   How did Elizabeth come to find and buy a

23  $165,000, 34 foot boat?

24  A.   We -- I contacted Fountain Boats. She and I

25  went to the factory in Chocowinity, discussed the boat

1   and a price.

2        They located the boat in Florida. And sir, I

3   want to say in Sarasota, but I'm not sure of that.

4        And then she and I went to Sarasota after this.

5   They located a boat that she wanted, and we went to the

6   dealership in Sarasota and picked up the boat, finished

7   the paperwork there.

8   Q.   How much are the mortgage payments on the boat;

9   do you know?

10  A.   Approximately a thousand dollars.

11  Q.   A month?

12  A.   Yes, sir.

13  Q.   Okay. And who pays that?

14  A.   She paid some. I paid some. Her mother paid

15  some.

16  Q.   Do you have an arrangement with Elizabeth

17  Henley for paying for your use of the boat?

18  A.   No, sir.

19  Q.   So aside from paying some of the mortgage --

20  when you say some, how much are we talking?

21  A.   I paid some of the payments in the past.

22  Q.   In their entirety?

23  A.   Yes, sir.

24  Q.   Okay. So at times you've paid up to a thousand

25  dollars a month for a boat that you don't own?

1   A.   At times I've paid a thousand dollars for a

2   payment on the boat.

3   Q.   How many bank accounts do you have, Mr. Henley?

4   A.   One.

5   Q.   You only have one bank account?

6   A.   Yes, sir.

7   Q.   And all your transactions are through that

8   bank?

9   A.   Yes, sir.

10  Q.   Okay. And that's for your business as well as

11  your personal --

12  A.   Yes, sir.

13  Q.   -- transactions?

14  A.   Yes, sir.

15  Q.   Okay. And what bank is that?

16  A.   Citizens Bank -- Citizens State Bank.

17  Q.   Okay. And where is that bank located?

18  A.   Steinhatchee, Florida.

19  Q.   So you don't have any other accounts anywhere

20  else that you use for paying your bills or receiving

21  money?

22  A.   No, sir.

23  Q.   Okay. So you don't have a money market

24  account? You don't have a brokerage account with

25  checking --

1  A.  No.
2  Q.  -- attached to it?  Okay.  So this is it.  This
3  is all she wrote, --
4  A.  Yes, sir.
5  Q.  -- Citizens State Bank.
6      Do you know your account number?
7  A.  No, sir.
8  Q.  Can you provide that account number if we ask
9  for it?
10  A.  Yes, sir.
11  Q.  Now, with your chartering, what's the terms of
12  your contract with your passengers?  And when I say
13  contract, I don't mean a written contract.  I mean
14  whatever your agreement is as to how, for instance,
15  they're going to pay you, what the conditions of the trip
16  are.  Can you tell me how you conduct that business?
17  A.  It's verbal.  Again, they ask for a date.  If
18  it's available with me, then we discuss a fee, time of
19  pickup, and where that pickup would be.
20  Q.  Okay.  And when you say 'fee', you had said a
21  figure before earlier in your testimony.  What is your
22  fee for --
23  A.  My fee now is $450 a day, $375 for half a day.
24  Q.  Okay.  And how much does it cost in fuel to
25  take out the 34 foot Fountain for a day's trip?

1  A.  I never chartered that boat.
2  Q.  But you pay for fuel.
3  A.  Sure.
4  Q.  So how much does it cost?
5  A.  Anywhere from $300 to $600 a day.
6  Q.  Okay.  And as far as the Carolina Skiff, how
7  much does that cost?
8  A.  Today I average $75 to $80 a day.
9  Q.  Okay.  So it's a lot more efficient to use the
10  Carolina Skiff, would you say, --
11  A.  Yes, sir.
12  Q.  -- for a day's fishing trip, because the money
13  that you would be getting would be more than what you'd
14  be expending in fuel?
15  A.  In fuel.
16  Q.  How much did it cost to maintain the 34 foot
17  Fountain for a year?  I mean you talked about servicing
18  the engines and running the vessel on maintenance runs.
19  Do you know how much that cost?
20  A.  I would say I spent something in the $5,000
21  range to do that.
22  Q.  Per year?
23  A.  Yes, sir.  Average.
24  Q.  So it was $5,000 to maintain it per year.  You
25  said you made six to eight trips with that boat, a year,

1  on average?
2  A.  Yes, sir.
3  Q.  And you said that it would be almost up to $600
4  per trip for fuel for that boat?
5  A.  Yes, sir.
6  Q.  Do you have a mortgage on your home?
7  A.  Yes, sir.
8  Q.  How much remains on that mortgage?
9  A.  $85,000 approximately.
10  Q.  Okay.  So I'm going back now to the 19th on
11  your trip with Mr. Gibson and Mr. Hulen.  So you met them
12  around 8:00 in the morning on your boat.  Did any of them
13  chip in for fuel?
14  A.  No, sir.
15  Q.  Chip in for beers or lunch?
16  A.  No alcohol on the boat.
17  Q.  Okay.  Did anyone bring lunch?
18  A.  They did.
19  Q.  Did they offer any of it to you?
20  A.  I'm sure.
21  Q.  Did you accept any of it?
22  A.  No, sir.
23  Q.  No?  Did you bring your own lunch?
24  A.  Yes, sir.
25  Q.  What did you have?

1  A.  Probably a pack of crackers.
2  Q.  Was it that rough?
3  A.  That's normally what I eat on a boat.
4  Q.  Do you charge money for preparing the fish
5  after they've been caught?
6  A.  Not off of my vessel.  And if I clean them, I
7  don't.  I don't charge if they come off my vessel.
8  Q.  Okay.  I'm sorry.  Let me get this straight.
9  If you've taken passengers out with you, --
10  A.  Yes, sir.
11  Q.  -- and then you bring them back and they have
12  fish, --
13  A.  Yes, sir.
14  Q.  -- you'll clean them for them for free?
15  A.  That's correct.
16  Q.  Okay.  So do you clean fish from other vessels?
17  A.  Yes, sir.
18  Q.  Okay.  And you'll charge for that?
19  A.  Yes, sir.
20  Q.  Okay.  All right.  How long have you known
21  Albert Hulen?
22  A.  2004.
23  Q.  Okay.  Is he a neighbor of yours?
24  A.  Yes, sir.
25  Q.  Okay.  Right next door?

1    A.   Across the street.

2    Q.   Across the street neighbor?

3    A.   Yes, sir.

4    Q.   Okay.  And how many times would you say you've

5    been fishing with him?

6    A.   ·How about the term 'a lot'.

7    Q.   Okay.  On what boats did you fish with him?

8    A.   Albert and I have fished on the Fountain and in

9    the Carolina Skiff, both of them.

10   Q.   Okay.  And have you ever paid Albert Hulen for

11   coming fishing with you?

12   A.   No.

13        MR. THIEL:  He said has he ever paid Albert

14   Hulen.  Did you mean the other way around?

15        THE WITNESS:  No.

16        MR. MASSEE:  No.

17   BY MR. MASSEE:

18   Q.   Actually, I'm asking have you ever paid any to

19   Albert Hulen --

20        MR. THIEL:  Okay.

21   Q.   -- for going fishing with you?

22   A.   No, sir.

23   Q.   Even on the Carolina Skiff?

24   A.   That's correct.

25   Q.   Okay.  Has he ever gone with you when you've

1    had paying passengers, people paying for charter?

2    A.   No.

3    Q.   So he has only gone with you on recreational

4    voyages where you were fishing for yourself, but you

5    weren't taking other people for hire?

6    A.   That's correct.

7    Q.   Okay.  Is Albert Hulen licensed like you are?

8    A.   No, sir.

9    Q.   Okay.  Does he have a lot of experience on

10   boats that you know of?

11   A.   I would say average.

12   Q.   How old is Mr. Hulen?

13   A.   82.

14   Q.   Okay.  And it's my understanding, and I believe

15   you said this before, that you don't ever charter

16   offshore.

17   A.   Correct.

18   Q.   Okay.  And offshore was, by your definition, 20

19   miles or more.

20        MR. THIEL:  Asked and answered.

21        MR. MASSEE:  Okay.

22   Q.   So you've chartered up to 19 miles?

23   A.   No, sir.

24   Q.   All right.  Okay.  When you take passengers out

25   for hire, how do you get paid?

1    A.   It's either cash or check.

2    Q.   Okay, cash or check.  And do you expect to be

3    paid before you leave the dock?

4    A.   No, sir.

5    Q.   You get paid when?

6    A.   When I return to the dock.

7    Q.   Okay.  And what's your policy for refunds?

8    A.   I don't take any deposits.

9    Q.   Okay.  I'm sorry.  You get paid when you get

10   back to the dock?

11   A.   Correct.

12   Q.   So if you go out and come back in less than a

13   full days fishing, what happens?

14   A.   I charge for either a half a day or a full day.

15   Q.   So you'll charge them regardless of how much

16   time you've been out?

17   A.   No, sir.

18   Q.   Okay.  So if you were to take passengers out

19   for hire for an hour and come back, you would charge them

20   how much?

21   A.   Rephrase.

22   Q.   Okay.  Okay.  People call you to go on your

23   boat.

24   A.   Yes, sir.

25   Q.   Okay.  And I'm sure they ask, 'Well, how much

1    does it cost?'

2    A.   Yes, sir.

3    Q.   And I'm sure, and I'm making a big assumption

4    here, I guess, but I'm sure that they will ask, 'Well,

5    what if the weather turns bad and we've got to come back?

6    Do I have to pay you the full amount?'  What do you say?

7    A.   No, sir.

8    Q.   You say no,--

9    A.   No.

10   Q.   -- that they don't have to pay?

11   A.   That's correct.

12   Q.   Okay.  So what would they have to pay?

13   A.   I've never charged anyone who got less than

14   what they had requested because of weather.

15   Q.   Okay.  Who decides whether the boat stays out

16   or not?

17   A.   Their call up until a safety issue presents

18   itself.

19   Q.   Okay.  So --

20   A.   It's my call.  I'm in command of that vessel.

21   Q.   Okay.  I'm sorry.  Which one is it?  Is it

22   their call or your call?

23   A.   If we get out there and it starts to rain, if

24   they want to continue to fish in the rain, that's fine.

25        If we have thunder and lightning or heavy wind,

81

1   that's my call.
2       Q.   But in the time that you've been in Florida,
3   how many passengers have you taken out on your charter
4   fishing boat?
5       A.   To date?
6       Q.   Yes.
7       A.   Range.  No specifics.  I have no record of
8   specifics.
9       Q.   More than a hundred?
10      A.   Yes, sir.
11      Q.   More than two hundred?
12      A.   Yes, sir.
13      Q.   More than three hundred?
14      A.   I doubt it.
15      Q.   Okay.  So is it accurate to say between 200 and
16  300?
17      A.   Yes, sir.
18      Q.   And that's paying charter passengers?
19      A.   Yes, sir.
20      Q.   Okay.  And I'm sorry.  I'm not sure if I
21  remember, but you said that you do have an account with
22  Yahoo, and you'd be able to provide us that account
23  information?  You have that information at home?
24      A.   Yes, sir.
25      Q.   And would Marcy -- and I won't be able to say

82

1   her last name --
2       A.   McMenamin.
3       Q.   -- McMenamin be the best person to talk to
4   about how that website works or --
5       A.   Yes, sir.
6       Q.   Okay.  But you said before you have the final
7   say on what goes on the website and what doesn't?
8       A.   Yes, sir.
9       Q.   Okay.  And that website's been up how long,
10  again?
11      A.   Two to three years.
12      Q.   All right.  I'm going to ask you to look at
13  this.
14           (Mr. Massee tenders document to the witness.)
15      Q.   Does that look familiar to you?
16      A.   Yes, sir.
17      Q.   Okay.  Is that a printed page of one of your
18  web pages from the site saltwaterfishn.com?
19      A.   Yes, sir.
20           MR. MASSEE:  And I'd like to have this marked
21  as an exhibit, the next in order.
22           COURT REPORTER:  No. 4.
23           (Thereupon, Plaintiff's Exhibit No. 4 was
24  marked for identification.)
25  BY MR. MASSEE:

83

1       Q.   Okay.  So those pictures there, this is an
2   accurate depiction of your website?
3       A.   Yes, sir.
4       Q.   Okay.  Now, it looks like those are pictures of
5   you with fish?
6       A.   That's correct.
7       Q.   And is this currently how your website looks?
8       A.   To the best of my recollection.
9       Q.   Okay.  It looks like it contains a biography
10  there of you.  Can you read that for me?
11      A.   'Captain James ('Jim')D. Henley has over 10
12  years as a captain with the US Coastguard and over 45
13  years of fishing experience.  He fished professionally
14  for over 6 years before becoming a full-time guide in
15  Steinhatchee, Florida.'
16           'Captain Jim's love for people and knowledge of
17  fishing and boating provides you a fun, safe day on the
18  water.  The focus on the trip is about "you".  Call
19  352-498-0792 to schedule your fun fishing trip.  Captain
20  Henley has taken people fishing for over 45 years.'
21      Q.   Okay.  And there's references there to your
22  professional fishing experience and being a full-time
23  guide?
24      A.   That's correct.
25      Q.   Okay.  And it also says you were licensed with

84

1   the Coastguard for 10 years.  Is that --
2       A.   I'm in my second term of five.
3       Q.   Right.  But you haven't actually been licensed
4   with the Coastguard for 10 --
5       A.   That's correct.
6       Q.   -- years.  Okay.  Okay.  And I'd like you to
7   take a look at that.
8           (Mr. Massee tenders document to the witness.)
9       Q.   Is this another page from your website,
10  saltwaterfishn.com?
11      A.   I believe so.  That picture has been on my
12  website.  If it's --
13      Q.   Okay.
14      A.   -- not still there, it was on my website.  Now,
15  whether it is today, I don't recollect.
16      Q.   Okay.  And can you read that section right
17  there.
18      A.   'Fishing is always the Captain's Choice.
19  Safety is of the utmost important, and decisions
20  regarding fishing in any inclement weather will always be
21  at the sole discretion of the captain.  In the event that
22  the Captain cancelled the charter, any deposits will be
23  returned and no further charges will be due.'
24           'We hope you will extend us the courtesy of
25  cancelling at the earliest possible time.  We would

1   appreciate any and all communication regarding the
2   specific.'
3        Q.   Right.  And you mentioned 'deposits' there.
4   You said you didn't take any deposits.
5        A.   No.
6        Q.   But you put that on your website?
7        A.   That's correct.
8        Q.   Okay.  Okay.  And the picture depicted here on
9   the website, what does that say right there at the top?
10  I know it's hard to -- because it was blocked out on the
11  computer it's hard to read.
12       A.   'Charters'.
13       Q.   Okay.  And what is the vessel depicted in this
14  picture there?
15       A.   That's a Carolina Skiff, DLX24.
16       Q.   Okay.  And is that mentioned anywhere else on
17  the website?  Is it written in there that it's the 25
18  foot?
19       A.   The 25 foot Carolina Skiff.
20       Q.   Okay.  And it specifies 'inshore fishing',
21  doesn't it?
22       A.   That's correct.
23            MR. MASSEE:  Okay.  I'd like to mark that next
24  in order, please.
25            COURT REPORTER:  That will be Exhibit No. 5.

1            (Thereupon, Plaintiff's Exhibit No. 5 was
2        marked for identification.)
3   BY MR. MASSEE:
4        Q.   Okay.  And going back to Plaintiff's Exhibit
5   No. 4, this is the home page.  Speaking of these fish,
6   what kind of fish are you holding there?
7        A.   The top fish is a speckled trout.  The bottom
8   two fish is a king fish and -- king mackerel in my right
9   hand and a grouper in my left hand.
10       Q.   Okay.  And is there any difference, like with
11  these different species of fish, where you catch them?  I
12  mean you don't --
13       A.   Yes, sir.
14       Q.   -- all catch them in the same place, right?
15       A.   That's correct.
16       Q.   Okay.  So what kind of fish would you catch
17  close in the flats and what kind of fish would you catch
18  farther out?
19       A.   This fish, the speckled trout is caught in the
20  flats.  The other two could be caught within the 10 mile
21  limit or further out.
22       Q.   Okay.  But as a guide, speaking as a guide and
23  someone running a charter fishing business, where would
24  you most expect to catch -- for instance, which one was a
25  grouper?

1        A.   This is the grouper, which is in my left hand.
2        Q.   Where would you expect to catch grouper?
3        A.   Bottom fishing from 20 feet deep and further.
4        Q.   But certainly farther than two miles?
5        A.   Yes, sir.
6        Q.   Okay.  And this other kind of fish?  I'm sorry.
7        A.   This is --
8        Q.   I don't know fish.
9        A.   That's a king mackerel.
10       Q.   Okay.  And are those usually deeper water fish
11  as well?
12       A.   Not in the flats.
13       Q.   Okay.  Now, how often do you take --
14            THE WITNESS:  Stop.  Can I go off the record
15       with you?  I mean you can put it on if you want to.
16            MR. THIEL:  Just answer the question.
17            MR. MASSEE:  I think you probably ought to talk
18       to your attorney about that.
19  BY THE WITNESS:
20       A.   You can catch that king fish in narrow water.
21       Q.   Okay.
22       A.   Okay?  He normally lives in deeper water.  You
23  can catch that grouper in narrow water.  They all have
24  tails and fins.
25       Q.   Okay.  When you --

1        A.   But the --
2        Q.   Okay.
3        A.   The norm is as I told you, --
4        Q.   Okay.
5        A.   -- okay?  I have caught both of those fish in
6   narrow water.
7        Q.   Right.  Okay.  But as a fishing guide, if I
8   were to come on your boat as a passenger and were to say,
9   'I want to catch grouper', would you take me to the flats
10  or would you take me out?
11       A.   I wouldn't take you.
12       Q.   Okay.  And why not?
13       A.   I'm not a grouper fisherman.
14       Q.   Okay.  So those fish were caught by accident?
15       A.   Those fish were caught with me on the boat by
16  myself.
17       Q.   Okay.  And you put those on your website to
18  show folks on your home page, 'Give me a call,
19  352-498-0792.  This is the kind of fish that you can
20  catch.'  That pretty much was the idea?
21       A.   Then I'll refer you to an offshore captain.
22       Q.   But it doesn't say that on there, does it?
23       A.   I refer charters every day, two of them this
24  morning.
25       Q.   Right.  The question was that it doesn't say

89

1  that, though, does it?
2      A.  But that's your choice as to whether you want
3  me or them.  I won't take you.
4      Q.  Right.  But again, both the --
5      A.  My conversation, when you call in that regard,
6  is I do not go offshore, but I will find you a captain.
7          I have people who refer to me who know I don't
8  do that, but they know that I will find them a captain.
9  As I told you earlier some of those captains are inshore
10 and some are offshore.
11     Q.  Okay.  And I'm just going to say it one more
12 time because your answer is nonresponsive to my question,
13 which is it doesn't say that anywhere on your website.
14     A.  That's correct.
15     Q.  Thank you.  Okay.  Okay.
16         (Mr. Massee tenders document to the witness.)
17     A.  All right.
18     Q.  Okay.  Can you tell me what is depicted on that
19 document?
20     A.  The people who have fished on my boat --
21     Q.  Okay.  Is that --
22     A.  -- and me with a fish.
23     Q.  Okay.  Is that an accurate depiction of a web
24 page from your website, saltwaterfishn.com?
25     A.  Yes, sir.

90

1      Q.  Okay.  And can you read the biography there?
2      A.  'James (Jim) D. Henley has over 10 years as a
3  captain with the US Coastguard and over 45 years of
4  fishing experience.  He fished professionally for over 6
5  years before becoming a full-time guide in Steinhatchee,
6  Florida.'
7          'Captain Jim's love for people and knowledge of
8  fishing and boating provides you a fun, safe day on the
9  water.  The focus of the trip is about "you".  Call
10 352-498-0792 to schedule your fun fishing trip.  Captain
11 Henley has taken people fishing for over 45 years.'
12     Q.  Okay.  Can you read the last three lines there?
13     A.  Yeah.  'Inshore fishing, offshore fishing, and
14 scalloping.'
15     Q.  Okay.  So aside from where it says 'charter
16 services available' and it says 'inshore fishing,
17 offshore fishing, and scalloping', would you say that the
18 text in Exhibit No. 4 is identical to the text in this
19 document depicting your web page?
20     A.  Yes, sir.
21         MR. MASSEE:  Okay.  I'd like to have this one
22 marked the next in order, please.
23         COURT REPORTER:  That will be Exhibit No. 6
24     (Thereupon, Plaintiff's Exhibit No. 6 was
25 marked for identification.)

91

1  BY MR. MASSEE:
2      Q.  Now, Exhibit No. 6, this is from your website.
3  And it even says 'recent catch September and October,
4  2007'; is that correct?
5      A.  Correct.
6      Q.  Okay.  And it does say 'offshore fishing'.
7      A.  That's right.
8          MR. THIEL:  Asked and answered.
9      Q.  Okay.  But you never take charters offshore
10 fishing?
11     A.  I do not charter offshore.
12     Q.  Okay.  And you never used the 34 foot Fountain
13 to do that?
14     A.  I do not charter offshore.
15     Q.  Okay.
16         THE WITNESS:  I need to take a break.
17         MR. THIEL:  Jules, is this a good time --
18         MR. MASSEE:  Oh.
19         MR. THIEL:  -- do you think, --
20         MR. MASSEE:  Okay.
21         MR. THIEL:  -- to take a break.
22         MR. MASSEE:  Okay.  I didn't hear you.  I'm
23 sorry.
24         MR. THIEL:  No, that's all right.  If you want
25 to look at it now.  Or if not, I don't care.

92

1          MR. MASSEE:  Oh, it doesn't matter; however you
2  want to do it.
3      (Thereupon, a recess was taken.)
4          MR. MASSEE:  Okay.  And just for the record,
5  during the break you looked at the next document
6  I'm --
7          MR. THIEL:  Yes.
8          MR. MASSEE:  -- going to show Mr. Henley.
9      Okay.
10 BY MR. MASSEE:
11     Q.  Mr. Henley, does this document depict a web
12 page from saltwaterfishn.com?
13     A.  Yes, sir.
14     Q.  And is that web page the 'Charters' web page?
15     A.  Yes, sir.
16     Q.  Okay.  And can you please tell me is the
17 picture of this vessel here identical to the picture in
18 Exhibit No. 5?
19     A.  Yes, sir.
20         MR. THIEL:  And just for the record, the
21 diagram we're talking about he pointed to the one in
22 the upper-right corner.
23         MR. MASSEE:  Okay.
24     Q.  And Mr. Henley, is the center picture on the
25 document I'm showing you, which we're going to be marking

93

1  next in order, is that you?
2      A.  Yes, sir.
3      Q.  Okay.  And what does this picture depict?
4      A.  The Fountain.
5      Q.  Okay.  Is this the 34 foot Fountain?
6      A.  Yes, sir.
7      Q.  Okay.  And here does this section describe
8  inshore (flats) fishing charters on the Carolina Skiff?
9      A.  Yes, sir.
10     Q.  Okay.  And what are the rates depicted on that?
11     A.  A half day is $350.  A full day is $450.
12     Q.  Okay.  And what does this section right here
13 say?
14     A.  'Offshore fishing charter.  Looking for an
15 offshore adventure.  Experience bottom fishing for pinks,
16 blacks, and grouper or troll for king or Spanish
17 mackerel.'
18     Q.  Okay.  And what does the next paragraph say
19     A.  'Choice of boats is the captain's choice based
20 on weather conditions.'
21     Q.  Okay.  So choice of boats is a captain's
22 decision.  And then does it list two boats beneath that?
23     A.  '26 foot Carolina Skiff DVX, 34 foot Fountain
24 powered by three 225 horsepower engines.'
25     Q.  Okay.  And what does it say for a full day as a

94

1  rate there?
2      A.  $850.
3      Q.  Okay.  And earlier when I asked you to look --
4          MR. MASSEE:  And I'm showing the defendant
5      Plaintiff's Exhibit No. 1.
6      Q.  When I asked you earlier what these 225's were
7  on the engines in the upper picture, did you describe the
8  vessel as a 34 foot Fountain with three 225 horsepower
9  engines?
10     A.  Yes, sir.
11     Q.  Okay.  And that's identical to the
12 description --
13     A.  Yes, sir.
14     Q.  -- on this document?
15         And earlier in your testimony you said that
16 grouper is normally caught offshore.  I'm not trying to
17 misquote you.  I understand that you could catch it other
18 places, but you would say that you would normally find it
19 farther out?
20     A.  Yes, sir.
21     Q.  Okay.  And is grouper specifically listed under
22 the fish --
23     A.  Yes, sir.
24     Q.  -- for the offshore fishing charter?
25     A.  Yes, sir.

95

1          THE WITNESS:  Can I go off the record with my
2      counsel?
3          MR. THIEL:  Just answer the questions he asks
4      you.
5          THE WITNESS:  Okay.
6          (Thereupon, a recess was taken.)
7          MR. MASSEE:  Okay.  We've been having power
8      outages.  Hopefully, it won't happen again.
9          Well, actually, let's go ahead and mark this,
10     which is the 'Charters' web page for
11     saltwaterfishn.com that Mr. Henley has just been
12     looking at.  Can we mark that next in order.
13         (Thereupon, Plaintiff's Exhibit No. 7 was
14     marked for identification.)
15 BY MR. MASSEE:
16     Q.  So we're comparing now Plaintiff's Exhibit
17 No. 5 and Plaintiff's Exhibit No. 7.  Okay.  And you've
18 already identified that the pictures of the Carolina
19 Skiff were identical on both?
20     A.  Yes, sir.
21     Q.  Okay.  And this is a picture of your 34 foot
22 Fountain?
23     A.  No, sir.
24     Q.  Okay.  Where did that picture come from?
25     A.  That's a picture of Elizabeth's 34 foot

96

1  Fountain.
2      Q.  Okay.  Fair enough.  But it is the one that you
3  were aboard on 1-19-2008?
4      A.  Yes, sir.
5      Q.  All right.  And you testified before that it
6  costs about $600 in fuel to run that vessel for a day's
7  trip.
8      A.  Yes, sir.
9      Q.  And on this web page it says for a full day for
10 offshore fishing it looks like the charge is actually
11 $850 as opposed to the $450 you were telling me before.
12 Is there any explanation for that?
13     A.  That's what other captains charge --
14     Q.  Okay.
15     A.  -- approximately.
16     Q.  Okay.  So it's other captains charge to use
17 your boat or Elizabeth's boat?
18     A.  No, sir.
19     Q.  Okay.  But Elizabeth's boat is the 34 foot
20 Fountain that's mentioned here right above the 'full day,
21 $850 charge'.
22     A.  Correct.
23     Q.  Okay.  And this was on your website?
24     A.  Yes, sir.
25     Q.  Okay.  But you never chartered offshore and you

1  never used that boat for charter ever?
2      A.   No, sir.
3      Q.   And you never intended to do that?
4      A.   Never had any requests for it. I refer
5  offshore charters.
6      Q.   Okay.
7      A.   No one ever requested a Fountain. I don't
8  charter offshore. I refer offshore charters to other
9  captains, and that's approximately what they charge.
10     Q.   Okay. But you advertized a 34 foot Fountain
11 powered by three 225 horsepower engines for a full day of
12 $850 with a picture of Elizabeth's 34 foot Fountain on
13 your web page under the 'Charter' section. And it says
14 'Charter Options'. But you never, ever intended to do
15 any offshore chartering with that boat?
16     A.   I never chartered that offshore.
17     Q.   You only put it on your website?
18     A.   That's correct.
19     Q.   For no reason at all?
20     A.   No, sir, that's not correct.
21     Q.   Okay. So why did you put it on your website?
22     A.   Cause if I can refer those charters to other
23 captains, they refer to me.
24     Q.   Okay. But it doesn't talk about referrals on
25 the web page, does it?

1      Q.   Okay. How about before 1-21-2008?
2      A.   Yes, sir.
3      Q.   Okay. When did you talk to insurance adjusters
4  when you made a claim for the loss of the 34 foot
5  Fountain?
6      A.   They were spoken to on, I believe, the night of
7  the 19th.
8      Q.   Okay. Did you --
9      A.   We talked to the claims --
10     Q.   Okay. Who are 'we'?
11     A.   I -- not 'we'. They were -- the adjuster was
12 talked to on the night of the 19th.
13     Q.   By who?
14     A.   Elizabeth.
15     Q.   Okay. So Elizabeth called the adjuster. Did
16 you ever have any conversations with any claims
17 adjusters?
18     A.   Only with Captain John Smith.
19     Q.   Okay. So you talked to Captain John Smith.
20 Did you ever have a telephone call with Christine Janke
21 with Ski Safe Insurance?
22     A.   I had a conversation with somebody at Ski Safe.
23 As to a specific name, you're going to have to give me a
24 minute to look at a document.
25          A note where I did fax to someone named Chris.

1      A.   No.
2      Q.   No. It talks about a 34 foot Fountain powered
3  by three 225 horsepower engines. And it says 'Choice of
4  boats is the captain's choice.'
5      A.   That's correct.
6      Q.   Okay. But it doesn't say 'referring to other
7  charters or vessels'.
8          MR. THIEL: Objection to form. Asked and
9  answered.
10         You can still answer if you like, again.
11     A.   Choice of boats is captain's choice.
12     Q.   Right. Okay. What is the date that you see on
13 Plaintiff's Exhibit No. 7?
14     A.   1-21-08.
15     Q.   Okay. And what is the date you see on the
16 bottom of Plaintiff's Exhibit No. 5?
17     A.   9-18-2008.
18     Q.   Okay. Is Plaintiff's Exhibit No. 7 an accurate
19 depiction of what the website showed on January 21, 2008?
20     A.   It's what your printout says.
21     Q.   Okay. When did saltwaterfishn.com display this
22 web page showing the 34 foot Fountain and offering
23 offshore fishing charters?
24     A.   I would gather during the time period of
25 1-21-2008.

1  And I do remember that the first person that I talked to
2  with Ski Safe was a female.
3      Q.   Okay. Is there a date on the fax?
4      A.   1-22-08.
5      Q.   And do you recall whether you had a
6  conversation with Chris the day before that fax?
7      A.   I had several phone calls from Chris. As far
8  as a specific record of date, I don't have that.
9      Q.   Okay. But this information was sent out on the
10 22nd of January, 2008; is that correct?
11     A.   That's correct.
12         MR. MASSEE: Okay. Can we go off the record
13 for a second.
14         (Thereupon, a discussion was held off the
15 record.)
16 BY MR. MASSEE:
17     Q.   So is it safe to say that on or about January
18 22, 2008 you had a phone conversation with Christine
19 Janke of Ski Safe Insurance?
20     A.   A lady named Chris.
21     Q.   Okay.
22     A.   Yes.
23     Q.   Okay. Fair enough.
24         And sometime after that conversation the
25 chartered web page for saltwaterfishn.com went from the

101

1   way it is depicted in Plaintiff's Exhibit No. 7 to the
2   way it's depicted in Plaintiff's Exhibit No. 5.
3       A.   Correct.
4       Q.   Okay.  During your conversation with Chris, did
5   she ask you whether you used the 34 foot Fountain for
6   commercial use?
7       A.   I don't remember that.
8       Q.   During that conversation, did she ask you do
9   you ever hire crew to work on your boat?
10      A.   I don't remember that she asked me that.
11      Q.   Okay.  Do you remember telling Ms. Janke that
12  you only had two other people on the boat with you?
13      A.   Those were passengers; that were the people.
14  That was Mr. Gibson and -- and Mr. Hulen.
15      Q.   Okay.
16      A.   I did not tell her that Mr. Gibson had his son,
17  because he's a minor son -- he's a minor.  I didn't think
18  that was --
19      Q.   Okay.
20      A.   -- worth --
21      Q.   I'm sorry.
22      A.   Sorry.
23      Q.   No.  No.  Okay.  So you --
24      A.   I disclosed the adults that were on board.
25      Q.   Okay, but not --

102

1       A.   Not the minor.
2       Q.   -- the minor.  Why not?
3       A.   I didn't feel it was important.
4       Q.   Okay.
5       A.   I disclosed the two adults that she could get
6   information from and probably rely on.
7       Q.   Okay.  But you still considered a minor a
8   passenger, yes?
9       A.   Yes, sir.
10      Q.   All right.  In that conversation did you talk
11  about 'a trip log'?
12      A.   She asked me if I kept a log.
13      Q.   And what did you respond?
14      A.   I told her I don't keep a trip log.
15      Q.   Okay.
16      A.   I do not keep a captain's log.
17      Q.   Okay.  And did you, on or about January 22,
18  2008, tell Ms. Janke that you don't charter offshore?
19      A.   I'm sure I did.
20      Q.   Okay.  I'm about to show you a document that
21  was produced with the Plaintiff's 26A1 disclosures, Bates
22  No. 019.  Have you ever seen this before?
23      A.   If I had to tell you when and where or if, the
24  answer's no.
25      Q.   Okay.

103

1       A.   If --
2       Q.   So --
3       A.   If it was provided to me, then I saw it.  But
4   as far as specifics of that document, I can't tell you
5   that.  If it was e-mailed to me or sent to me, then yes.
6       Q.   Okay.  It says here, 'Producer, John Darr
7   Agency'.  Is that the insurance agency that you contacted
8   to procure insurance for the 34 foot --
9       A.   Yes, --
10      Q.   -- Fountain?
11      A.   -- sir.
12      Q.   Okay.  And is the information contained here
13  what you were asking in terms of amounts when you applied
14  for insurance?
15      A.   The only amount I requested was for the hull.
16      Q.   Okay.  But I guess these were included in the
17  policy.  You don't have to answer that.  It's not a
18  question.
19           And where it says 'horsepower', 675.
20      A.   Yes, sir.
21      Q.   What does that mean to you?
22      A.   That's the three 225's.
23      Q.   Okay.  And right here, what does that say?
24      A.   'Occasional charter' marked 'no'.
25      Q.   Okay.  So there's an 'X' next to the 'no'.  And

104

1   your understanding is that that means that the
2   application for insurance, the vessel was never going to
3   be used for an occasional charter?
4       A.   That's correct.
5       Q.   Okay.
6       A.   It was never -- it was always understood
7   between all of us that it was for recreation.
8       Q.   Okay.  When you say 'all of us', who are you
9   talking about?
10      A.   It's between -- when I talked to the John Darr
11  Agency and --
12      Q.   Okay.
13      A.   -- the people there.
14      Q.   Okay.  But you were asked --
15      A.   Yes.
16      Q.   -- by the John Darr Agency?
17      A.   Yes.
18      Q.   Okay.  Did you get any money from Ron Gibson --
19      A.   No, sir.
20      Q.   -- for the fishing trip on January 19th, --
21      A.   No, sir.
22      Q.   -- 2008?
23      A.   I'm sorry.  No, sir.
24      Q.   Did you take any money from Ron Gibson's son on
25  January 19th, 2008 or for the voyage on January 19th,

105

1  2008?
2      A.  No, sir.
3      Q.  Okay.  Did you take any money from anybody at
4  all?
5      A.  No, sir.
6      Q.  Were you expecting anyone else to come that
7  day?
8      A.  No, sir.
9      Q.  Okay.  So you weren't expecting any other
10  passengers?
11      A.  No, sir.
12      Q.  Okay.  So no one called you to cancel to say
13  that they weren't coming that day?
14      A.  Not to my recollection.
15      Q.  Did Mr. Gibson or his son express any concern
16  with going out that morning?
17      A.  Not to my recollection.
18      Q.  So when they came down to the boat, they were
19  ready to go fishing?  They didn't express any --
20      A.  That's my -- that's my recollection.
21      Q.  Okay.  They didn't express any concerns about
22  the weather?
23          MR. THIEL:  Objection to form.  Asked and
24  answered.  You can still answer it.
25      A.  Not to my recollection.

106

1      Q.  Did you talk to Mr. Gibson after the voyage at
2  all?
3      A.  Not to my recollection.
4      Q.  Have you talked to David Webb since the voyage?
5      A.  No, sir.
6      Q.  Have you ever been convicted of a crime?
7      A.  No, sir.
8      Q.  And in terms of sources of incomes, we talked
9  about that before, can you identify specifically where
10  you get income?  And I am saying 'income'.  Now I'm
11  talking about taxable income.
12      A.  Yes, sir.  I get some monies from the sale of
13  clients from my previous profession, client files, and I
14  receive disability from social security.
15      Q.  Okay.  And what is your reported income?  Like
16  what was your reported income last year?
17      A.  Let's again define 'net' and 'AGI'.
18      Q.  Well, --
19      A.  Adjusted gross income?
20      Q.  What was your gross income reported on your
21  last tax return?
22      A.  $20,000.
23      Q.  So how much is left on the mortgage on the 34
24  foot Fountain?
25      A.  I don't have a specific number.

107

1      Q.  Okay.  And we talked before that the Fountain
2  was purchased in 2004.
3      A.  Correct.
4      Q.  Okay.  And that would make Elizabeth 18 years
5  old at the time?
6      A.  Approximately.
7      Q.  Okay.  And what year did she go into college?
8      A.  Right after graduation from high school.
9      Q.  But around age 18; is that fair --
10      A.  That's correct.
11      Q.  -- to say?  And was it a private or public
12  college?
13      A.  Public.
14      Q.  And so right about the time that she was going
15  into college she purchased a $165,000 boat?
16      A.  Correct.
17      Q.  And Ronald Gay, as far as you know, never
18  contributed any money, --
19      A.  That's --
20      Q.  -- but --
21      A.  -- correct.
22      Q.  -- he's co-owner of the vessel?
23      A.  Correct.
24      Q.  And approximately how many of the payments --
25  how much, since the purchase of the vessel, has Elizabeth

108

1  actually paid?
2      A.  I can't give you a specific.
3      Q.  Now, let me ask you this.  Is it your
4  understanding now that if the vessel's mortgage needs to
5  be paid, who would the bank go to for the money?
6          THE WITNESS:  Do I have to answer?
7          MR. THIEL:  Yeah.
8  BY THE WITNESS:
9      A.  You.
10      Q.  I like your style.
11          Okay.  Do you think that the person who holds
12  the note is obliged to pay the mortgage?  The person
13  who's name is on the note indebted to the mortgage bank
14  for the vessel, are they required to pay that money back?
15      A.  Yes, sir.
16      Q.  Okay.  Who was insured under the policy that
17  you took out on the 34 foot Fountain?
18      A.  I was.
19      Q.  Okay.  Is your name on the title of the 34 foot
20  Fountain?
21          MR. THIEL:  Objection.  Form.  Asked and
22  answered.
23          You can go ahead and answer it.  You've
24  answered it several times already.
25      A.  Repeat the question.

109

1    Q.   Your name is not on the title of the 34 foot
2  Fountain.
3    A.   Pertaining to the question, the answer is my
4  name is not on the title to the 4 -- 34 foot Fountain.
5    Q.   Right. And therefore, you're under no
6  obligation to pay any of the mortgage on that boat; is
7  that correct?
8        MR. THIEL: I'm going to object. No
9    foundation.
10       MR. MASSEE: Well, I think the rules require
11   that you only object to the form.
12       MR. THIEL: Well, it's form based on lack of
13   foundation.
14       MR. MASSEE: Okay. Would you like me to
15   rephrase the question?
16       MR. THIEL: If you like.
17       MR. MASSEE: Okay. Are you going to object
18   when I bring up things I've already brought up --
19       MR. THIEL: Well --
20       MR. MASSEE: -- on the basis of lack of
21   foundation?
22       MR. THIEL: No.
23       MR. MASSEE: Okay.
24  BY MR. MASSEE:
25    Q.   You do not hold title to the 34 foot Fountain?

110

1    A.   Correct.
2    Q.   Bank of America has a mortgage on the 34 foot
3  Fountain.
4    A.   Correct.
5    Q.   Under your understanding of that arrangement,
6  having people who have title to the vessel and a mortgage
7  being on the vessel, who is obligated to pay the mortgage
8  aside from an insurance company?
9    A.   People listed on the title and the note.
10   Q.   Right, which is Elizabeth Henley --
11   A.   The people, the people that are listed on the
12  note.
13   Q.   Okay. And who is listed on the note?
14   A.   Elizabeth Henley and Ron Gay.
15   Q.   Okay. You took out an insurance policy on the
16  34 foot Fountain.
17   A.   Yes, sir.
18   Q.   You did not tell -- or sorry -- did you tell
19  the insurance company that you didn't own the vessel?
20   A.   I don't recollect.
21   Q.   Did Christine Janke, when you talked to her on
22  the phone, inform you that they had no knowledge of the
23  mortgage on the vessel?
24   A.   I told her there was a mortgage on that vessel,
25  and she said that she would add it, and she did.

111

1    Q.   Okay.
2    A.   There's never been any secret that there was a
3  mortgage on that vessel. There was never any secret or
4  withholding of information that there was a mortgage on
5  that vessel.
6    Q.   Okay. But if the insurance company were to pay
7  for the loss of the vessel, they'd give the money to you
8  because you were the insured on the policy; is that
9  correct?
10   A.   At that time since there was not a loss payee
11  assigned, that's why I told her. If I'd wanted to hide
12  that, I wouldn't have told her.
13   Q.   All right.
14   A.   But I didn't want to hide anything. I knew
15  that there was a loss payee. When I got the copy of the
16  policy from her, I noticed there was not a loss payee,
17  and I informed her of that.
18   Q.   Right. But you didn't do that when you applied
19  for insurance.
20   A.   I don't know. Who's to say that I told them
21  and it didn't get put down.
22   Q.   When you were a CPA did you work for somebody
23  else or did you have your own business?
24   A.   My own practice at the end of my career.
25   Q.   Okay. And how old are you, sir?

112

1    A.   54.
2    Q.   Okay. And did you retire in 2004?
3    A.   Yes.
4    Q.   Okay. Have you ever been in a lawsuit other
5  than this one?
6    A.   Yes, sir.
7    Q.   Do you remember where and what court?
8        THE WITNESS: Off the record. I'm going off
9    the record.
10       MR. MASSEE: I'm --
11       THE WITNESS: Huh-uh.
12       MR. MASSEE: I think you have to answer the
13   question.
14  BY THE WITNESS:
15   A.   Rephrase that, please. Tell me that question
16  again; read me that.
17       MR. MASSEE: Yeah. Could we read it back,
18   please.
19       (Thereupon, the above-recorded question was
20   read by the court reporter.)
21       MR. THIEL: He's just asking --
22       THE WITNESS: I can answer that.
23       MR. THIEL: He's asking where and what court.
24  BY THE WITNESS:
25   A.   Brunswick, Georgia, Glynn County Superior

113

1    Court.

2        Q.   Okay.  And who were the parties?

3            MR. THIEL:  He's entitled to ask you questions

4    to seek information that may lead to admission of

5    discoverable evidence.  So --

6        A.   I can't disclose the parties because of

7    confidentiality --

8            MR. THIEL:  Okay.  So if you want me to talk to

9    him for a second, we can probably work this out.  So

10   if we can go off the record.  Let me just talk to

11   him and find out what's the --

12           MR. MASSEE:  Okay.

13           (Thereupon, a recess was taken.)

14           THE WITNESS:  Read me the question, again,

15   please.

16           (Thereupon, the above-recorded question was

17   read by the court reporter.)

18   BY THE WITNESS:

19       A.   I can't disclose the names of the parties

20   pursuant to my confidentiality agreements.

21       Q.   Okay.  But this was a case in Glynn County,

22   Georgia?

23       A.   Correct.

24       Q.   Okay.  What year?

25       A.   No recollection.  I don't remember.

114

1        Q.   You have no idea at all what year?

2        A.   Due to the confidentiality agreements I have in

3    my clause, I'm not going to disclose anything in regards

4    to those lawsuits.

5        Q.   Well, were the records in that case sealed by

6    the court?

7        A.   Under my confidentiality agreement and under my

8    clause agreements, I will not disclose anything regarding

9    that lawsuit.

10       Q.   Okay.  Were you a named party in that lawsuit?

11           MR. THIEL:  You asked him questions about the

12   nature of the lawsuits as well as the parties.  He's

13   told you that based on the confidentiality

14   agreements he cannot answer these questions.  And

15   I'm going to instruct him not to answer questions on

16   that on the basis of privilege and the

17   confidentiality agreement.

18           He's told you the location and what court it

19   was pending.

20   BY MR. MASSEE:

21       Q.   I'm sorry.  That was circuit court?

22       A.   Superior.

23       Q.   Superior.  But we don't know what year.  Okay.

24           Can you tell me was it around the time that you

25   moved from Georgia to Florida?

115

1            THE WITNESS:  I want to go off the record.

2            MR. THIEL:  Okay.  Let's go off the record and

3    step outside for a second.

4            (Thereupon, a discussion was held off the

5    record.)

6            (Thereupon, the above-recorded question was

7    read by the court reporter.)

8    BY THE WITNESS:

9        A.   It was around 2002.

10       Q.   Okay.  Did you receive a check from either Ski

11   Safe or Axis Reinsurance Company in the amount of

12   $3,550.15?

13       A.   Yes.

14       Q.   And did you deposit or cash that check?

15       A.   No, sir.

16       Q.   So you still have the check in your possession?

17       A.   No, sir.

18       Q.   Did you return it to the insurance company?

19       A.   No, sir.

20       Q.   Did you tear it up?

21       A.   No, sir.

22       Q.   Okay.  Where is the check?

23       A.   It's in the safe in Mr. J.L. or Jack Skelton,

24   Attorney at Law, in Atlanta, Georgia.

25       Q.   And Jack Skelton is your attorney?

116

1        A.   He represents me.

2            Would you repeat that amount, again, please?

3        Q.   I believe the amount was $3,550.15.

4        A.   Correct.

5        Q.   Did you ever approach any insurance company at

6    all other than Ski Safe for insurance for the 34 foot

7    Fountain?

8        A.   Yes, sir.

9        Q.   Okay.  Who else did you talk to insurance

10   about?

11       A.   I know I talked to Progressive.  I don't know

12   of any other specifics.  I'm sure there were.

13       Q.   Okay.  Was that you shopping around for

14   insurance?

15       A.   Yes, sir.

16       Q.   And that wasn't through John Darr?

17       A.   That's correct.

18       Q.   That was on your own?

19       A.   Yes, sir.

20       Q.   Okay.  And did you ever fill out any

21   applications for insurance policies with them online or

22   on the phone?

23       A.   Yes, sir.

24       Q.   Okay.  And you received quotes from them?

25       A.   Yes, sir.

117

1    Q.    Okay.  Do you still have those quotes?
2    A.    No, sir.
3    Q.    And did you ever make any inquiries as to
4    insurance for a commercial vessel?
5    A.    No, sir.
6    Q.    So you don't know what the difference between
7    insuring a commercial vessel or a recreational vessel
8    would be in a dollar amount --
9    A.    No, sir.
10   Q.    -- from your own research?
11   A.    No, sir.
12   Q.    So you don't know.  It could only be a dollar
13   more; is that correct?
14   A.    Correct.
15   Q.    When you moved to Florida, have you always been
16   in Steinhatchee?
17   A.    Yes, sir.
18   Q.    At the same address, 1708 King Street?
19   A.    Yes, sir.
20   Q.    Okay.  Did you own that house before you moved
21   to Florida?
22   A.    No, sir.
23   Q.    Have you ever made a claim on an insurance
24   policy for any other boat?
25   A.    No, sir.

118

1    Q.    Okay.  So this is your first experience with a
2    loss on a boat?
3    A.    Yes, sir.
4    Q.    Where does Ronald Gay live?
5    A.    Brunswick, Georgia.
6    Q.    Okay.  And how do you know him?
7    A.    He's a friend of mine.
8    Q.    Okay.  How long have you been friends?
9    A.    A long time --
10   Q.    Okay.
11   A.    -- as adults.
12   Q.    Okay.  Were you ever in business together?
13   A.    No, sir.
14   Q.    Is it your understanding that if the mortgage
15   doesn't get paid, Ron Gay, being on the note, would
16   subject him to liability to pay the mortgage?
17   A.    Rephrase.
18   Q.    Okay.  If, for some reason, nobody pays the
19   mortgage bill on the boat, the bank would go after Ron
20   Gay to pay.
21   A.    Correct.
22   Q.    Okay.
23   A.    It's my understanding.
24   Q.    Okay.  Why would Ron Gay do that if he never
25   uses the boat, didn't put any money into the boat, isn't

119

1    getting any money out of the boat?  Why would he do that?
2    A.    He did it as a favor to me and to Elizabeth.
3    Q.    Why didn't you just put the boat in your own
4    name?
5    A.    I didn't want the boat in my name.
6    Q.    Why not?
7    A.    I didn't want the boat in my name, plain and
8    simple.
9    Q.    Right.  Is it because you didn't want the asset
10   to show for the amount of money you have being owner of a
11   boat?
12   A.    No.
13   Q.    I'm almost finished.  I'm sure you're happy to
14   hear that.
15   A.    It's fine.  I want you to get all the
16   information that you want.
17   Q.    All right.
18   A.    I have nothing to hide.
19   Q.    Okay.  Do you know what a written interrogatory
20   is?
21   A.    I've probably seen one.
22   Q.    Okay.  Well, basically, we have sent -- through
23   counsel we serve questions that -- and please, you can
24   turn to your lawyer if I'm saying anything out of the
25   ordinary -- that you are required to answer.

120

1    A.    Yes, sir.
2    Q.    Have you seen any written questions to you in
3    this case?  And they would be titled 'Interrogatories'.
4    And they would have been served on your counsel on August
5    11, 2008.
6    A.    This is them right here.  August 26, 2008.
7    Q.    Okay.  So you received written questions.
8    A.    I have a copy of it from Mr. Pope.
9    Q.    And did you answer those questions?
10   A.    I'm sure I did.  Yes, I answered those
11   questions as to the best of my recollection.
12   Q.    Okay, because we haven't received them.
13         Do you use the e-mail address, 'captainjim
14   henley@yahoo.com'?
15   A.    Yes, sir.
16   Q.    Okay.  And do you receive e-mails from people
17   taking charters with you or asking about charters with
18   you at that address, Captain Jim Henley --
19   A.    It's available.
20   Q.    Okay.  Have you ever received e-mails from
21   persons requesting --
22   A.    It's possible.
23   Q.    -- charters --
24         COURT REPORTER:  Wait a minute.
25   A.    I mean --

1    COURT REPORTER:  Wait a minute.  Let him finish
2  his question.
3    THE WITNESS:  I'm sorry.  Go ahead.
4  Q. Have you ever received emails from persons
5 requesting information about chartering with you?
6  A. Yes.
7  Q. Is the computer that you use to receive and
8 send e-mails in your house?
9  A. Yes, sir.
10  Q. How long have you owned that computer?
11  A. Previous to 2004 when I moved to Florida.
12  Q. The same computer?
13  A. Yes, sir.
14  Q. Do you have any external hard drives that you
15 store information on?
16  A. No, sir.
17  Q. And is there information such as your e-mails
18 and other things relating to your chartering business on
19 that computer, on its --
20  A. Yes, sir.
21  Q. -- hard drive?
22  A. Yes, sir.
23  Q. And you'd be able to provide that information
24 to us if we requested it?
25  A. Sure.

1    MR. THIEL:  Subject to --
2    MR. MASSEE:  Well, --
3    MR. THIEL:  -- privilege.
4    MR. MASSEE:  To privilege, of course.  They'd
5  screen it first.
6 BY MR. MASSEE:
7  Q. Have you ever been approached or boarded or
8 received a letter or citation from the Florida Fish and
9 Wild Life?
10  A. Yes, sir.
11  Q. When was that?  Well, what was --
12  A. Years ago.
13  Q. Yeah.  What was the incident first, I guess?
14  A. Boarded on a routine.  Catch was checked.  I
15 had a shore fish.
16  Q. Okay.  So they were checking to see that you
17 were in -- there's limits on the size of fish you can
18 take; is that correct?
19  A. That's correct.
20  Q. Okay.  And were you on a charter then or --
21  A. Fun fishing.
22  Q. Okay.  There's only one area that I haven't
23 touched on, and I just want to ask you.
24    Okay.  So Randy Cole's the mechanic who worked
25 on the vessel.  How long have you known Randy?

1  A. Several years.
2  Q. Okay.  And has he worked on your vessel or have
3 other people worked on the 34 foot Fountain before, too?
4  A. Yes, sir.
5  Q. Okay.  Who else?
6  A. There was a service entity in Jacksonville that
7 worked on and did the engine maintenance on its checkup
8 that's required by the number of hours.  I don't remember
9 specifically what those numbers were, a hundred hours,
10 150 hours and so forth.
11    There's also a service entity in Brunswick,
12 Georgia, that worked on that vessel at one time, and
13 worked on the engines.  And I believe that's correct,
14 that it was that vessel.
15  Q. And who is 'Charlie' at the Sea Hagg Marina?
16  A. He owns the Sea Hagg Marina.
17  Q. Okay.  He's the owner.  Do you know his last
18 name?
19  A. No.
20  Q. Okay.  And what is your dealings with the Sea
21 Hagg Marina?  Do you keep your boat there?  What goes on
22 at the Sea Hagg Marina?
23  A. They're a full-service marina that I use for
24 bait and tackle.
25  Q. Okay.  So --

1  A. They're a full service marina shop.
2  Q. Okay.  I understand.  Do you get ice from them?
3  A. I could.
4  Q. All right.  Do you get ice from someone else?
5  A. I have an ice machine.
6  Q. Oh, you make your own ice.
7    Do you have any tax liens against you from the
8 IRS?
9  A. Yes.
10  Q. Do you know in what amount?
11  A. No, sir.
12  Q. Do you have more than one?
13    THE WITNESS:  Do I have to say?
14  A. Yes.
15  Q. And what caused those tax liens to arise?
16  A. Payroll tax.
17  Q. Payroll tax from --
18  A. When I was in business in Georgia.
19  Q. Okay.  From your CPA firm?
20  A. Yes, sir.
21  Q. What was the name of the firm?
22  A. Henley and Associates.
23    MR. MASSEE:  Okay.  I have nothing further.  Do
24 you have any followup?
25    MR. THIEL:  I have no questions.  And we will

125

1  read.
2          MR. MASSEE:  One thing before we go off the
3  record.  We really haven't received the --
4          MR. THIEL:  As I told you off the record
5  before, I don't know.  I'll look in the file and
6  check on the status.
7          MR. MASSEE:  Well, what I have to do then -- I
8  mean I'm going to adjourn this deposition,, because
9  if we get information coming out of interrogatories
10  that are either different or add new things to what
11  we talked about today, I may need to be in here
12  again.
13          MR. THIEL:  Do what you have to do.
14          MR. MASSEE:  All right.  So we're just going to
15  adjourn this deposition.  We're not terminating it.
16          (Thereupon, the deposition was adjourned.)
17
18
19
20
21
22
23
24
25

---

126

1  Case No.:  4:08cv168-WS/WCS
   Style:  Axis Reinsurance Company vs. James D. Henley
2  Witness:  James D. Henley
   Date of Deposition:  September 18, 2008
3
4                    ERRATA SHEET
   STATE OF FLORIDA:
5
   COUNTY OF ALACHUA:
6
7          I, James D. Henley, have read the foregoing
8  pages of my deposition and these pages constitute a true
9  and accurate transcription of my deposition given on the
10  18th day of September, 2008, at the time and place stated
   therein.
11
   PAGE     LINE        CORRECTION
12
13
14
15              .
16                       .
17
18
19
20
21          Signature of Witness
22  Sworn to and subscribed before
   me this _____ day of _____, 2008.
23
24
   Notary Public, State of Florida at Large
25

---

127

1              REPORTER'S CERTIFICATE OF ACCURACY
2  STATE OF FLORIDA   )
3  COUNTY OF ALACHUA  )
4          I, Penny Tobin, Court Reporter and Notary
5  Public in and for the State of Florida at Large, do
6  hereby certify that a deposition of James D. Henley was
7  taken in re:  Axis Reinsurance Company, Plaintiff, vs.
8  James D. Henley, Defendant, Case No. 4:08cv168-WS-WCS, at
9  Trenton, Florida, on Thursday September 18, A.D. 2008;
10          That I was authorized to and did report the
11  foregoing deposition, and that the transcript constitutes
12  a true and correct transcription of my stenographic notes
13  taken aforesaid, which were reduced to printing under my
14  personal supervision.
15          IN WITNESS WHEREOF, I have hereunto affixed my
16  hand this 18 day of September, A.D. 2008.
17
18
19
20
21
22  Penny Tobin, Court Reporter
    and Notary Public in and for
23  the State of Florida at Large.
24
25  My Notary Commission
    Expires:   November 28, 2010

#DD 614577

---

128

1              CERTIFICATE OF NOTARY PUBLIC, STATE OF FLORIDA
2  STATE OF FLORIDA
3  COUNTY OF ALACHUA
4
5          I, the undersigned authority, certify that
6  James D. Henley personally appeared before me and was
7  duly sworn.
8          WITNESS my hand and official seal this 18 day
9  of September, 2008.
10
11
12
13
14  PENNY TOBIN
15  Notary Public, State of Florida
16  Expires:  November 28, 2010
17
18
19
20
21
22
23
24
25

#DD 614577

---





**PLAINTIFF'S EXHIBIT**

9-18-08    #1

JAMES O. HENLEY



STATE OF FLORIDA
RECREATIONAL LICENSE

CUST# 009-192-444

JAMES D HENLEY
PO BOX 565
STEINHATCHEE, FL 32359

PRIVILEGE(S) PURCHASED:

14 CHARTER CAPTAIN - 4 OR LESS  $201.50
Valid For: 03/24/2008 - 03/24/2009
Coast Guard License #: 1163488

TOTAL: $201.50
I CONFIRM THE ABOVE AND UNDERSTAND THE
RESIDENCY REQUIREMENTS PRINTED ON BACK.
SIGNATURE:

ALL SALES FINAL

TRAN #: 007840050        03/24/2008 09:48
AGENT: 150010           TERMINAL: 4205660

#3

PLAINTIFF'S
EXHIBIT
9-18-08        #3
JAMES HENLEY



Charters ▶ | Lodging Info ▶ | Contact Us ▶ | Fish'n Photos ▶

Capt. James D. Henley

## Articles featuring Captain Jim!

Visit Florida - 2007

Family Times - August 2007

Sport Fishing Magazine - August 2008

Captain James ("Jim") D Henley has over 10 years as a captain with the US Coast Guard and over 45 years of fishing experience. He fished professionally for over 6 years before becoming a full-time guide in Steinhatchee, FL.

Captain Jim's love of people and knowledge of fishing and boating provides you a fun, safe day on the water. The focus of the trip is about "you". Call (352) 498-0792 to schedule your fun fishing trip. Captain Henley has taken people fishing for over 45 years.





**Charter Services Available**

**Inshore**

**Scalloping**



PLAINTIFF'S EXHIBIT

9-18-08    #4

JAMES P. HENLEY

Saltwater Fish'n

| Home | | Lodging Info | Contact Us | Fish'n Photos |

## SPECIAL NOTES

All charters include ice, bait & fishing tackle. Bait includes the Captain's choice of artificial bait and lures.

Fishing licenses are not necessary as you are covered under Captain Jim's license.

Fishing cleaning service is available at a rate of $.50 a pound. Fish fillets are neatly bagged and ready to go home according to your specifications.

Half Day Charters typically leave the dock at 7 or 8am and the fishing grounds are left around 12:00 or 1:00pm. Others choose to leave mid-morning or early afternoon for a four hour outing. Feel free to ask the Captain to meet your specific request.

Full Day Charters typically leave the dock at 7 or 8am and the fishing grounds are left around 3:30 or 4:00pm.

## Charter Options



### Inshore("Flats") Fishing Charter
25 Foot Carolina Skiff DVX

Fish the flats for trout, silver trout, redfish, blue fish and the ocassional spanish mackrel.

Half Day (4 hours) - $350

Full Day (8 hours) - $450

### Scalloping Charter

This is what Steinhatchee's famous for. Families, friends, and couples enjoy hours in the water searching for those curious little creatures. Scoop one up out of the grass or reach out and grab one in flight. Snorkel gear not included. Scallop season runs from July 1 through September 10.

$350 For the Day!!

### Custom Charters

We're flexible! Some people choose to spend part of the day fishing and part of the day scalloping. Others want the guys to go fishing in the morning and the ladies & guys go fishing or scalloping in the afternoon. Discuss your special requests with the Captain to see if your request can be accommodated.

## REFUND & CANCELLATION POLICY

1) Fishing is always the Captain's Choice  Safety is of the utmost important and decisions regarding fishing in any inclement weather will always be at the sole discretion of the Captain. In the event that the Captain cancels the charter, any deposits will be returned and no further charges will be due.

2) We hope you will extend us the courtesy of cancelling at the earliest possible time. We would appreciate any and all communication regarding the your specific

Freshwater Fisheries Management Rules & Regulations

Local Weather

Marine Fisheries Regulations

Licenses & Permits

**PLAINTIFF'S EXHIBIT**

9-18-08          #5

JAMES D. HENLEY



**Saltwater** fishn

| Charters ▶ | Lodging Info ▶ | Contact Us ▶ | Photo Album ▶ |

Recent Catch
September & October 2007







## Capt. James D. Henley

### Experienced Captain

Captain James ("Jim") D Henley has over 10 years as a captain with the US Coast Guard and over 45 years of fishing experience. He fished professionally for over 6 years before becoming a full-time guide in Steinhatchee, FL.

Captain Jim's love of people and knowledge of fishing and boating provides you a fun, safe day on the water. The focus of the trip is about "you". Call (352) 498-0792 to schedule your fun fishing trip. Captain Henley has taken people fishing for over 45 years.

### Charter Services Available

- Inshore fishing
- Offshore fishing
- Scalloping





PLAINTIFF'S
EXHIBIT

9-18-08
JAMES O. HENLEY   #6

## Saltwater Fish'n

| Home ▶ | | Lodging Info ▶ | Contact Us ▶ | Photo Album ▶ |

### SPECIAL NOTES

All charters include ice, bait
& fishing tackle. Bait includes
the Captain's choice of
artificial bait and lures.

Fishing licenses are not
necessary as you are
covered under Captain Jim's
license.

Fishing cleaning service is
available at a rate of $.50 a
pound. Fish filets are neatly
bagged and ready to go
home according to your
specifications.

Half Day Charters typically
leave the dock at 7 or 8am
and the fishing grounds are
left around 12:00 or 1:00pm.
Others choose to leave
mid-morning or early
afternoon for a four hour
outing. Feel free to ask the
Captain to meet your specific
request.

Full Day Charters typically
leave the dock at 7 or 8am
and the fishing grounds are
left around 3:30 or 4:00pm.

## Charter Options

### Inshore("Flats") Fishing Charter
**25 Foot Carolina Skiff DVX**

Fish the flats for trout, silver
trout, redfish, blue fish and
the ocassional spanish
mackrel

**Half Day (4 hours) - $350**

**Full Day (8 hours) - $450**





### Offshore Fishing Charter
Looking for an offshore
adventure? Experience bottom
fishing for "pinks","blacks", and
"grouper" or troll for "king" or
"spanish" mackerel.

*Choice of boats is the Captain's
choice based on
weather conditions.*

26 Foot Carolina Skiff DVX -

34 Foot Fountain powered by
3-225 HP Engines

Full Day - $850



### REFUND & CANCELLATION POLICY

1) Fishing is always the
Captain's Choice. Safety is
of the utmost important and
decisions regarding fishing
in any inclement weather will
always be at the sole
discretion of the Captain. In
the event that the Captain
cancels the charter, any

### Scalloping Charter

This is what Steinhatchee's famous for.
Families, friends, and couples enjoy
hours in the water searching for those
curious little creatures. Scoop one up
out of the grass or reach out and grab
one in flight. Snorkel gear not included.

### Custom Charters

We're flexible! Some people choose
to spend part of the day fishing and
part of the day scalloping. Others
want the guys to go fishing in the
morning and the ladies & guys go
fishing or scalloping in the afternoon.

PLAINTIFF'S
EXHIBIT
9-18-08   #7
JAMES D. HENLEY