IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

IN ADMIRALTY

AXIS REINSURANCE COMPANY,

    Plaintiff,

Case No.: 4:08-cv-168-WCS

v.

JAMES D. HENLEY,

    Defendant.

_____/

## **PLAINTIFF'S PROPOSED MEMORANDUM OF DECISION**

Plaintiff, AXIS REINSURANCE COMPANY ("AXIS"), by and through its undersigned counsel and pursuant to the Federal Rules of Civil Procedure, hereby files its Proposed Memorandum of Decision

    Respectfully submitted,

/s/ Michael J. Bradford
**ROBERT B. BIRTHISEL**
Florida Bar Number: 906654
**MICHAEL J. BRADFORD**
Florida Bar Number: 184314
**JULES V. MASSEE**
Florida Bar No.: 0041554
Hamilton, Miller & Birthisel, LLP
100 S. Ashley Drive, Suite 1210
Tampa, Florida 33602
Tel: 813-223-1900
Fax: 813-223-1933
rbirthisel@hamiltonmillerlaw.com
mbradford@hamiltonmillerlaw.com
jmassee@hamiltonmillerlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

IN ADMIRALTY

AXIS REINSURANCE COMPANY,

    Plaintiff,

v.

                                                    Case No.: 4:08-cv-168-WCS

JAMES D. HENLEY,

    Defendant.
_____/

## MEMORANDUM OF DECISION

THIS CAUSE was tried to the Court without a jury, and the Court hereby enters its Memorandum of Decision in this matter:

### I. INTRODUCTION

Plaintiff, Axis Reinsurance Company ("Plaintiff"), instituted this action seeking declaratory relief to determine its rights and obligations arising from an alleged marine insurance contract between it and James D. Henley ("Defendant"), the owner of a center console vessel. Defendant counterclaimed against Plaintiff for repair, sue and labor, and miscellaneous expenses incident to the vessel's sinking, and denies Plaintiff is entitled to declaratory relief.

### II. FINDINGS OF FACT

The Vessel involved in this matter is a 2004 34-foot Fountain center console motor vessel with three 225-horsepower engines ("Vessel").

On or about February 5, 2007, Defendant applied for insurance for the Vessel with the Plaintiff over the phone through the John Darr Agency, a broker acting on behalf of the Defendant.

During Plaintiff's application process, the Defendant was specifically asked whether the Vessel would be used for commercial charter purposes.

Defendant represented to the brokers at the John Darr Agency the Vessel would be used for recreation only.

Plaintiff does not insure any commercial charter vessels.

Based on the Defendant's representations, Plaintiff agreed to issue a contract of insurance (the "Contract") to Defendant, insuring the Vessel.

The Contract is an all risk marine insurance policy that contains no traditional *Inchmaree* clause.

Prior to leaving the dock on the morning of January 19, 2008, Defendant failed to physically check if the Vessel's bilge pumps were operating and relied solely on light switches on the console dashboard as an indication the pumps were working. He was unaware one of the bilge pumps was missing.

On the morning of January 19, 2008, Defendant took three persons fishing on the Vessel from the River Haven Marina in Steinhatchee, Florida out into the Gulf of Mexico.

At approximately 1:00 p.m., the Vessel took on several feet of water at the stern. The Defendant asked the passengers to bail the water out of the Vessel with five-gallon buckets.

At approximately 2:00 p.m., Defendant called a towing service to escort the Vessel back to the shore. The towing vessel never passed a line to the Vessel or assisted Defendant in pumping out the Vessel, but merely escorted it back to Steinhatchee.

Defendant dropped off his passengers at the River Haven Marina at approximately 3:00 p.m.

The Defendant then docked the Vessel behind his house and left it in the water. Before leaving the boat, Defendant checked the stern hatch and found the Vessel still had water in the bilge.

At approximately 4:30 p.m., the Vessel experienced weather consisting of thunder, lightning, and heavy rain.

The rainfall in the Steinhatchee area for the day of January 19, 2008 was 1.79 inches.

At approximately 5:00 p.m., the Vessel listed to port and partially sank while secured to the dock.

The Defendant watched the Vessel list, but did nothing to prevent the sinking.

The Vessel's bilge flooded through the ungasketed lazarette hatchway and the bilge pump discharge hoses. The Vessel's deck scuppers, clogged with trash, prevented proper drainage and increased bilge water accumulation.

The Vessel's starboard bilge pump had been removed prior to the voyage on January 19, 2008, and the open end of its discharge hose had never been plugged. The open hose allowed water to siphon into the bilge.

The Vessel's port bilge pump was inoperable, and allowed water to siphon through its discharge hose into the bilge.

The sinking was not an accident, but was caused by wear and tear over time and a lack of vessel maintenance.

A seaworthy vessel with clear scuppers and operable bilge pumps would easily sustain rainwater flooding in an amount of 1.79 inches.

The vessel was unseaworthy prior to its voyage on January 19, 2008.

The Defendant failed to take reasonable steps to save the Vessel when it reached the dock.

Defendant could have hauled the Vessel out of the water or ensured the Vessel was dewatered.

After filing a claim with the Plaintiff for the loss, adjuster Christine Janke spoke with Defendant on January 21, 2008, and asked whether the Vessel had been used commercially, to which the defendant replied the Vessel was strictly recreational.

After speaking with the Defendant on January 21, 2008, Ms. Janke viewed a page from the Defendant's website, saltwaterfishn.com, which advertised the Vessel for offshore fishing charters at a rate of $850 per day.

The Defendant reviews and approves all changes to the website saltwaterfishn.com, which he has owned for approximately three years.

After filing the claim for the loss, the Defendant altered the website – removing all references to offshore fishing charters and the Vessel.

Had any of the Plaintiff's underwriters been aware of Defendant's advertising the Vessel for offshore fishing charters, the Plaintiff would have declined to issue the Contract.

### III. CONCLUSIONS OF LAW

**A. APPLICABLE LAW**

Marine insurance policies are maritime contracts subject to federal admiralty jurisdiction. *Morrison Grain Co. v. Utica Mut. Ins. Soc.*, 632 F.2d 424, 428 n. 4 (5th Cir.1980). Ordinarily the General Maritime Law of the United States controls the interpretation of marine insurance policies. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 320-21 (1955); *Kilpatrick Marine Piling v. Fireman's Fund. Ins. Co.*, 795 F.2d 940, 948 (11th Cir.1986); *Florida Marine Towing, Inc. v. United Nat. Ins. Co.*, 686 So.2d 711, 712 (Fla. 3d DCA 1997); *Aetna Ins. Co. v. Dudney*, 595 So.2d 238, 239 (Fla. 4th DCA 1992).

However, when there is no established federal maritime precedent on point, state law controls. *Wilburn Boat Co.*, 348 U.S. at 320-21. Nevertheless, "when neither statutory nor judicially created maritime principles provide an answer to a specific legal question, courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." *All Underwriters v. Weisberg*, 222 F.3d 1309, 1312 (11th Cir.2000) (quoting *Coastal Fuels Mktg., Inc. v. Florida Express Shipping Co.*, 207 F.3d 1247, 1251 (11th Cir.2000)).

**B.     UBERRIMAE FIDEI**

The marine insurance doctrine of "utmost good faith" or "*Uberrimae Fidei*" is a well-entrenched doctrine of the general maritime law and is the controlling law in this circuit. *HIH Marine Servs., Inc. v. Fraser*, 211 F.3 1359, 1362 (11th Cir. 2000). "*Uberrimae fidei* requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk." *Id.* Further, under this doctrine, "a material misrepresentation on an application for marine insurance is grounds for voiding the policy," even if the misrepresentation is a result of "'mistake, accident, or forgetfulness.'" *Id.* at 1363 (*citing Steelmet v. Caribe Towing Corp.,* 747 F.2d 689, 695 (11th Cir. 1984)); *see also Gulfstream Cargo, Ltd. v. Reliance Ins. Co.,* 409 F.2d 974, 980 (5th Cir. 1969) ("nothing is better established in the law of marine insurance than that a mistake or omission material to a marine risk, whether it be willful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy"); *Certain Underwriters at Lloyd's, London v. Giroire,* 27 F. Supp. 2d 1306, 1312 (S.D. Fla. 1998) ("under *uberrimae fidei* a material misrepresentation on a marine insurance policy, even if innocently made, is grounds for rescission").

"The doctrine of *uberrimae fidei* places a strict burden on the insured to volunteer all information which might have a bearing on the scope or the risk assumed." *Giroire,* 27 F. Supp.

6

2d at 1312. Thus, a misrepresentation is material under the doctrine if "it might have a bearing on the risk to be assumed by the insurer." *HIH Marine Servs.,* 211 F.3d at 1363; *see also Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.,* 795 F.2d 940, 942-43 (11th Cir. 1986) (materiality is "that which could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk"). Further, an insurer's request for an answer to a specific question ordinarily establishes its materiality as a matter of law. *Pacific Ins. Co. v. Kent*, 2000 AMC 969 (C.D. Ca. 2000).

In this case, the Plaintiff specifically asked the Defendant whether the Vessel would be used for commercial charter. As the Plaintiff does not insure any commercial charter vessels, the inquiry went to a fact material to the Plaintiff's assessment of the risk to be assumed under the Contract. In response to this inquiry, Defendant represented that the Vessel would be used only for recreational purposes. However, he advertised the Vessel for offshore fishing charters through his website, a fact the Plaintiff only became aware through its own investigation after the Defendant reported a loss. Such an advertisement would undoubtedly "influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk." Had Plaintiff's underwriters known about the Defendant's internet advertisement, they would not have issued any policy of insurance for the Vessel.

The Defendant misrepresented material facts and caused the Defendant's underwriters to enter into the Contract based upon his misrepresentations. Accordingly, the Defendant failed to exercise the utmost good faith in dealing with the Plaintiff by presenting all facts material to the Plaintiff's calculation of the risk assumed.

C. **RESCISSION OF THE CONTRACT**

Under the general maritime law, "concealment" is the failure to disclose "any material fact or circumstance in relation to the subject matter of the contract which may increase the

7

liability to loss, or affect the risk assumed, and which is, in fact or law, within or ought to be within, the knowledge of one party, and of which the other party has no actual or presumptive knowledge." *Steelmet,* 747 F.2d at 695.  Further, the Contract expressly provides in relevant part:

Part B: General Limitations and Exclusions

> CONCEALMENT, MISREPRESENTATION OR FRAUD: All coverage provided by us will be voided from the beginning of the policy period if you intentionally conceal or misrepresent any material fact or circumstance relating to this contract of insurance, or the application for such insurance, whether before or after a loss.

Plaintiff admitted he owned and controlled the website saltwaterfishn.com, and had final approval of all changes made to the website.  On January 21, 2008, the Defendant represented to Plaintiff's adjuster Christine Janke he used the Vessel strictly for recreational purposes.  At the time of the conversation, the Plaintiff was still advertising the Vessel on the website for offshore fishing charters at $850 per day.  The Plaintiff further admitted he changed the website to remove all references to the Vessel and offshore fishing charters after he spoke with Ms. Janke.

The Defendant had knowledge of the website's contents, but never revealed it to the Plaintiff, who had no actual or presumptive knowledge the Defendant was advertising the Vessel for commercial use.  The Defendant further actively attempted to conceal the advertisement by obliterating the ad from the web page soon after the Plaintiff's claim investigation began.  If the Defendant had been successful, the Plaintiff would never have discovered the ad, which is clearly a material fact and circumstance relating to the Contract.  Accordingly, the Defendant is entitled to rescission due to the Plaintiff's concealment, which violated the express provisions of the Contract.

### D.    LACK OF FORTUITY

All risk marine insurance contracts, such as the one in this case, do not cover non-fortuitous or inevitable losses.  *See Morrison Grain Company v. Utica Mut. Ins. Co.* 632 F.2d

424 (5th Cir. 1980); *Int'l Ship Repair & Marine Servs, Inc. v. St. Paul Fire & Marine Ins. Co.*, 944 F. Supp. 886, 892-93 (M.D. Fla. 1996); *Axis Reinsurance Co. v. Resmondo*, No. 8:08-cv-569-T-33TBM, 2009 WL 1537903 (M.D. Fla. June 2, 2009); *Great Lakes Reinsurance (UK), PLC v. Soveral*, 2007 WL 646981 at *3 (S.D. Fla. 2007). "[A]ccident is synonymous with fortuitous." *Great Lakes Reinsurance (UK) PLC,* 2007 WL 646981 at *3. Thus, a loss is not fortuitous "if it results from … ordinary wear and tear…." *Id*. (citing *Int'l Ship Repair & Marine Servs, Inc.*, 944 F. Supp. at 892-93) (emphasis added). "A fortuitous event . . . is an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass." *Morrison*, at 430 (citing the Restatement of Contracts § 291 cmt. a (1932)).

In this case, the loss at issue was not an accident, but an inevitable, non-fortuitous event brought about by ordinary wear and tear and lack of maintenance. One of the Vessel's bilge pumps was not operable, the other was missing entirely. (*Id*. at 5 of 16). Further, the scupper drains were clogged with trash, the lazarette hatch was not watertight and the discharge hose for the missing bilge pump was unplugged, and allowed water to freely pass through it into the Vessel's bilge. These maintenance issues allowed water to flood the Vessel and cause it to sink under conditions that the Vessel, if in a normal state of repair, would have been able to weather. A far cry from being "beyond the power of any human being" to prevent, this loss could have been easily avoided by the simple expedient of proper maintenance, hauling the Vessel out of the water, or thorough dewatering. All of these reasonable steps were well within the Defendant's power. However, prior to leaving the dock on the morning of the sinking, the Defendant did not even check to see if his bilge pumps were actually working – and in fact did not know the starboard bilge pump had been removed from the Vessel. Further, the remaining bilge pump was inoperable; the Defendant required his passengers to bail the Vessel out with five gallon buckets

in order to keep the Vessel afloat long enough to make it back to shore. Even after nearly having the Vessel sink while at sea, the Defendant merely tied the Vessel up at the dock and left it unattended, and then stood by and watched as it listed to port and sank scarcely two hours after returning to the dock.

Defendant's loss was not fortuitous and is not covered by the Contract.

**E.     WEAR AND TEAR EXCLUSION**

The Contract's express terms exclude the loss, as it was caused by wear and tear and lack of maintenance.

The Contract provides, in relevant part:

Part D: Property Damage Coverage

> 2.   EXCLUSIONS: We do not provide Property Damage coverage against or resulting damage from:
>
>> a. wear and tear, mechanical breakdown, gradual deterioration, corrosion, weathering, insect, mold, animals, marine life damage;

*See* **DE 18-3**.

Due to the utter lack of a functioning bilge pump, clogged scupper drains, leaky lazarrette hatch, and an unplugged discharge hoses, water flooded the Vessel and caused it to sink under conditions that the Vessel, if in a normal state of repair, would have been able to weather.

**F.     UNSEAWORTHINESS**

For a vessel to be seaworthy it must be reasonably fit for its intended use. *Mitchell v. Trawler Racer Inc.,* 362 U.S. 539, 550 (1960); *Aguirre v. Citizens Casualty Co.,* 441 F.2d 141, 144 (5th Cir. 1971), *cert. denied,* 404 U.S. 829, 92 (1971); *Meyers By and Through Meyers v. Scoot-a-Way Corp.*, 662 So.2d 411, 413 (Fla. 3d DCA 1995). The duty of seaworthiness is implied in every marine insurance policy. *The Caledonia,* 157 U.S. 124, 132, (1895). The duty includes maintaining the vessel and its equipment in a proper operating condition, and can be

breached either by temporary or permanent defects in the equipment. *See Trawler Racer,* 362 U.S. at 550. A finding of unseaworthiness is not affected by whether the owner was or was not negligent or at fault. *See Id.* at 548 (reaffirming that "the duty to provide a seaworthy ship depends not at all upon the negligence of the ship owner or his agents").

A vessel that sinks in calm waters while tied to a dock is presumed to be unseaworthy. *Kilpatrick Marine Piling*, 795 F.2d at 944; *Rosenberg v. Maritime Ins. Co.*, 212 So. 2d 45, 47 (Fla. 3d DCA 1968). An insured cannot recover where the insured fails to rebut this presumption by producing competent evidence from which a fact finder could determine that the vessel sank for some reason other than the alleged unseaworthy condition. *Ins. Co. of N. Am. v. Lanasa Shrimp Co.*, 726 F.2d 688, 690 (11th Cir. 1984)*; see also Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 10 (1st Cir. 2001) (affirming judgment in favor of insurer on the grounds that recreational vessel was presumptively unseaworthy where owner left vessel unattended overnight and vessel sank at dock when unsealed hoses allowed seawater to flood the vessel in perfectly calm waters); *Phillips Petroleum Co. v. Koch Ellis Marine Contractors, Inc.*, 118 F. Supp. 940, 942 (E.D. La. 1954) (holding Vessel presumptively unseaworthy where it sank while left unattended overnight secured to a dock in calm waters and where evidence of pre-existing unrepaired cracks in the vessel plainly showed), *aff'd*, *Koch Ellis Marine Contractors, Inc. v. Phillips Petroleum Co.*, 219 F.2d 520 (5th Cir. 1955).

In this case, the Defendant secured the Vessel to the dock in Steinhatchee, left it unattended and it sank scarcely two hours later. It is undisputed that the rainfall in Steinhatchee for January 19, 2008 was only 1.79 inches, an amount that an otherwise seaworthy Vessel could have easily sustained. Aside from thunder, lightning and heavy rain, the Vessel was not in rough seas docked behind the Defendant's house. The Vessel's clogged scuppers, lack of functioning

bilge pumps, leaky lazarette hatch, and unplugged bilge pump discharge hoses allowed seawater to flood the Vessel, and but for these conditions, the Vessel would not have sunk.

Further, Defendant simply failed to properly maintain the Vessel so as to correct or otherwise address its unseaworthy condition. Unseaworthiness may occur as a result of the operation of a vessel, as well as in its structure and gear, and a vessel's unseaworthiness is a condition which does not turn on a finding of fault; if the condition exists, it is irrelevant how the condition arose. *Aguirre,* 441 F.2d at 143-44. A warranty of seaworthiness remains in effect throughout the occurrence of events which proximately cause a sinking when the risk to the vessel was readily capable of being resolved at all times by the simple expedient of maintenance or even temporary repair. *See Labarca*, 260 F.3d at 9. Here, the Vessel, in its state of disrepair was clearly in an unseaworthy condition, and the risks of sinking could easily have been avoided by replacing the missing starboard bilge pump, repairing the port bilge pump, cleaning out the deck scuppers, renewing the lazarette hatch gasket, or hauling the Vessel out of the water altogether. Accordingly, the warranty of seaworthiness remained attached at the time of the sinking, and was breached.

Defendant's failure to rebut the unseaworthiness presumption and his breach of the implied warranty of seaworthiness bars his recovery under the policy as a matter of law, and Plaintiff is therefore entitled to judgment on the issue of unseaworthiness.

## IV. CONCLUSION

Accordingly, for the reasons set forth above, it is **ORDERED, ADJUDGED,** and **DECREED** as follows:

1. Judgment shall be entered in favor of Plaintiff Axis Reinsurance Company and against Defendant James D. Henley as to Counts I through V of the Complaint for Declaratory Relief.

2. Judgment shall be entered in favor of Plaintiff Axis Reinsurance Company and against Defendant James D. Henley on Defendant's Counterclaim. Defendant shall take nothing from his Counterclaim.

**DATED** this _____ day of September, 2009.

_____<br>
WILLIAM C. SHERRILL, JR.<br>
UNITED STATES MAGISTRATE JUDGE

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of August, 2009, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Michael J. Bradford
Attorney