
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

------------- x
AXIS REINSURANCE COMPANY, :
:
Plaintiff, :
:
vs : CASE NO.: 4:08cv168-WS/WCS
:
JAMES D. HENLEY, :
:
Defendant. :
------------- x

VIDEOTAPED
DEPOSITION OF: ELIZABETH ANN HENLEY

TAKEN: Pursuant to Notice by Counsel for Plaintiff
DATE: Wednesday, September 30, 2009
PLACE: Hamilton, Miller & Birthisel, LLP
100 South Ashley Drive
Suite 1210
Tampa, Florida

TIME: 1:05 p.m. to 1:56 p.m.

REPORTED BY: Beverly Replogle
Notary Public
State of Florida at Large

Pages 1 - 45

Page 1

APPEARANCES:

MICHAEL J. BRADFORD, ESQUIRE
JONAH LEVINE, ESQUIRE
Hamilton, Miller & Birthisel, LLP
100 South Ashley Drive
Suite 1210
Tampa, Florida 33602
813-223-1900
mbradford@hamiltonmillerlaw.com

Appeared on behalf of Plaintiff

DAVID F. POPE, ESQUIRE
Banker Lopez Gassler, P.A.
501 East Kennedy Boulevard
Suite 1500
Tampa, Florida 33602
813-221-1500

Appeared on behalf of Defendant

ALSO PRESENT:

James D. Henley
Fred Gartrell, Videographer

INDEX

| | PAGE |
|---|---|
| Examination By Mr. Bradford | 4 |
| Certificate of Oath | 44 |
| Certificate of Reporter | 45 |

Page 2

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Mortgage | 9 |
| 2 | Sea-Safe Yacht Policy | 29 |
| 3 | Bill of Sale | 31 |
| 4 | Quote from A Boaters Paradise, signed | 32 |
| 5 | Quote from A Boaters Paradise, unsigned | 35 |
| 6 | Notice to Co-Signer dated 5/21/04 signed by Ms. Henley | 35 |
| 7 | Marine Loan Agreement | 37 |

Page 3

The videotaped deposition of ELIZABETH ANN HENLEY, taken pursuant to notice by counsel for the Plaintiff, on September 30, 2009, commencing at 1:05 p.m., at Hamilton, Miller & Birthisel, LLP, 100 South Ashley Drive, Suite 1210, Tampa, Florida, before Beverly Replogle, Notary Public, State of Florida at Large.

THE VIDEOGRAPHER: Today is Wednesday, September 20 -- September 30, 2009. The approximate time is 1:05 p.m. We are on the record. You may proceed.

ELIZABETH ANN HENLEY,

having been duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE WITNESS: I do.

EXAMINATION

BY MR. BRADFORD:

Q Ms. Henley, hi. Again, my name is Mike Bradford. I'm an attorney with Hamilton, Miller & Birthisel. We're in our offices this afternoon. I appreciate you coming down here.

I have some questions I want to ask you about a case that is ongoing. My client in this case is Axis Reinsurance Company. Your father, as I understand it,

Page 4

A Paid the rest, correct.
Q Okay. So you paid the majority of it yourself?
A Yes.
Q And then you said it was financed. Do you remember how much you financed?
A Not without seeing like a paper or my invoice at home.
(Mr. Levine left the room.)
(Exhibit Number 1 marked for identification.)
BY MR. BRADFORD:
Q Ms. Henley, I'm going to show you a document that I'll mark Exhibit 1 to your deposition. This is a document that was produced to us by Bank of America. I'll just ask you to take a look at it first and tell me if you recognize it.
(Mr. Levine entered the room.)
A Yes.
BY MR. BRADFORD:
Q What is that document?
A It would be the invoice of sale.
Q It's -- and by the way, it's a very poor copy, so I apologize. This is what we got from the bank. But it looks to be the mortgage. Is that --
A Correct.
Q -- fair to say?

Page 9

Okay. And again, it's a poor copy, but I think at the top it indicates that the amount financed was $144,994?
A Yes.
Q Does that sound right?
A Yes.
Q Okay. And then if you look at the last page -- it's a three-page document -- there's a signature that appears to be your signature. Is that your signature?
A Yes.
Q Okay. And then there's another signature there with the name Ronald Gay. Do you see that?
A Yes.
Q Who is Mr. Gay?
A A friend of mine.
Q And he also was on the mortgage?
A Yes.
Q Okay. Is he a co-owner of the boat?
A Yes.
Q Did he have a financial interest in the boat?
A Not at the time.
Q Let me get that back.
Did he put any money toward the purchase?
A No.
Q Did he ever make any of the mortgage payments?

Page 10

A No.
Q Why was his name on the -- on the boat?
A At my age at the time it would have -- it was helpful to have someone who had established credit to get a better interest rate.
Q Okay. So you and Mr. Gay owned the boat together?
A Yes.
Q Did anyone else have an ownership interest in the boat?
A No.
Q What about your father?
A He -- he had an interest as far as us using it together.
Q You and your father?
A Yes.
Q Okay. Did -- how did you use it together? Did the two of you go fishing?
A To go fishing.
Q Okay. I saw in some paperwork, and I don't remember where it was; but it looked like there was a discount on the purchase price because you were going to use this for tournament fishing. Does that ring a bell?
A Yes.
Q Would -- is that what you intended to do with

Page 11

the vessel?
A Yes.
Q Okay. Did you ever actually use it for tournament fishing?
A Yes.
Q About how many times?
A A season lasts about eight months, and I used it for two seasons.
Q And about how many times would you take it out during a season?
A 8 to 10.
Q Where did you do that?
A Wherever the tournament was being held; sometimes in Florida, sometimes in South Carolina, North Carolina.
Q Were they all over the country or --
A Just the Southeast.
Q -- limited to the Southeast?
Okay. I take it you grew up fishing?
A Yes.
Q Okay. Did you ever win any of these tournaments?
A No.
Q Come close?
A Sometimes.

Page 12

A Not right away.
Q Eventually?
A Yes.
Q Now, you said you still own the vessel. Does Bank of America still have the mortgage on it?
A Yes.
Q Are you still making payments on it?
A Yes.
Q And are you still making those payments yourself?
A My mother is helping.
Q What about Ron Gay? Is he helping at all?
A No.
Q Okay. Is he still on the mortgage?
A Yes.
Q It hasn't been refinanced or anything?
A Correct.
Q Okay. Now, if you were to fail to make payments, do you know what would happen?
A No.
Q In other words, if you stopped paying on the -- on the mortgage, would Bank of America look to you for payment?
A I would assume so. My name's on the mortgage.
Q And to Mr. Gay. Is that accurate?

A Sure.
Q Okay. How are you employed now?
A Walt Disney World.
Q What do you do there?
A Operations guest service manager.
Q How long have you been employed there?
A Since 2005.
Q And you said your mother's helping you with payments. Describe how she's helping you.
A Re -- rephrase.
Q Does she pay the mortgage payment for you? Does she give you money to help cover the payment?
A Both.
Q Okay. And then if she gives you money, you send a check to Bank of America?
A Most of the time she will just go to the nearest Bank of America branch, since I live three hours from her --
Q Okay.
A -- so...
Q Did you go to college?
A Yes.
Q Where did you go?
A Georgia College & State University.
Q Georgia College & State University?

A Yes.
Q Where is that?
A Milledgeville, Georgia.
Q When did you graduate?
A 2008.
Q Did you go to work with Walt Disney World after that?
A Full time after that, yes.
Q Okay. Had you been with them part time before?
A I had been an intern as well as -- I had been an intern as well as part time.
Q I take it you no longer own your business?
A Correct.
Q Did you sell the business?
A I dissolved it.
Q Okay. Did you have any partners in the business?
A No.
Q When you dissolved the business, did you have any assets?
A Rephrase.
Q Did the business have any assets?
A No.
Q Okay. Liabilities?
A Not that I remember.

Q What is, if you remember -- and if you don't, you can -- you can feel free to try to read this document. What is the -- the term of the loan?
A I don't remember.
Q Do you know -- how much longer are you going to have to make payments on the vessel?
A I believe it was originally something like 30 years.
Q Where is the vessel now?
A In Steinhatchee, Florida.
Q Where?
A At Mr. Albert Hulen's house -- or property.
Q Okay. And is it just sitting there?
A Yes.
Q Is it in use at all?
A No.
Q Is it in the water?
A No.
Q Okay. Is it on a trailer?
A Yes.
Q As I understand it, there was -- this vessel took on water and sank on January 19, 2008. Are you familiar with that incident?
A Yes.
Q Okay. Has this vessel, to your knowledge, been

we take it off the trailer, we make sure that it's -- all of the engines start.

Q Who would do that, you or your father --

A Either one of us.

Q -- or both?

A Both.

Q Okay. Are you at all familiar with the -- the loss that occurred in this case?

A A little bit.

Q How did you learn about it? From your father?

A Yes. My father called.

Q What has he told you about what happened?

A Rephrase the question.

Q What do you know about the incident? Why did the boat sink?

A He called me the night that it happened, and basically said that he had been fishing that day and had come back to the dock. And they were upstairs in their house when a neighbor came over and said that -- or basically screamed that -- that they noticed the boat was sinking, so -- and it was raining and it was really windy he said.

Q Did your father mention anything about having trouble with the boat while it was out on the water?

A No.

Q Did he say anything to you about calling Towboat US to escort the boat in?

A No.

Q Have you talked to your father about that since the first time he called you?

A Yes.

Q Okay. What did he tell you about that?

A That just as if we would have had problems if I would have been there, we'd call for safety reasons. So he said he had called on the way in Towboat US to just come and escort them in, because he had an engine down.

Q Okay. So at some point since the incident he's told you about some kind of trouble out on the water that caused him to call Towboat US?

A Yes.

Q Exactly what did he tell you happened?

A He lost an engine on the way home.

Q Anything else?

A No.

Q Has he ever told you anything about the boat taking on water?

A No.

Q Has he ever told you about guests who were on the boat?

A No.

Q Do you know who was with him that day?

A He said he was just with friends and our neighbor.

Q Did he mention anything to you about some of the passengers on the boat having to bail water --

A No.

Q -- at any point?

A No.

Q He's never said anything to you about the boat taking on water while it was away from the dock?

A No.

Q Okay. Has your father said anything to you about the condition of the bilge pumps on that day?

A No.

Q Do you know if the bilge pumps were working on that day?

A I'm sure if he went through the checks in the morning, he wouldn't have gone if something wouldn't have been working.

Q Has your dad ever told you that one of the bilge pumps was missing on the day of the incident?

A No.

Q Do you have any knowledge of that?

A No.

Q Whenever you would take the boat out, would you

check the bilge pumps?

A I checked to see if they're working.

Q How did you go about doing that?

A There's switches on the console, and you can turn those on and they light up. And you can also hear them running in the bottom of the boat.

Q Okay. Have you ever seen your father check the bilge pumps?

A Yes.

Q Okay. In your experience with this boat, did water ever collect in the bilge area?

A There's always a little bit of water in any boat that I've ever been on or owned in -- in the bottom.

Q When you say "a little bit," how much do you mean?

A 2 inches.

Q Okay. And that -- that amount of water wouldn't be removed by a bilge pump?

A Correct. It's whatever is below the intake of the bilge pump.

Q Now, I understand this vessel was insured when you first bought it. Right?

A Correct.

Q Where did you get insurance?

A Ski-Safe.

A Not that I remember.
Q Have you ever talked to Albert Hulen about the sinking of the boat?
A Yes.
Q What did he tell you about what happened?
A He said he went fishing that day with them. And he said when they got in, that there was a bad storm. And then he was -- when I came the next day, he was there.
Q After they got in, there was a bad storm?
A Yes.
Q How was the weather before the -- before they got in --
A He didn't say.
Q -- if you know?
Has your father ever said anything to you about that?
A Yes.
Q What did he say?
A It was just -- he said it was a normal day, which I assume means pretty good seas; 2 to 3 feet, 1 to 2 feet, light breeze, acceptable to go fishing.
Q Did your father say there was anything wrong with the vessel other than the one engine not starting?
A No.

Q Did he tell you what he did when he got back?
A He said that he cleaned the fish that they had caught. And he said he was downstairs talking to Mr. Albert; and I don't know anybody -- who else was there, but it seemed like a group of people that he was just talking to, and then they went upstairs to make dinner.
Q Was he having any trouble with the boat -- the boat at that point?
A No.
Q Did he ever get that engine started --
A I don't know.
Q -- as far as you know?
Do you know if he even tried?
A No.
Q We also received some -- some documents from A Boaters Paradise; and I was going to ask you about some of those, but it doesn't really sound like I need to.
They were not involved in the actual sale of the vessel?
A Not from what I remember.
Q Let me show you one document we got from them. And actually, I think it's the same document we looked at before, but it's a bigger, better copy. And this one doesn't have your signature on it.

What number are we on? 5, I believe?
A 5.
(Exhibit Number 5 marked for identification.)
MR. BRADFORD: Okay. We'll make this Exhibit Number 5 to your deposition.
David, you want to see it?
BY MR. BRADFORD:
Q Do you recognize that document?
A Yes.
Q Okay. Hand that back to me.
There is a purchase price listed that would have been 213-; and then there's a reference to a "Level 2 fish team discount," and then finally we have a cash sale price of 180,174 -- $180,174.
Is that approximately what you paid for the vessel you ultimately purchased?
A Yes. I remember it being a little less than that, but...
Q I'm going to show you what I'll mark Exhibit 6 to your deposition.
(Exhibit Number 6 marked for identification.)
BY MR. BRADFORD:
Q This is another document from Bank of America. Take a look at that, please. Can you tell me what that is?

A It's basically saying make sure that you can pay for what you're about to mortgage.
Q Okay. At the top it says "Notice to Co-Signer." Right?
A Yes.
Q And it says, "You are" -- the first sentence says, "You are being asked to guarantee this debt." Right?
A (Witness nods head.)
Q Okay. You understood at the time you purchased this vessel that you were guaranteeing the debt?
A Absolutely.
Q And as I understand it, Mr. Gay was too. Right?
A Yes.
Q Did anyone else guarantee the debt on this boat?
A No.
Q I'm showing --
A Can we go back to this one?
Q Sure.
A It's --
Q Which one?
A This Exhibit 5.
Q Okay.
A This wouldn't be the boat that we had based on the equipment and accessories that are listed.

(Recess taken from 1:53 p.m. to 1:54 p.m.)

THE VIDEOGRAPHER: On record. The approximate time is 1:53 p.m.

BY MR. BRADFORD:

Q Okay. You said it's been at least more than a year since your father helped you make a payment on the vessel --

A Yes.

Q -- right?

Do you know how much total your father has -- has either given to you or loaned to you --

A No.

Q -- to help pay for this vessel?

A No.

Q Do you have any idea?

A I don't.

Q Okay. You said earlier that you over time would pay your dad back. Do you owe him any money at this point --

A I'm sure I do.

Q -- in connection with this vessel?

A Yes.

Q How much?

A If I had to guess, I'd probably say a couple thousand dollars.

Page 41

Q This vessel is sitting on the property of Albert Hulen?

A Yes.

Q Are you paying him anything --

A No.

Q -- to --

Okay. Are you employed in any fashion other than with Walt Disney World?

A No.

Q Are you an officer with any kind of corporation?

A No.

Q Have you ever been, besides your business?

A Oh, no.

Q When you first started your business, the -- the print business --

A Yes.

Q -- making the checks, how did you -- how did you fund the start-up?

A With my own money from -- I had had a job before that, and I had saved up a little bit of money. And I had -- I think it was something like $2,000 to use for marketing purposes. And then I used friends and family to ask about who -- who they knew that might own businesses that used checks and things like that.

MR. BRADFORD: Okay. That's all I have.

Page 42

Thank you very much.

THE WITNESS: Thank you.

MR. POPE: Okay. You have the right to read -- I have no questions. You have the right to read to -- if there's a transcript to check it for read and sign; but we know the court reporter, and we recommend you waive that.

THE WITNESS: That's fine.

MR. POPE: Great. Thank you.

MR. BRADFORD: Thank you.

THE VIDEOGRAPHER: This deposition concludes. The approximate time is 1:56 p.m.

THE COURT REPORTER: Do you want this typed up?

MR. BRADFORD: Yes, please.

THE COURT REPORTER: What do you like?

MR. BRADFORD: Hard copy. Can you e-mail it?

MR. POPE: And for me a copy, but do you do the condensed copy? That's what I like.

MR. BRADFORD: I'll take a condensed.

(Deposition concluded at 1:56 p.m.)

Page 43

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that ELIZABETH ANN HENLEY personally appeared before me and was duly sworn.

WITNESS my hand and official seal this date: September 30, 2009.

BEVERLY REPLOGLE
Notary Public
State of Florida
My Commission Expires 2/25/12
Commission No. DD 743178

Page 44

Document Type: MORTGAGE
Batch Number: 249713
Document ID: 2247978
User ID: SCANNER5
Filed Date/Time: 03-JUN-2004 10:40 AM

Bank of America, N.A. [illegible]

Vessel QUEEN OF KINGS [illegible] of the [illegible] this Mortgage, [illegible] interest, expenses and fees, is $ 144,994.75

1. Parties (Mortgagor(s)):

Name [illegible] GAY

Address [illegible], GA [illegible]

Name [illegible]

Address [illegible]

[illegible]

Mortgagee, Bank of America, N.A. PO Box [illegible], [illegible]

[illegible]

All freights, charter hire, [illegible] [illegible]

3. Identification of Vessel; Statement of Use

Name QUEEN OF KINGS.

USCG Official Number

Vessel (Hull) I.D. Number FG0AX054H304

Home Port [illegible]

State Registration Number

State where Vessel is to be principally used [illegible]

Summer Mooring (address) ST. SIMONS ISLAND GA

Winter Mooring (address) SAME

Net Tons Gross Tons (Hull Material) [illegible]

Manufactured by [illegible]

Model/Year [illegible] 2004

L.O.A. 34'

Engines Gas Diesel

Year 2004 Horse Power

Manufacturer [illegible]

Serial Number [illegible]

Optional Equipment Includes [illegible] MERCURY ENGINE SERIAL NUMBER [illegible]

How Will You Use the Vessel
(Initial appropriate box(es) below)

Pleasure Use Only

Principal Dwelling

Bareboat Charter

Commercial (and you represent that all appropriate U.S. Coast Guard licenses and inspections have been obtained and will be maintained in force)

2. Mortgage Obligations: This Mortgage secures your obligations [illegible] under a Marine Loan Agreement, dated MAY 21, 2004 [illegible]

[illegible]

4. Multiple Mortgagors: [illegible]

5. Other Owners: [illegible]

6. Mortgage Conveyance: [illegible]

7. Governing Law: [illegible]

8. Citizenship: [illegible]

9. Federal Documentation and Continued Ownership: [illegible]

10. Good Standing of Corporate Mortgagor: [illegible]

11. Partnership or Trust as Mortgagor: [illegible]

12. Liens: [illegible]

13. Title Warranty: [illegible]

14. Risk of Loss; Insurance: [illegible]

[illegible]
COPYRIGHT [illegible]
LICENSE TO BANK OF AMERICA, N.A.
REVISED [illegible]

NATIONAL VESSEL DOCUMENTATION CENTER
U. S. COAST GUARD

I HEREBY CERTIFY THIS TO BE A TRUE COPY OF THE RECORDS OF THIS OFFICE.

DOCUMENTING OFFICER

DATE

EXHIBIT
E. Henley
#1

Document Type: MORTGAGE
Batch Number: 249713
Document ID: 2247978
User ID: SCANNER5
Filed Date/Time: 03-JUN-2004 10:40 AM

Axis v. Henley 0007
Bank of America

Document Type: MORTGAGE
Batch Number: 249713
Document ID: 2247978
User ID: SCANNER5
Filed Date/Time: 03-JUN-2004 10:40 AM

Mortgagor: X [signature] (Seal)
RONALD GAY

Witness: ______ (Seal)

Mortgagor: [signature] (Seal)
ELIZABETH A. HENLEY

Witness: ______ (Seal)

Mortgagor: ______ (Seal)

Witness: ______ (Seal)

By: ______
Attorney-in-Fact for the Mortgagor(s)

Mortgagor: ______ (Seal)

Name:

Title: ______
(Corporate Seal)

Attest: ______ (Seal)

Name:

Title:

Acknowledgment (Individual)

State of Georgia
County of Glynn

I hereby certify that on this 21st day of MAY 2004, before me, a Notary Public, personally appeared RONALD GAY

[signature] Mara A. McMenamin
Notary Public
Notary Public, Glynn County, Georgia
My Commission Expires Aug. 11, 2007.

Acknowledgment (Individual)

State of Georgia
County of Glynn

I hereby certify that on this 21st day of MAY 2004, before me, a Notary Public, personally appeared ELIZABETH A. HENLEY

[signature] Mara A. McMenamin
Notary Public
Notary Public, Glynn County, Georgia
My Commission Expires Aug. 11, 2007.

Axis v. Henley 0008
Bank of America

# SEA-SAFE YACHT POLICY

Named Insured & Mailing Address:

Ronald Gay
Elizabeth Henley
235 Windridge Drive
Brunswick, GA 31520

Policy Term:
Effective: **May 25, 2004** to **May 25, 2005**
(12:01 A.M. standard time at address of named insured)
Policy # **S13706502**

Administrator: Tel: 800-225-6560
Sullivan & Strauss Agency, Inc.
One Hollow Lane
Lake Success, NY 11042
Producer Code: 331813 6289

Producer: 06269
Veritas Insurance Group Inc
742 Second Avenue South
St Petersburg, FL 33701-0000

Company Providing this Insurance: Ace American Insurance Company.
We will provide the insurance described in this policy in return for the premium and compliance with all applicable policy provisions. Coverage is provided where an Amount of Insurance is shown for the coverage of this policy of which this Declarations Page is a part.

| PART | COVERAGE | AMOUNT OF INS. | DEDUCTIBLE |
|---|---|---|---|
| A. PROPERTY DAMAGE | 2004 34' Fountain Powerboats Sportfish | $175,174 | $5,255 |
| | Deductible for losses caused by theft * | | $15,766 |
| | Deductible for losses caused by windstorm * | | $43,794 ** |
| | Hull ID: FGQ4K054H304 | | |
| | PART G. | | |
| | TRAILER | $5,000 | $250 |
| B. | LIABILITY COVERAGE | $100,000 | NONE |
| C. | MEDICAL PAYMENTS | $5,000 | NONE |
| D. | UNINSURED BOATERS LIABILITY | $25,000 | NONE |
| E. | LONGSHOREMAN/HARBORWORKER COMP | Statutory | NONE |
| | **FULL TERM PREMIUM:** | *** $1,466 *** | |

*** Deductible is not waived in a total loss.**
**This policy is subject to a lay-up period of: November 01 to March 01**
**Navigational Limits:** Inland and Coastwise Waters of the United States and Canada.

**Attachments:**

****Sea-Safe Windstorm Deductible SSW-101Y**
Countersigned at Lake Success, New York 24 May, 2004

Minimum Earned Premium: $ 250

______________________________, Agent.

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-1340 (REV. 9-82) | BILL OF SALE | THIS SECTION FOR COAST GUARD USE ONLY |
|---|---|---|

1. VESSEL NAME

2. OFFICIAL NUMBER OR HULL ID NUMBER
FGQ4X054H304

3. NAME(S) AND ADDRESS(ES) OF SELLERS:

PIER 57/INTERCOASTAL MARINE, INC.
7891 NORTH TAMIAMI TRAIL
SARASOTA, FL 34243

3A. TOTAL INTEREST OWNED (IF LESS THAN 100%) ______ %

RECORDED:
BOOK: PAGE:
PORT (IF NOT FILING PORT)
DOCUMENTATION OFFICER

4. NAME(S) AND ADDRESS(ES) OF BUYER(S) AND INTEREST TRANSFERRED TO EACH:

RONALD GAY AND ELIZABETH A. HENLEY
777 GLOUCESTER STREET #405
BRUNSWICK, GA 31520

4A. TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED) ______ %

4B. MANNER OF OWNERSHIP. UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.

[X] JOINT TENANCY WITH RIGHT OF SURVIVORSHIP [ ] TENANCY BY THE ENTIRETIES [ ] COMMUNITY PROPERTY
[ ] OTHER (DESCRIBE)

5. CONSIDERATION RECEIVED:

(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)

6. I (WE) DO HEREBY SELL TO THE BUYER(S) NAMED ABOVE, THE RIGHT, TITLE AND INTEREST IDENTIFIED IN BLOCK 4 OF THIS BILL OF SALE, IN THE PROPORTION SPECIFIED HEREIN.

VESSEL IS SOLD FREE AND CLEAR OF ALL LIENS, MORTGAGES, AND OTHER ENCUMBRANCES OF ANY KIND AND NATURE, EXCEPT AS STATED ON THE REVERSE HEREOF. VESSEL IS SOLD TOGETHER WITH AN EQUAL INTEREST IN THE MASTS, BOWSPRIT, SAILS, BOATS, ANCHORS, CABLES, TACKLE, FURNITURE, AND ALL OTHER NECESSARIES THERETO APPERTAINING AND BELONGING, EXCEPT AS STATED ON THE REVERSE HEREOF.

7. SIGNATURES OF SELLER(S) OR PERSON(S) SIGNING ON BEHALF OF SELLER(S).
[signature]

8. DATE SIGNED
05-25-04

9. NAME(S) OF PERSON(S) SIGNING ABOVE, AND LEGAL CAPACITY IN WHICH SIGNED (E.G., OWNER, AGENT, TRUSTEE, EXECUTOR)

David Woods, Chief Manager

10. ACKNOWLEDGMENT (TO BE COMPLETED BY NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED BY A LAW OF A STATE OR THE UNITED STATES TO TAKE OATHS.)

ON 05-25-04 (DATE), THE PERSON(S) NAMED IN SECTION 9 ABOVE ACKNOWLEDGED EXECUTION OF THE FOREGOING INSTRUMENT IN THEIR STATED CAPACITY(IES) FOR THE PURPOSE THEREIN CONTAINED.

STATE: TN
COUNTY: Hardin
NOTARY PUBLIC [signature]
MY COMMISSION EXPIRES 09-23-06

PREVIOUS EDITION OBSOLETE
1020

SN 7530-00-F01

**A Boaters Paradise**
3405 East Victory Drive, Thunderbolt, GA 31404
912-354-7769

*Customer Satisfaction Is Our #1 Goal!*

Lynn Jackson — Ordered

| | | | | |
|---|---|---|---|---|
| SOLD TO: | Elizabeth Henley | PHONE: 478-457-4337 | DATE: | 26-Mar-04 |
| ADDRESS: | 777 Gloucester Street, Suite 405, Brunswick, GA 31520 | | REP: | Mark |
| COUNTY OF: | | | | |

SUBJECT TO THE TERMS AND CONDITIONS ON BOTH SIDES OF THIS AGREEMENT,
SELLER AGREES TO SELL AND PURCHASER AGREES TO PURCHASE THE FOLLOWING DESCRIBED PROPERTY:

| | MFG | YEAR | MODEL/SIZE | SERIAL NO# | | | |
|---|---|---|---|---|---|---|---|
| BOAT | Fountain | 2004 | 34' Cen. Console | | XX NEW | USED | $ 207,231.00 |
| PORT MOTOR | Mercury | 2004 | 225 Optimax | | XX NEW | USED | |
| CENTER MOTOR | Mercury | 2004 | 225 Optimax | | XX NEW | USED | |
| STARB MOTOR | Mercury | 2004 | 225 Optimax | | XX NEW | USED | |
| TRAILER MFG | Loadmaster | 2004 | 34' | | XX NEW | USED | $ 6,700.00 |

| OPTIONAL EQUIPMENT & ACCESSORIES | | NET |
|---|---|---|
| Enclosure, T-Top- Front & Side Curtians | $ | 1,034.00 |
| Fans, Oscillating in head | | |
| Fresh Water Flush | $ | 700.00 |
| Fresh Water Washdown | $ | 1,111.00 |
| Ladder Swim, Bracket Mount | $ | 617.00 |
| Life jacket Storage in T-top | $ | 581.00 |
| Additional Halogen Light, front mounted | $ | 494.00 |
| Rod Holders, Additional 2 in transom | $ | 365.00 |
| Stand Base System | $ | 1,163.00 |
| Red Canvas Color | | |
| 420 Gallon Fuel Tank | $ | 2,384.00 |
| Outriggers, TG Radial | $ | 1,672.00 |
| Plexiglass White | | |
| Black Steering Wheel | | |
| T-Top/Rails/Seat Frame/Rod Holders Chrome - Rod Holders Black | | |
| Electronics Package, including CA44 Radar | $ | 6,638.89 |
| Installation Labor (Sub Contract) | $ | 3,500.00 |

| | | |
|---|---|---|
| TOTAL PURCHASE ABOVE | | $ 212,931.00 |
| OPTIONAL EQUIP (BELOW) | | $ 21,246.89 |
| SPECIAL CREDITS | Level 2 Fish Team | $ 65,201.70 |
| | SUB TOTAL | $ 169,976.19 |
| SALES TAX | 6.00% | $ 10,198.57 |
| DEALER PREP | | $ - |
| DOC FEES | | $ - |
| LABOR/INSTALL/WARRANTIES | | $ |
| FREIGHT | | |
| | CASH SALE PRICE | $ 180,174.76 |

OK
EH.

| TRADE IN ALLOWANCES | |
|---|---|
| BOAT(S) | |
| MOTOR | |
| TRAILER | |
| TOTAL TRADE IN | $ - |
| LESS BALANCE DUE | |
| NET ALLOWANCE | $ - |
| CASH DOWN PMT | $ 16,000.00 |
| OTHER CREDIT | |
| TOTAL CREDITS | $ 16,000.00 |

SALES TAX NOT INCL. ABOVE

OPTIONAL EQUIPMENT CARRIED FWD $ - $ 21,246.89

UNPAID BALANCE OF CASH SALE PRICE $ 164,174.76

_____ WHEN THIS IS BOX IS CHECKED, THE UNIT WHICH IS THE SUBJECT OF THIS CONTRACT IS BEING SOLD ON AN "AS IS" BASIS. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THIS UNIT IS WITH THE PURCHASER.

Title to the above described property shall be transferred to the buyer when buyer has made payment in full for the equipment.

TRADE IN YEAR SIZE S/N#

BALANCE DUE TO:

The parties to this Agreement are aware that the trade-in allowance or purchase price shown above may require adjustment pursuant to the provisions of paragraphs 5,6,7, and 11 of the Terms and Conditions on the reverse side of this document.

Buyer certifies that he/she has read the Terms and Conditions on the back of this document and agrees that they shall be incorporated as part of this Agreement.

Buyer certifies the following: 1) he/she is of legal age to enter into this agreement; 2) the above described equipment and insurance (if applicable) have been purchased voluntarily; 3) the trade-in is free from all liens and encumbrances other than those listed herein.

Buyer agrees that all provisions to this agreement (including the Terms and Conditions on the reverse side hereof) are severable. If any provision is held to be invalid, it shall not affect the other provisions, which shall be given full force and effect.

DEALER ☐ CUSTOMER ☐ TO PAY OFF TRADE IN

I, OR WE, HEREBY ACKNOWLEDGE RECEIPT OF A COPY OF THIS ORDER AND THAT I, OR WE, HAVE READ THE BACK OF THIS AGREEMENT.

Not Valid Unless Signed and Accepted by an Officer of the Company
DEALER: A Boaters Paradise

PURCHASER

PURCHASER

From: 478 604 4143 Page: 2/2 Date: 5/4/2004 1:06:04 PM

**A Boaters Paradise**
3005 East Victory Drive, Thunderbolt, GA 31404
912-354-7759

*Customer Satisfaction Is Our #1 Goal !*

SOLD TO: *Elizabeth Henley* PHONE: *478-457-4337* DATE: *28-Mar-04*
ADDRESS: *777 Gloucester Street, Suite 408, Brunswick, GA 31520* REP: *Martin*
COUNTY OF:

SUBJECT TO THE TERMS AND CONDITIONS ON BOTH SIDES OF THIS AGREEMENT.
SELLER AGREES TO SELL AND PURCHASER AGREES TO PURCHASE THE FOLLOWING DESCRIBED PROPERTY:

| | MFG | YEAR | MODEL/SIZE | SERIAL NO# | NEW | USED | |
|---|---|---|---|---|---|---|---|
| BOAT | Fountain | 2004 | 34' Cen. Console | | XX NEW | USED | $ 207,231.00 |
| PORT MOTOR | Mercury | 2004 | 225 Optimax | | XX NEW | USED | |
| CENTER MOTOR | Mercury | 2004 | 225 Optimax | | XX NEW | USED | |
| STARB MOTOR | Mercury | 2004 | 225 Optimax | | XX NEW | USED | |
| TRAILER MFG | Loadmaster | 2004 | 34' | | XX NEW | USED | $ 6,700.00 |

| OPTIONAL EQUIPMENT & ACCESSORIES | NET |
|---|---|
| Enclosure, T-Top- Front & Side Curtians | $ 1,034.00 |
| Fans, Oscillating in head | |
| Fresh Water Flush | $ 700.00 |
| Fresh Water Washdown | $ 1,111.00 |
| Ladder Swim, Bracket Mount | $ 617.00 |
| Life jacket Storage in T-top | $ 591.00 |
| Additional Halogen Light, front mounted | $ 494.00 |
| Rod Holders, Additional 2 in transom | $ 395.00 |
| Stereo Base System | $ 1,162.00 |
| Red Canvas Color | |
| 420 Gallon Fuel Tank | $ 2,386.00 |
| Outriggers, TG Radial | $ 1,626.00 |
| Plexiglass-White | |
| Black Steering Wheel | |
| T-Top/Rails/Seat Frame/Rod Holders Chrome - Rod Holders Black | |
| Electronics Package, Including CA44 Radar | $ 8,638.89 |
| Installation Labor (Sub Contract) | $ 2,600.00 |

| | | |
|---|---|---|
| TOTAL PURCHASE ABOVE | | $ 213,931.00 |
| OPTIONAL EQUIP (BELOW) | | $ 21,246.89 |
| SPECIAL CREDITS | Level 2 Fish Team | $ 65,201.70 |
| | SUB TOTAL | $ 169,976.19 |
| SALES TAX | 6.00% | $ 10,198.57 |
| DEALER PREP | | $ - |
| DOC FEES | | $ - |
| LABOR/INSTALL/WARRANTIES | | $ - |
| FREIGHT | | |
| | CASH SALE PRICE | $ 180,174.76 |

| TRADE IN ALLOWANCES | |
|---|---|
| BOAT(S) | |
| MOTOR | |
| TRAILER | |
| TOTAL TRADE IN | $ - |
| LESS BALANCE DUE | |
| NET ALLOWANCE | $ - |
| CASH DOWN PMT | $ 16,000.00 |
| OTHER CREDIT | |
| TOTAL CREDITS | $ 16,000.00 |

SALES TAX NOT INCL. ABOVE

OPTIONAL EQUIPMENT CARRIED FWD $ - $ 21,246.89

UNPAID BALANCE OF CASH SALE PRICE $ 164,174.76

____ WHEN THIS IS BOX IS CHECKED, THE UNIT WHICH IS THE SUBJECT OF THIS CONTRACT IS BEING SOLD ON AN "AS IS" BASIS. THE ENTIRE RISK AS TO THE QUALITY AND PERFORMANCE OF THIS UNIT IS WITH THE PURCHASER.

Title to the above described property shall be transferred to the buyer when buyer has made payment in full for the equipment.

TRADE IN YEAR SIZE SN#

BALANCE DUE TO:

The parties to this Agreement are aware that the trade-in allowance or purchase price shown above may require adjustment pursuant to the provisions of paragraphs 5,6,7, and 11 of the Terms and Conditions on the reverse side of this document.

Buyer certifies that he/she has read the Terms and Conditions on the back of this document and agrees that they shall be incorporated as part of this Agreement.

Buyer certifies the following: 1) he/she is of legal age to enter into this agreement; 2) the above described equipment and insurance (if applicable) have been purchased voluntarily; 3) the trade-in is free from all liens and encumbrances other than those listed herein.

Buyer agrees that all provisions to this agreement (including the Terms and Conditions on the reverse side hereof) are severable. If any provision is held to be invalid, it shall not affect the other provisions, which shall be given full force and effect.

DEALER ☐ CUSTOMER ☐ TO PAY OFF TRADE IN

I, OR WE, HEREBY ACKNOWLEDGE RECEIPT OF A COPY OF THIS ORDER AND THAT I, OR WE, HAVE READ THE BACK OF THIS AGREEMENT.

Not Valid Unless Signed and Accepted by an Officer of
DEALER: A Boaters Paradi

EXHIBIT
E. Henley
#5

PURCHASER PURCHASER

## NOTICE TO CO-SIGNER

You are being asked to guarantee this debt. Think carefully before you do. If the buyer/borrower doesn't pay the debt, you will have to. Be sure you can afford to pay this debt if you have to, and that you want to accept this responsibility.

You may have to pay the full amount of the debt, if the buyer/borrower doe not pay. You may also have to pay late fees or collection costs, which increases the loan debt amount.

The creditor can collect this debt from you without first trying to collect from the buyer/borrower. The creditor can use the same collection methods against you that can be used against the buyer/borrower, such as suing you, garnishing your wages, etc. If this debt is ever in default, that fact may become a part of your credit record.

This notice is not the contract that makes you liable for the debt.

When you sign below, you acknowledge that on this date you received a copy of this notice.

Elizabeth A. Henley | 05/21/04
---|---
**Co – Signer Signature** | **Date**

EXHIBIT
E. Henley
#6

Bank of America, N.A.

# Marine Loan Agreement

Borrower(s): RONALD GAY
ELIZABETH A HENLEY
Address: 235 WINDRIDGE DRIVE
City: BRUNSWICK State: GA. Zip: 31520

LENDER: Bank of America, N.A.
1355 Windward Concourse, Alpharetta, GA 30005

Date of Agreement: MAY 21 2004

1. **Parties/Vessel.** In this Agreement, the words you, your and yours mean each and all who sign this Agreement. The words we, us and our refer to the Bank. By signing this Agreement, you, individually and together, agree to all of its terms. The boat described below is referred to as the Vessel. This Marine Loan Agreement is referred to as the Agreement.
2. **Payment.**
   (A) **Promise to Pay.** You promise to pay Bank of America, N.A., at the address shown above, the principal sum of $ 144994.76 plus interest and other charges and fees.
   (B) **Monthly Payments.** You agree to make regular monthly payments in accordance with the Payment Schedule. Your final payment also may change if you consistently make payments either before or after their scheduled due dates.
   (C) **Application of Payments.** Each payment you make will be credited and applied in the following order: first to earned interest, next to that portion of unpaid principal balance then due, next to any late charges or other charges due, and last to any remaining unpaid principal balance.
   (D) **Prepayment.** You may prepay all or any part of the unpaid principal balance without paying any penalty. If you prepay, we will not refund to you any portion of the prepaid finance charge.
   (E) **Late Payments.** If we have not received the full amount of any payment by the end of 15 calendar days after it is due, then you may be required to pay a late charge equal to 4% of the unpaid portion of the payment.
3. **Interest**
   (A) **Interest Rate.** This is a fixed rate agreement. Your interest rate is an annual rate of simple interest of 5.63 %.
   (B) **Interest Charges.** Simple interest will be computed on a daily basis of 1/365th (1/366th in a leap year) beginning on the date of this loan and continuing until the full amount of the principal has been paid. This means that the amount of interest you pay will be less if you make your payments early and more if you pay late.
4. **Security.** As security for your payment of all that is owed under this Agreement, you grant to us a security interest under the Uniform Commercial Code in the Vessel described below. The word "Vessel" when used herein refers to the whole of the Vessel named and described herein and further described in her last marine document, if any, including substitutions or replacements of the Vessel, together with all engines, machinery, sails, riggings, auxiliary boats, anchors, chains, tackle, apparel, furniture, fittings, fixtures, tools, pumps, radar and other electronic equipment and all fishing equipment and other attachments, accessories, supplies of all kinds, now used in or on the Vessel or which may be used in or on the Vessel, in the future, whether or not removed from the Vessel. If however, the Borrower is not a corporation and the Vessel is purchased primarily for your non-business use, we will have no security in any of those items acquired by you more than 10 days after the date of this Agreement unless they are installed in or affixed to the Vessel. You also give to us a security interest in all freights, charter hire, earnings, income, revenue, profits and proceeds of sale or lease of the Vessel by governmental authority, if any, insurance claim payments and returned or unearned premiums, whether in the form of cash or other property, derived from the Vessel. If the Vessel is to be kept in any state without a boat title law, you also agree to apply for an appropriate certificate of title showing our security interest. You will sign financing statements showing our security interest in the Vessel which we can file from time to time in any filing office we may think appropriate. We may also file a photocopy of such financing statement. We can file financial statements without your signature in any state where permitted by law.

**Annual Percentage Rate**
The total cost of your credit as a yearly rate. 5.63 %

**Finance Charge**
The dollar amount the credit will cost you $ 96944.44 *

Amount Financed
The amount of credit provided to you or on your behalf. $ 144994.76

Total of Payments - The amount you have paid after you have made all payments as scheduled. $ 241939.20 *

Your Payment Schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due |
|---|---|---|
| | | Monthly beginning |
| 240 | 1008.08 | 06/20/04 |
| | | |
| | | |

Security: You are giving a security interest in:
[X] The goods or property being purchased: NEW 04 FOUNTAIN 34CC FGD4K054H304
NEW 04 LOADMASTER 4YPAB3335AT036390
[ ] Other personal property: ____

Filing Fees: $ 25.00

Prepayment: If you pay off early, you will not have to pay a penalty.

Late Charge: If a payment is more than 15 days late, you may be charged a fee equal to 4% of the unpaid portion of the payment.

Property Insurance: You may obtain required property insurance from any insurance company licensed to provide the required coverage and acceptable to us.

See your contract documents for additional information about non-payment, default, any required repayment in full before the schedule date and security for this debt.

(*) means an estimate. The amounts shown as the Finance Charge and the Total of Payments above are estimates. These amounts have been computed on the assumption that all payments will be received on the scheduled due dates. Early payments will decrease these amounts, but late payments will increase them. The amount of any decrease or increase will be reflected in the amount of the final payment.

Year 2004 Manufacturer FOUNTAIN Model 34CC Hull Serial # FGD4K054H304
New [X] Used [ ] Hull Material: [ ] Fiberglass [ ] Wood [ ] Metal ____ LOA ____ Beam ____
Gross Tons ____ Engines [X] Gas Year 2004 Manufacturer MERCURY H.P. 225
Net Tons ____ [ ] Diesel Engine Serial # P- 0T832788 S- 0T833176
Optional Equipment Included ____ C- 0T848171
Name of Boat QUEEN OF KINGS State or Coast Guard No GEORGIA
Home Port or Anchorage ST. SIMONS ISLAND Winter Storage ____

**Itemization of Amount Financed**

1. Amount given to you directly ........ $ N/A
2. Amounts credited to your loans with us
   (a) ____ $ N/A
   (b) ____ $ N/A
   Total amounts credited to your loans with us (a + b) .. $ N/A
3. Premiums paid to Insurance Companies*
   (a) Life Insurance $ N/A
   (b) Disability Insurance $ N/A
   (c) Other ____ $ N/A
   Total Insurance premiums (a + b + c) ........ $ N/A
4. Fees paid to public officials*
   (a) Title fee $ N/A
   (b) Filing fee $ 25.00
   (c) Other ____ $ N/A
   (d) Other ____ $ N/A
   (e) Other ____ $ N/A
   Total fees (a + b + c + d + e) ........ $ 25.00
5. Additional amounts paid to others*
   (a) To Priority One Financial $ 144969.76
   (b) To ____ $ N/A
   (c) To ____ $ N/A
   (d) To ____ $ N/A
   (e) To ____ $ N/A
   (f) To ____ $ N/A
   (g) To ____ $ N/A
   Total additional amounts (a+b+c+d+e+f+g) ..... $ 144969.76
6. Prepaid Finance Charge
   (a) Documentation Service Fee $ N/A
   (b) Points or other charges $ N/A
   Total Prepaid Finance Charge ........ $ N/A
7. Amount Financed (1 + 2 + 3 + 4 + 5 - 6) ........ $ 144994.76

*We may retain or receive a portion of these charges.

Credit Insurance: Credit Insurance is not required to obtain credit and will not be provided unless you sign and agree to pay the additional cost. The term of this insurance coverage is for ____ months. You indicate the insurance coverage you want by checking the appropriate box(es) and signing below:

Credit Life Insurance Premium $ N/A
Joint Credit Life Insurance Premium $ N/A
Disability Insurance for Primary Borrower Premium $ N/A

Primary Borrower's Signature ____

Co-Borrower's Signature ____

**The terms on the reverse side are part of this Agreement.**

By signing below you acknowledge that you have read this Agreement, that you agree to its terms, including those on the back of this Agreement, that you authorize the disbursement of the loan proceeds as shown in the Itemization of Amount Financed, and that you have received a completed copy of this Agreement. Sign your full name in ink; do not print.

Borrower's Signature RONALD GAY (Seal)

Co-Borrower's Signature ELIZABETH A HENLEY (Seal)

Borrower: ____
By: ____ (Seal)
(Seal)

If the Borrower is a Corporation, the signature should be attested by the Secretary or Assistant Secretary of the Corporation and the Corporate seal affixed.

Attest: ____ (Seal)
Name: ____ Name: ____
Title: ____ Title: ____
(Corporate Seal)

Other Owner: Other Owners of the Vessel that are not borrowers sign below to grant us a security interest in the Vessel and to agree to the promises on the back of this Agreement and any agreement securing this Agreement concerning use and maintenance of, and insurance on, the Vessel. Other Owners are not liable to make the payments required by this Agreement, but agree that upon default by Borrower, we may repossess and sell the Vessel or exercise any other rights we have concerning the Vessel. The Other Owners are not responsible for any deficiency.

Other Owner's Signature ____ (Seal) Other Owner's Signature ____ (Seal)

**Notice to Cosigner**

You are being asked to guarantee this debt. Think carefully before you do. If the Borrower doesn't pay the debt, you will have to. Be sure you can afford to pay if you have to, and that you want to accept this responsibility.

You may have to pay up to the full amount of the debt if the Borrower does not pay. You may also have to pay late fees or collection costs, which increase this amount.

The bank can collect this debt from you without first trying to collect from the Borrower. The bank can use the same collection methods against you that can be used against the Borrower, such as suing you, garnishing your wages (where permitted by law), etc. If this debt is ever in default, that fact may become a part of your credit record.

This notice is not the contract that makes you liable for the debt.

I acknowledge that I have received and read a copy of the above Notice to Cosigner.

Date 05/21/04 Signature of Cosigner ____

33-06-1762 (11-99) ORIGINAL

EXHIBIT
E. Hanley
#7

Axis v. Henley 0071
Bank of America

**Additional Terms**

5. **Coast Guard Registration.** If we require, the Vessel will be registered with the United States Coast Guard and you must sign and deliver a First Preferred Ship Mortgage (or authorize someone to do so for you under a "Power of Attorney") giving us a lien on the Vessel. We may record a First Preferred Ship Mortgage with the United States Coast Guard.

6. **Costs for Titling and Security Interest.** You agree to pay, and we may charge and collect, all costs, filing fees, and taxes relating to titling the Vessel and perfecting our security interest in the Vessel, including (if required by us) costs of obtaining a certificate of title under applicable law showing a lien or encumbrance in our favor, costs of enrolling the Vessel as a Vessel of the United States and recording a First Preferred Ship Mortgage in our favor and costs of recording any financing statements.

7. **No Prior Liens.** You represent that the Vessel is free from all prior liens, bills, taxes, mortgages or encumbrances of any nature or kind whatsoever except for the security interest provided in this Agreement and the lien of a First Preferred Ship Mortgage filed against the Vessel in our favor.

8. **Care and Maintenance of Vessel.** You agree to keep the Vessel seaworthy and in good condition and repair at all times. You agree to pay when due any lawful repair bills, storage bills, taxes, fines or other charges with respect to the Vessel, its purchase or use. We may, but do not commit to, pay any of those bills if you do not. If we do, you agree to repay us on demand, with interest at the rate provided in this Agreement. You agree that such amount will be secured by the security interest you have granted us.

9. **Location and Use of Vessel.** You will keep the Vessel at the home port, anchorage, or place of winter storage stated herein except for voyages made with the intent of returning. The Vessel may be operated only for pleasure, unless we otherwise agree in writing. The Vessel may be operated only within the geographical limits and other requirements of the marine insurance covering the Vessel. You shall not sell the Vessel, pledge it as security for another loan, give it away, lease it or charter it, or otherwise use it other than as stated in this Agreement and any instrument securing this Agreement without our written permission. We may withhold such permission at our sole discretion. If the Vessel is chartered, with or without our written permission, you agree to and you hereby assign to us all charter hire and all other payments received in consideration for said charter as additional security for this Agreement. You shall not, without our prior written permission, allow maritime liens to attach to the Vessel that are not discharged by you within 30 days. You shall keep all dockage charges current. You shall not use, or allow the use of the Vessel for any illegal purpose or contrary to any provision of the laws, treaties, regulations or orders of the United States or other jurisdictions where the Vessel is operated. If you take the Vessel to another country, you will comply with all pertinent treaties between the United States and such country. The illegal commerce in, or possession, carriage, or use of any firearms or controlled substance whatsoever on or about the Vessel is absolutely prohibited. You shall make reports, in such form and at such times we may reasonably require with regard to the Vessel, including but not limited to the use, operation and location of the Vessel.

10. **Required Insurance.** You agree to maintain in full force and effect "all risk" marine hull and liability (protection and indemnity) insurance on the Vessel, and such other insurance covering such risks and perils, upon such terms and hazards as we may reasonably require (up to the amount you owe under this Agreement). The insurance must be provided by a company acceptable to us. Such insurance must protect us as loss payee (up to the amount you owe under this Agreement) as well as you. The insurance must be written for at least one year at a time. You must pay the premium in advance at the beginning of each policy year and give us a bill from the insurance company or its agent marked "paid." You authorize the insurance company to pay any loss to us. In addition to protecting you the insurance must protect us as a named loss payee and, if we choose, as an additional insured (without liability for payment of premium). The underwriter and maximum deductible on your insurance must be reasonably satisfactory to us. We may sign any proof of loss and endorse any check, draft, or other form of payment issued by the insurance company or its agent as a loss payment and you hereby appoint us as your attorney-in-fact for this purpose. This power of attorney shall not be affected by your disability. We may use the proceeds of the insurance either to repair the Vessel or to reduce the amount you owe in our sole discretion. Such insurance proceeds applied to the amount you owe shall not advance the due date or change the repayment schedule. If such insurance lapses or is cancelled at any time before the amount you owe under this agreement is fully paid we must be given prompt notice of said lapse or cancellation. In the event of lapse or cancellation, or in the event of your failure to pay any premiums when due or otherwise to provide or maintain insurance coverage, we may, but are not obligated to, buy coverage as determined within our sole discretion and you agree to pay the premiums for coverage at our request with interest at the rate provided in this Agreement for at least the term of the Agreement and any other period beyond the term of the Agreement required by the insurance company. We will have no liability to your insurer for any unpaid premiums, and every policy of insurance you obtain for our benefit hereunder must also so state. We have no duty to inquire if you have obtained the insurance required hereunder, to examine your insurance, or to advise you in the event that the insurance you obtain does not comply with the requirements of this Section.

11. **Seizure of the Vessel.** You shall notify us promptly, and in any event within 48 hours, by telephone, confirmed by telegraph, cable or facsimile, if the Vessel is arrested, libeled, attached, detained, seized or levied upon or taken into custody, or if you become aware that any claim of lien upon the Vessel has been filed or prosecuted. You shall immediately take steps to have the Vessel released or take such other steps as we may reasonably require, including posting bond or security for the Vessel. In the event the Vessel is seized as aforesaid, although we do not commit to do so, you authorize us to disclose any information necessary to protect our interest in the Vessel and you further authorize us or our agents in your name and as your attorney-in-fact to (i) receive or take possession of the Vessel, (ii) defend any action and/or discharge any lien and (iii) after the protection of our interest in the Vessel under this Agreement to an attorney not a salaried employee of ours and receive from you a reasonable attorney's fee which you agree shall be at least 15% of the amount you owe under this Agreement or such higher amount awarded by a court. This power of attorney shall not be affected by your disability.

12. **Attorney's Fees.** If you default under the terms of this Agreement and we refer this Agreement to any attorney who is not our salaried employee, you agree to pay our reasonable attorney's fees which you agree shall be at least 15% of the amount you owe under this Agreement or such higher amount as awarded by a court. You also agree to pay all court and collection costs actually incurred by us relating to default.

13. **Demand for Full Payment.** We may demand full payment at once of all that you owe under this Agreement, if:
(a) You have made a false or misleading statement about any important fact in this Agreement or application for credit; or
(b) You do not make any payment when due; or
(c) You die; or
(d) You become insolvent; or
(e) You file for bankruptcy or similar relief or creditors file a bankruptcy proceeding against you; or
(f) You let someone put a lien on the Vessel; or
(g) You permit the Vessel to lessen in value or the Vessel becomes valueless other than through normal depreciation; or
(h) You break any promise made in this Agreement, the First Preferred Ship Mortgage or other instrument securing this Agreement, if any; or
(i) You allow any of the events of default set forth in the First Preferred Ship Mortgage or other instrument securing this Agreement to occur; or
(j) Anything else happens that we in good faith and with reasonable cause believe may endanger your ability to pay the amount owed under this Agreement.
If you are a corporation, we also may demand full payment if you cease doing business as a going concern, make an assignment for the benefit of creditors, liquidate substantially all of your assets, file for dissolution or if all or any part of your stock is transferred to any person not an original guarantor of this Agreement.

14. **Repossession.** If you violate this Agreement, or any instrument securing this Agreement (including but not limited to the First Preferred Ship Mortgage) in any way, we can take the Vessel without your permission and without any court order. We may enter your property to get the Vessel, so long as we do it lawfully and peacefully. If the Vessel is stored at a marina, you give us permission to enter the marina to repossess the Vessel. You agree that our right to repossess the Vessel is superior to your right to possess the Vessel. Any accessories and equipment which are used to operate the Vessel and any substitutions and replacements of such items will remain on the Vessel. Any personal property not used to operate the Vessel will be returned at your request. Except where a longer period of time is provided by applicable law, if you do not call for such property within 30 days after we tell you where the property can be claimed, we may deal with such property in any manner permitted by law. In performing the repossession and in otherwise holding and disposing of the Vessel after repossession, we shall have all the rights of a secured party under the Uniform Commercial Code of the state in which this Agreement is accepted, except as those rights and remedies are lawfully changed by this Agreement. We shall have all the rights and remedies set forth in any agreement securing this Agreement including but not limited to the First Preferred Ship Mortgage. Use of one remedy will not stop us from using any other remedy which we may have. We may require you to return the Vessel to its home port or anchorage, and we also may require you to assemble upon the Vessel any equipment which should be installed in or located on the Vessel.

15. **Sale or Use of Repossessed Vessel.** If we repossess the Vessel, we may, in your name, lease, charter, operate or otherwise use the Vessel, as we think advisable, and keep the Vessel free of charge at your premises or elsewhere, at your expense. For such purpose and subject to any applicable federal or state regulation, we and our agents are irrevocably appointed your true and lawful attorneys-in-fact to make all necessary transfers of the Vessel upon resale after repossession, in your name and stead. Any requirements of applicable law concerning the repossession and sale of goods, your right of redemption, application of sale proceeds, and your liability for any deficiency, are hereby incorporated in this Agreement. The following provisions of this paragraph apply except to the extent prohibited by applicable law. It is mutually agreed that commercial reasonableness and good faith require the giving of no more than ten days prior notice of the time and place of any public sale of the Vessel, or of the time after which any private sale or other intended disposition of the Vessel is to be made. In any such private or public sale, we may purchase the Vessel. If, after default and before we have sold or otherwise disposed of the Vessel (or entered into any agreement for the sale or disposition), you wish to redeem the Vessel for full cash payment of all amounts due under this Agreement, then you shall also reimburse us for our expenses incurred in retaking, holding and preparing the Vessel for disposition, in arranging for the sale, and for legal expenses and reasonable attorney's fees.

16. **Net Sale Proceeds.** To the extent permitted by law, we will subtract any costs of taking the Vessel, storage, costs of sale (including but not limited to cleaning, repairing, auctioneer's fee, reasonable attorney's fees, sales commission, advertising and similar expenses) from the price at which the Vessel is sold after repossession to arrive at the "net sale proceeds." Any net sale proceeds will be applied by us to the unpaid balance owing under the Agreement. Unless prohibited by law, if you owe more than the net sale proceeds, you will pay us the difference (this is called a "deficiency"). If you owe less than the net sale proceeds (this is called a "surplus"), you will, to the extent such proceeds are not required by law to be paid to other persons with liens on the Vessel, receive this surplus from us.

17. **Express Agreement to Repossess and Additional Remedies.** You expressly agree that, if any of the events listed in the paragraph entitled "Demand for Full Payment" occur, we may repossess the Vessel. You agree that we may enter upon your property or the place where the Vessel is stored, so long as we do so peacefully. You intend that we shall have the right to demand full payment and repossess the Vessel if you do not carry out any of the agreements or promises contained in this Agreement. In addition to the remedies we have under this Agreement, we may have additional rights to act under a First Preferred Ship Mortgage or other instrument securing this Agreement.

18. **Inspection of Vessel and Books.** You will at all times let us inspect the Vessel and its cargoes and papers and examine your related accounts and records; and you shall certify upon request that all wages and all other claims which might have created a lien on the Vessel have been paid.

19. **Further Assurances.** From time to time, you shall sign and deliver to us such other and further documents and assurances as we may require (a) to maintain the priority of this Agreement, the Preferred Ship Mortgage and any other security interest we have in the Vessel, and (b) to help us carry out a resale of the Vessel in the event it becomes necessary to repossess it.

20. **Financial Reporting.** If this Agreement is given by a business entity, you will give us such annual or other periodic financial reports as we may reasonably request.

21. **Joint Debtors.** If more than one borrower signs this Agreement, each of you is individually responsible for performing all obligations under this Agreement.

22. **Signing, Authority and Validity.** If this Agreement is given by a corporation, the corporation is duly incorporated and exists in good standing under the laws of the state of its incorporation. You (or, if this Agreement is given by a corporation, the Board of Directors of the corporation) have signed or authorized and directed the signing of all papers and taken all actions necessary for the signing and delivery of this Agreement. This Agreement is valid and enforceable.

23. **Assignment of Agreement.** We may assign this Agreement and deliver any property held as security for this Agreement to the assignee who shall have all of our powers and rights under this Agreement. After any assignment, we shall have no liability or responsibility to you under this Agreement, but we shall keep all rights and powers not so assigned. After assignment, the terms "we," "our" and "us" shall refer to the assignee.

24. **Waivers.** You agree to perform all obligations under this Agreement whether we provide any notices or make any demands. We can do any of the following without notice to you and without losing any rights against you: (i) give anyone responsible for paying any amounts due under this Agreement additional time to pay; (ii) give up or delay enforcement of the Agreement against anyone responsible to pay any amounts due under the Agreement; (iii) give up or delay enforcing any rights against the Vessel or any other property securing the Agreement. We will not give up our rights to have future payments made when due by accepting a late or partial payment or by delaying the enforcement of our rights on any occasion.

25. **Litigation.** In any legal action, we may have a receiver appointed for the Vessel and its earnings. Any receiver shall have full rights and powers to use and operate the Vessel and to obtain a court decree ordering or directing the sale or other disposition of the Vessel.

26. **Invalid Provisions.** If any provisions of this Agreement cannot be enforced, the rest of this Agreement will stay in effect.

27. **Applicable Law.** If this Agreement is secured by a First Preferred Ship Mortgage, federal law, including but not limited to, Chapter 313, Title 46, U.S. Code applies as to issues regarding our security interest in the Vessel. As to the rate of interest and charges applicable to amounts due and owing under this Agreement and as to any gaps in federal law, this Agreement shall be construed in accordance with the laws of North Carolina. If this Agreement is secured by a Vessel on which our lien is perfected by a method other than a First Preferred Ship Mortgage, the state laws of the state where our lien has been recorded applies as to issues regarding our security interest in the Vessel. As to the rate of interest and charges applicable to amounts due and owing under this Agreement, and to any gaps in applicable state law, this Agreement shall be construed in accordance with the laws of North Carolina.

28. **Entire Agreement.** This Agreement, or any instrument securing this Agreement (including but not limited to the First Preferred Ship Mortgage), is the entire agreement between us and you. There are no other oral or written representations, warranties or agreements. Any change in the terms of the Agreement must be made in writing and signed by us, or, if this Agreement has been assigned by us, any holder of the Agreement.