**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**AXIS REINSURANCE COMPANY,**

     **Plaintiff,**

**vs.**                            **Case No. 4:08cv168-WCS**

**JAMES D. HENLEY,**

     **Defendant.**

_____/


<u>**MEMORANDUM OPINION**</u>

This case is before me for all further proceedings upon consent of the parties and referral by Judge Stafford. Docs. 31 and 32. A bench trial was held on October 14, 2009. Closing arguments were heard the next day.

**Findings of fact**

This is a marine insurance case. The vessel at issue is a 34 foot Fountain open hull T-top. It is powered by three 225 horse power Mercury outboards. It sank on January 19, 2008, at Defendant's dock at his home in Steinhatchee, Florida.

The vessel was purchased in 2004 in Brunswick, Georgia, by Defendant's daughter, Elizabeth Henley, and a family friend, Ronald Gay. P. Ex. 1, tab 24 and 26. Elizabeth Henley

and Gay signed the mortgage for $144,994.76 on May 21, 2004.  P. Ex. 1, tab 24.  The purchase price was about $170,000.00.  The down payment must have been about $25,000.  The monthly mortgage payment was $1005.08 for 20 years.  P. Ex. 1, tab 26.

Elizabeth Henley was about 19 years old at the time she bought the vessel.  She testified that she and Gay owned the boat, and that her father, James Henley, did not own it.  She testified that she paid $20,000 to $25,000 as a down payment, and her father paid "the rest," which would have been nothing to $5,000, depending upon her down payment, assuming the purchase price was $170,000.  She did not have memory of details, however, or paper evidence of anything.  She did not know the exact purchase price, the exact down payment, the exact amount her father contributed, or the exact monthly mortgage payment.  Elizabeth Henley said that she had her own business at age 19, and felt she could afford a payment of $1,000 a month, but she could not remember the income she had from her business.  She presented no federal income tax returns, bank statements, or other accounting proof of her income.  She had two opportunities to do so, in her video deposition and at trial.

James Henley testified that he gave his daughter $16,000 for a down payment on the boat.        Elizabeth Henley said that she intended to use the vessel in fishing tournaments.  She said that from time to time, her father would help pay the monthly payment, but she said she always paid him back, but she also thought she might still owe him a couple of thousand dollars.  Neither she nor her father had any records for any down payment or monthly payments that her father made prior to the loss of the vessel.

The vessel was last registered in 2007 by Elizabeth Henley. P. Ex. 1, tab 22. It was registered in Georgia. It is uncertain when the Georgia registration expired. The registration card appears to contain a date of October 1, 2007. *Id.* The registration decal on the vessel had faded until it was almost illegible. P. Ex. 1, tab 3.

Elizabeth Henley testified that in December, 2007, about six weeks before the sinking, she went fishing in the vessel out of Steinhatchee. James Henley[1] testified that he moved to Steinhatchee, Florida, in 2004, and he said that the vessel has been in Steinhatchee since he moved there.

On March 2, 2007, Henley took out a policy of insurance with Plaintiff. P. Ex. 1, tab 2. Henley testified that he borrowed $3,515 from his former wife to make this payment. The policy states that the vessel was located in Steinhatchee, Florida, on March 2, 2007.

According to Henley, therefore, the vessel has been in Florida and he has lived in Florida since 2004. The vessel has never been registered in the State of Florida. Henley said that he was told he did not have to register the vessel until the Georgia registration expired.

Henley testified that he is retired. He said that he receives Social Security disability income payments. The nature of his disability is not in evidence. He also said that he sold a business and has some income from that sale.

Henley testified that he works in Steinhatchee as a charter captain for a fee. He testified that in 2008, he took in about $10,000 from his fishing charter business, but not

---

[1] I will refer to Defendant James Henley hereafter as "Henley," and his daughter by her full name.

enough, he said, to lose his Social Security disability income. Henley testified that since 2004, he has had 60 to 70 fishing charters and has taken out over 300 people. Henley's disability does not impair his ability to conduct a charter fishing business.

Henley became a certified public account in 1980. He is no longer a CPA because, he said, he "no longer wants it." Henley kept no records of the income and expenses from fishing charters and, as noted earlier, had no records of his own financial contributions toward the purchase of the 34 foot Fountain. He has a home on a canal in Steinhatchee, with a dock and direct access to the Gulf of Mexico. Defendant has federal Internal Revenue Service tax liens on his home.

The insurance policy issued on the 34 foot Fountain in March, 2007, was a "Sea-Safe Seafarer Yacht Policy" with Axis Reinsurance Company. P. Ex. 1, tab 2. The administrator was Sullivan & Strauss Agency. *Id.* Elizabeth Henley testified that she, rather than her father, had taken out the insurance on the vessel in previous years.

Henley testified that he needed the insurance on the vessel in March, 2007, because he had taken the vessel to a yacht yard elsewhere in Florida to be listed for sale. He said the vessel did not sell, so he brought it back to Steinhatchee in the fall of 2007.

Henley had the 34 foot Fountain listed on a website as available for fishing charters offshore out of Steinhatchee. P. Ex. 1, tab 5. As of January 21, 2008, two days after the sinking, the website listed two vessels as available, at his discretion ("Captain's choice based on weather conditions"), a 26 foot Carolina Skiff and the 34 foot Fountain. *Id.* A photograph of the Fountain vessel was provided on the website, and a full day charter of that vessel was listed at $850. *Id.* The Carolina Skiff is shown

docked behind James Henley's home.  *Id.*  The 34 foot Fountain was photographed at some other dock with a bridge in the background.  *Id.*  The website offered "offshore adventure," fishing on the bottom for "pinks," "blacks," grouper, and trolling for kingfish or Spanish mackerel.  The website shows about 28 photographs of people with their catch.  Most of the catch appears to be typical for shallow water fishing (spotted sea trout and red fish), but one photograph is entitled "grouper, grouper, and more grouper," and another displays a pile of fish and a king fish ("nice King"), both typically caught offshore, in deeper water.  *Id.*

On January 31, 2008, the website no longer had a photograph of the 34 foot Fountain, no longer offered offshore fishing charters, and the photograph of the grouper had been removed.  *Id.*  The photograph of "nice King" remained.

The website that is shown at tab 5 of Plaintiff's composite exhibit 1 was printed on January 21 and 31, 2007, by Christine Janke, claims adjuster for Sullivan & Strauss. Janke testified that on January 21, 2008, two days after the vessel sank, she spoke with James Henley.  Henley informed her of the existence of the website.  Janke asked Henley if he had ever used the 34 foot Fountain for a charter, and Henley said no. Janke immediately went to the website and printed a copy of what was there.  As noted above, the website then offered the 34 foot Fountain for charter.  Janke revisited the website ten days later, and all references to the 34 foot Fountain and offshore charters had been removed.

James Henley testified that he removed those portions of the website referring to the 34 foot Fountain and offshore charters because the boat was "gone" and no longer available for charters.  He also said he was "through" with trying to run charters

offshore.  He said that the photographs of people holding grouper had been taken on a trip with another boat on which he had been mate, but he took the photograph off the website because he did not want to do offshore charters.

Russell Musgrove, the Vice President for Claims for Plaintiff, testified that with the exception of ski school commercial marine policies, Plaintiff only underwrites insurance for individual recreational use of watercraft.  He said that the policy issued in this case is part of Plaintiff's recreational marine insurance program.  A lot of recreational marine policies are underwritten by Plaintiff for GEICO and other insurers. The agent for Plaintiff is Sullivan & Strauss.

Musgrove said that the risk of loss for charter and other commercial marine insurance is higher than for individual recreational use.  He explained that a charter vessel is used a lot more than a recreational vessel, often has an employed crew, and the passengers are paying customers who are strangers to the captain of the vessel.

Musgrove said that had Plaintiff known of Defendant's website, advertising the vessel for commercial charters, it would have immediately canceled the policy. Musgrove also said that had Plaintiff known of the website at the outset, it would never have issued the policy.  He explained that Plaintiff cannot continually go into the field to see if a vessel is being used for commercial purposes, contrary to the policy.

The insurance policy at issue here is at tab 2 of Plaintiff's composite exhibit 1. The policy is an "all risk" policy.  Subparagraph 1 of Part D provides that coverage extends to "all accidental direct physical loss or damage to your insured property, except as specifically excluded in this policy."  P. Ex. 1, tab 2, p. 6.  So long as the loss

or damage is not "specifically excluded in this policy," it is covered even though caused by the negligence of an insured or an agent of the insured.

The first exclusion is contained in subparagraph 1 of Part B. It provides in relevant part:

> **PRIVATE PLEASURE USE ONLY:** We do not provide any coverage while your insured property is used for charter, to carry persons or property for a fee, or for any other commercial use unless prior written consent has been obtained from us. . . .

P. Ex. 1, tab 2, p. 4.

Subparagraph 4 of Part B provides:

> **CONCEALMENT, MISREPRESENTATION OR FRAUD:** All coverage provided by us will be voided from the beginning of the policy period if you intentionally conceal or misrepresent any material fact or circumstance relating to this contract of insurance, or the application for such insurance, whether before or after a loss.

P. Ex. 1, tab 2, p. 4.

A second set of exclusions is contained in subparagraph 2 of Part D.

Subparagraph 2.a. of Part D provides:

> **Exclusions:** We do not provide Property Damage coverage against or resulting from damage from:
>
> a.    wear and tear, mechanical breakdown, gradual deterioration, corrosion, weathering, insect mold, animals, marine life damage.

P. Ex. 1, tab 2, p. 6.

The 34 foot Fountain sank at Defendant's dock on Saturday, January 19, 2008. It turned over on its port side in what appears to be about four to six feet of water, depending on the tide and the time of the photograph. P. Ex. 1, tab 10.

Ron Gipson testified by a video deposition. The video deposition is in evidence. P. Ex. 3. A transcript of his deposition is filed as an attachment to document 52. Doc. 52-8 on the electronic docket, pp. 1-12 (pages 1-45 of the deposition). Citations here are to the transcript.

Gipson and his 16 year old son went on a fishing trip on the vessel on the day of the loss. Gipson only vaguely knew Henley prior to the fishing trip, but had never met him before that day. Doc. 52-8, p. 3 (p. 7 of the transcript). Gipson had a friend, David Yagel, who had been aboard the vessel previously "and had caught fish," and he "set up" the trip for Gipson to go fishing with Henley. *Id.* and p. 4 (p. 10). Gipson said that he and Yagel both liked fishing and talked about fishing at work. *Id.*, p. 11 (p. 41). Gipson had been told that the vessel was a charter vessel, and he had seen Henley's website, with that vessel and another boat offered for charter fishing. *Id.*, p. 4 (p. 8); p. 4 (p. 10). Since Gipson saw the website before the fishing trip, he knew or should have known that the vessel was advertised for charter for $850 per day. Gipson said that he did not pay Henley or Yagel anything for this fishing trip. *Id.*, p. 11 (pp. 39-40). Gipson did not know if anyone else paid Henley for this fishing trip. *Id.* (p. 41). He said: "I was just wanting to get in on some of that catching them fish." *Id.*, p. 12 (p. 42).

Gipson said he was a supervisor for Suwannee American Cement, in the maintenance department. *Id.*, p. 3 (p. 6). He said that Yagel was a contractor, and "comes in and out when we need stuff done." *Id.*, p. 12 (p. 42).

Gipson, his son, Henley, and another man, later identified as Albert Hulen, were onboard that day. *Id.*, p. 3 (p. 9). Gipson and his son met Henley and Hulen on a dock, but not at Henley's house. *Id.*, p. 4 (p. 11). Bait was already onboard the vessel when

Gipson got on. *Id.* (p. 12). Gipson said that they caught black sea bass when they first anchored. *Id.* (p. 13); p. 6 (p. 18). The weather was not bad at that point. *Id.*

Gipson said that when they anchored a second time, he noticed several inches of water "in the back." *Id.*, p. 5 (p. 14); p. 6 (pp. 17-18). Gipson said that Henley "flipped some switches," which Gipson thought were the bilge pumps, and the water "disappeared off the floor." *Id.* (pp. 14-15). There was several inches of water on the deck but it did not cover the back deck. *Id.* (p. 15). The waves were "pretty rough" but Gipson did not see any water coming into the boat. *Id.*, p. 6 (p. 18). Gipson also said that the water was not crashing over the side of the boat; the waves sometimes sprayed in the back of the boat, but "as far as coming over the side of the boat, no." *Id.*, p. 8 (p. 28). He thought that the waves started out that day at one to three feet and became four to five feet later. *Id.*, p. 9 (pp. 31-32). Gipson was "very familiar" with the area. *Id.*

Gipson said that "a little bit later," after Henley had flipped the switches, "there was more water in the boat." *Id.*, p. 6 (p. 19). Henley told the older man, Hulen, to "open that door." *Id.* When the door in the deck (the lazarette hatch) was opened, said Gipson, "you could see there was a lot of water in the boat." *Id.* The water was "up to the top of the door." *Id.* (p. 20). The batteries were under water. *Id.*

Gipson said that Henley told Hulen to begin bailing with a 5 gallon bucket. *Id.* (p. 20). Gipson then began to bail until he "was wore out." *Id.* (p. 21). He emptied more than twenty 5 gallon buckets over the side. *Id.* Gipson said that after bailing, the water level below deck had been lowered two or three inches. *Id.*, p. 7 (p. 23). He did not see the water level come back up after they stopped bailing. *Id.* (p. 24). There is no evidence, one way or the other, whether the lazarette hatch was closed after Gipson

stopped bailing, but it probably was, to avoid falling or tripping into the bilge in the rough seas as the boat returned to shore.

Gipson testified that Henley then called on the marine radio to report the problem. *Id.*, p. 7 (p. 22). One of three engines would not start. *Id.* Henley told Gipson that he thought the engine did not start because the starter spindle did not pop up and engage the fly wheel. *Id.* Gipson said that Henley did not mention bilge pumps not working properly and did not mention bilge pumps at all. *Id.*

Gipson said it took a couple of hours to get back to shore, and a rescue vessel followed them. *Id.*, p. 7 (p. 25). They ran in at about 6 knots and were not up on plane during this trip. *Id.*, p. 10 (pp. 35-36). He said that no one bailed on the way back in. *Id.* (p. 24).

When they got back in, Gipson said that Henley dropped Gipson and his son off at the dock where they had been picked up earlier that day, and Henley drove the vessel to his house. *Id.*, p. 8 (p. 26). There was no discussion at that point about taking the boat out at the marina. *Id.* (p. 27). Gipson and his son met Henley at Henley's home and dock. *Id.* Gipson said that Henley "cleaned our fish. Gave us our fish and shook hands, and we left." *Id.* The boat was tied to Henley's dock. *Id.* (p. 28). The other man, Hulen, helped clean fish. *Id.*, p. 10 (p. 37). Gipson said that it was raining while he was at Henley's home as the fish were cleaned, but the rain had stopped and the weather seemed to clear when they left. *Id.*, p. 11 (p. 38). When he and his son left, the vessel was floating at Henley's dock. *Id.*, p. 11 (p. 40).

James Henley testified for the defense. He testified that he was not sure when he established the website. He was asked whether he told the insurance company

about the website on March 2, 2007, when he arranged for the insurance, and he said no.  He did not then say that the website did not exist on March 2, 2007.[2]

Henley testified that he had only an inshore charter business, using his 26 foot Carolina Skiff.  He said that he never used the 34 foot Fountain for a charter, and "no one has ever paid me for that."  He said that he was "not good" at offshore fishing, it "was not worth it," and it "costs too much."

Henley said that he sought insurance for the vessel in the spring of 2007 because he was planning to put the vessel in a yacht yard for sale, and insurance was required.  He said that the vessel stayed in the yacht yard for about six months, and in the fall of 2007, he brought it back to his home in Steinhatchee.  He said that he used the vessel less than six times before it sank on January 19, 2008.  He said that he "had permission" to use it.

Henley explained that he did not know Gipson or his son before this fishing trip.  He said that his friend, a man named Webb who had been fishing with him before, asked him if he would take Gipson and his son out fishing.  Henley said that he is "always looking for someone to go fishing with me."  He said at another point that he "gave *that charter* away" to the Gipsons.  (Emphasis added.)  Henley said that on a typical fishing trip with the 34 foot Fountain, he uses 100 to 125 gallons of fuel at a cost

---

[2] It is noted that Plaintiff asserts that Henley testified in his deposition that he reviews and approves all changes to his website, saltwaterfishn.com, "*which he has owned for approximately three years.*"  Doc. 44, ¶ 21, p. 9 (emphasis added), citing doc. 18-2, p. 5 (pp. 18-19 of the transcript).  I do not recall that this portion of this deposition was moved into evidence, and therefore I will not rely upon it.  I do find, however, that the website was in existence when Henley took out the insurance, on March 2, 2007.

of from $300 to $600 in fuel. Henley said that no one paid any expenses for the trip with the Gipsons.

Albert Hulen, Henley's "best friend," went on the fishing trip. Henley said that early in the morning on the day of the fishing trip, his boat was already in the water. He said that he "iced up" and loaded drinks and food onto the boat. He said that he checked the radio and all the gauges, switches, and instruments before starting off. He said that he did not check under the aft deck to look at the bilge pumps because he had checked the switches. Henley said that he routinely washes out his deck scupper drains, front and back, with a hose.

He and Hulen took the vessel down river and stopped at the River Haven Marina to pick up Gipson and his son. Gipson and his son brought a cooler and food onboard.

Henley said that he noted no problems with the boat when they anchored for the first period of fishing. The vessel did not behave sluggishly. After a couple of hours of fishing, he said they ran to another spot and anchored. He said that at about 1:00 p.m., the seas became rougher and Gipson said he was ready to go in. Henley said he tried to start the engines and the center engine would not start. Hulen then told him that there was "water back there." Henley said he flipped the two bilge pump switches and the water "went away." He said there was water below deck. Henley testified that "we completely emptied out the bilge area." He said he did not check to see if the bilge pumps were in the bilge area.

Henley said they then motored in with the escort from the rescue vessel. He dropped Gipson and his son at the River Haven Marina and drove to his home dock, a distance of about 3 to 3.5 miles. Henley said he tied up to his dock as shown in the

photographs, and shut down the engines and electronics.  He then said: "Contrary to popular opinion in this room, I opened up the hatch to see if there was any water in it."[3] He said there was a "couple of handfuls" of water in the bilge area.  The "couple of handfuls" characterization was repeated later in his testimony.

Henley said that he then cleaned fish.  Gipson came while he was cleaning the fish and he gave the fish to Gipson.

After Gipson left, Henley said that it began to lightning, thunder, and rain hard. He went upstairs into his home.  A few hours later, a neighbor told him his vessel was listing to port and was sinking.  When he got to the dock, the port gunnel of the vessel was already under water.

The vessel was righted the next morning and taken out of the water by trailer. The vessel had mud along the starboard side, the only side shown in the photographs of the vessel taken shortly after it was removed from the water.  P. Ex. 1, tab 10.  The vessel was probably muddy on the port side as well, but the photograph three weeks later, on a trailer at Sea Hag Marina where it was taken, shows a clean port side.  *Id.*, tab 1.

Henley said that he did nothing to the vessel from the time he docked it, on January 19, 2008, until the time that Plaintiff's expert, John Smith, examined the vessel, on February 8, 2008, at Sea Hag Marina.  He said he did not open the hatch to see if one of the bilge pumps was missing.

---

[3] There is no transcript, and this the best rendition I can make of this statement from my notes.

The photographs of the sunken vessel and the attempts to right it were taken the next day, January 20, 2008. The photographs show several other small vessels at docks in the canal where the 34 foot Fountain was docked. Visible in the photographs are: (1) a small boat with flat glass windscreen, stainless bow rail, and a blue Bimini top' a T top boat with a bow sprit and rail; (3) a Carolina Skiff (probably Henley's Skiff); (4) a small boat with an enclosed cabin; (5) and beyond that, another T top vessel. These boats are all riding properly in the water. None sank. Henley said that his Carolina Skiff had two batteries and a bilge pump with an automatic switch. Henley said that a boat ahead of his Carolina Skiff went down, but there is no evidence of that other than his testimony.

There is evidence that Henley made payments for estimates and repairs to the vessel after the vessel sank. D. Ex. 1, tabs 6-13.

The boat was examined at Sea Hag Marina by John Smith, an expert for Plaintiff, on February 8, 2008. The boat was on a trailer. Smith is a marine surveyor. He is trained in metallurgy, corrosion, and other forms of marine mechanical failure. His certifications include property casualty claim adjuster, accredited senior yacht appraiser, and certified marine consultant, and he is licensed as a Coast Guard boat inspector. He was accepted as an expert marine surveyor.

Smith testified that he spoke with Randy Cole at Sea Hag Marina and was told that nothing had been removed from the vessel after it arrived at that marina, with the exception of some debris from the scuppers. Smith examined the external hull and found it to be intact.

He went onboard.  The port and starboard scuppers drain water from the aft deck through the sides and out through small stern holes.  The scuppers are gravity drains. Smith said both were partially clogged.   P. Ex. 1, tab 3.  Water on the aft deck that did not drain through the scuppers would have collected in the lazarette or aft bilge area. Smith said that the clogging in the scupper drains was a partial cause of the loss of the vessel.

Smith opened the lazarette hatch to view the bilge area.  He found a bilge pump on the port side, but no bilge pump on the starboard side.

Smith explained that the bilge area or lazarette on the 34 foot Fountain is separated by steep keel stringer.  The two areas are not completely bisected by the keel, and are connect at some points.  The area is 8 feet wide and 20 to 30 inches deep.[4]  He said that a 34 Fountain should have had two Lovett bilge pumps as original equipment, one on each side of the keel stringer.  This Fountain had two bilge pumps as original equipment, said Smith.  He pointed out that it had controls on the console for two pumps.  P. Ex. 1, tab 3, p. 7.

Smith took photographs of the port side of the bilge.  P. Ex. 1, tab 3, p. 8.  He circled the square port bilge pump that was found in place.  *Id*.  He removed the port bilge pump and attached it to a 12 volt battery that he brought with him.  Smith found that the port bilge pump would not operate in either manual mode or in automatic mode. Automatic operation for a bilge pump is provided by a float switch.  As water collects in

---

[4] It is judicially noted that a cubic foot of water weighs about 62 pounds and that a gallon of water weighs about 8 pounds.  If the aft bilge area were 8 feet wide, 2 feet deep, and 6 feet long, it contained about 96 cubic feet.  Completely filled, it would have contained about 744 gallons of water weighing about 5,952 pounds.

the bilge, the float rises and automatically turns on the pump to eject the water.  Smith said that this bilge pump is made to operate submerged in water, and that submersion of the port bilge pump when the vessel capsized would not have rendered it inoperable.

Smith took photographs of the starboard side of the bilge.  P. Ex. 1, tab 3, p. 6. He explained that the cylindrical pump seen in this photo is not a bilge pump.  It is a high flow wash down pump that draws in sea water for washing the vessel.  The third photograph shows the bilge discharge hose that should have been attached to a bilge pump on the starboard side.  Plaintiff's composite exhibit 2 is a large photograph of this detached hose.  It shows buildup of sediment within the hose and on the edges.  Smith said that the sediment in the starboard bilge hose, and the dirt on the edges of the hose, indicated to him that there had not been a starboard bilge pump attached to that hose for "some time."

Smith said that the disconnected bilge hose on the starboard side ran almost directly downhill to the bilge.  He said that the "best marine practice" would have been to have mounted this hose with an anti-siphon loop, up to the highest point and then down, or to have added an anti-siphon break.  This hose was not mounted with an anti-siphon loop.

Smith said that both bilge pumps discharge bilge water through the hull at a point four inches above the static water line, that is, the water line when the vessel is not loaded.  He explained (on his photograph of the external exit points for the bilge pumps) that the inboard ends of the hoses for both bilge pumps were lower than the exit holes just outside the hull.  As the external discharge points became submerged, the discharge hoses became potential siphons to flood the lazarette.  This occurred

primarily with the starboard bilge discharge hose, said Smith, because the flow of water into the bilge was not impeded by an attached bilge pump. The siphon effect on the port side would have been slowed by the impeller in the existing bilge pump. However, since the starboard bilge pump did not exist, and the port bilge pump did not operate automatically, any siphoning that took place would flood the lazarette compartment. If water started to come in by siphoning, the flow into the lazarette would continue without remedy since the port pump did not operate automatically or manually.

Smith said that when the vessel carried four passengers, the exit holes for the bilge pumps would have been under water. Once the vessel had taken on the weight of water as indicated in footnote 3, it would have been even lower in the water. Once the discharge holes were under water and a siphoning flow established, it would continue.

Smith said that the fact that water on the deck disappeared when Henley threw the bilge switches was probably due to drainage through the scuppers, which were not entirely clogged. He said that also there was a sump pump under the center console, and perhaps that pump discharged some of the water.

Smith tested the electrical circuits from the batteries to the console bilge switches to the places where the pumps were supposed to be mounted. The circuits were intact. Smith said that when Henley tested the switches before going out that day, the lights would have come on since the circuits were electrically intact. That is, when the lights come on, power is going down the wires to the pumps. However, there would have been no mechanical effect as the port pump did not work and the starboard pump did not exist.

It is noted here that although Henley said he checked the switches before starting out that morning, he did not testify that he heard the bilge motors start up, or that he saw bilge water pumped out through the exit bilge holes. Indeed, no one testified that bilge water was ever pumped out through the exit bilge holes. Elizabeth Henley said she saw water exit the boat from the starboard side when it was hoisted out of the water, but that could not have been due to the operation of a bilge pump because there was no bilge pump on the starboard side.

Smith said that bilge pumps should be replaced on a vessel like this every two years as a matter of routine maintenance. The pumps had been replaced in April, 2006.

Smith said that had the vessel had two operable bilge pumps, it would not have taken on water. The pumps would have come on automatically when the water level in the bilge rose several inches. The automatic feature of the pump is an integral part of these pumps, said Smith. Smith said that he checked the weather report for Steinhatchee that day and there was a report of 1.7 inches of rain in that area. He said that operable bilge pumps should have automatically discharged that amount of rain with no problem or damage to the vessel. With bilges pumps operating automatically, the water in the bilge should never have gotten over 3 inches deep.

Smith said that with the bilges full, a slight shift of the vessel to port or to starboard will cause it to capsize since the water begins to flow in the bilge toward the down side. A person walking on the vessel, or the hitting of an engine foot on the bottom, can cause sufficient instability to cause the vessel to roll.

From all of this it is concluded that the vessel did not have a bilge pump on the starboard side and had not had a starboard bilge pump for some time. Further, the port

bilge pump was not operable when this fishing trip began. Henley saw the lights go on when he flipped the switch because the electrical connection was intact, not because the bilge pumps were there and operating. He did not say he heard a bilge pump running. Even though the water on the deck disappeared when Henley flipped the switches, there is no evidence that anyone heard a bilge pump running or saw bilge water exiting the bilge exit holes. Further, the water just under the Lazarette hatch was still there, said Gipson, when the run back to shore began. Despite a lot of bailing, the level in the bilge had only been reduced two or three inches.[5] Had there been two operating bilge pumps, the water would have been reduced to a level of only an inch or so left in the bilge area, and everyone would have heard the bilge pumps running and seen the bilge discharge from the sides.

Henley's testimony that there were just a "couple of handfuls" of water in the lazarette when he docked the vessel is not credible. He did not look. Henley's testimony is directly contradicted by Gipson's testimony. Gipson has no interest in the outcome of this case. Further, there is evidence that Henley is not a reliable or credible witness when it comes to his own pecuniary interest. He has an Internal Revenue Service lien on his home, and had an incentive to hide his ownership of this vessel from the Internal Revenue Service. He and his daughter failed to register and title the vessel in Florida, thereby further hiding their ownership and probably avoiding some Florida

---

[5] This is consistent with other evidence. As noted above, a full bilge area would have contained about 744 gallons of water. Twenty 5 gallon buckets of water bailed out is 100 gallons, leaving perhaps 644 gallons, lowering the level 15% (or 3.6 inches out of 24 inches). The level would be higher if water continued to siphon into the lazarette.

use tax.  Henley draws Social Security disability income, yet he is not unable to work as a charter fisherman.

It is also concluded that the fishing trip with Gipson and his son was a commercial charter trip.  Henley used 100 to 125 gallons of fuel to make this trip at a cost of from $300 to $600.  Since the return trip took several hours, the vessel was not up on plane, and the vessel was carrying three extra tons of water, the vessel probably used more fuel than usual due to the extra weight and water friction.  Henley used a vessel that cost his daughter $1,000 a month to own.  He had strong financial incentives to use the vessel for commercial purposes.  Further, Henley put ice, food, drinks, and bait on the vessel before he picked up the Gipsons, just as a charter captain would.  He did not know the Gipsons.  Gipson had been steered to this fishing trip by a person who did business with Gipson's company.  Gipson knew that the vessel was a charter vessel, and saw the website before the trip, and either knew or should have known that the advertised cost of the trip as a charter was $850.  The website was fully active on the day this trip took place.  After the trip was over, Henley and Hulen cleaned the fish and gave them to the Gipsons, just like a charter captain would do.  Gipson said he did not pay anything for this trip, and that is accepted as true, but someone benefitted commercially.  It is most probable that Yagel gave this trip to Gipson to curry commercial favor with Gipson, and Yagel paid Henley for it.  It is also possible but less likely that Henley decided to run the trip without cost to Gipson as a means of drumming up offshore business for the 34 foot Fountain.  After all, this expensive vessel was just sitting at his dock costing $1,000 a month, he was drawing Social Security disability income, and he had a website advertising that it was available for offshore trips at $850

for a full day.  One or the other is the truth, and I need not decide exactly which.  Both constituted commercial use of the vessel on January 19, 2008.

The existence of the website was a material fact that would have caused Plaintiff to immediately cancel the policy.  It was also a material fact that would have caused Plaintiff not to issue the policy had it been known at the outset.  The policy plainly states that it covers recreational use only, and Henley knew this when he took out the policy. Henley was asked whether he would use the vessel for commercial purposes when he applied for insurance, and he said no, which was untrue.  The website probably existed on March 2, 2007, and should have been disclosed to Plaintiff then.  Henley intentionally did not disclose it.  When the vessel was lost, Henley disclosed the website but tried to alter it so that Plaintiff would not know that it advertised the vessel for commercial charter.  Henley has practiced a number of deceptions about his interest in this vessel and about his income from charters.  Henley was a CPA, and he knows how to keep records.  From all of this evidence, it is concluded that Henley intentionally concealed the fact that he planned to use the 34 foot Fountain for commercial purposes both at the inception of the policy and at the time of the loss.

It is accepted as fact that Henley paid some small portions of the monthly payments for this vessel, and that a small amount has not been repaid to him, and he had full possession of the vessel.  That Henley provided any money for the down payment has not been established as fact.

**Conclusions of law**

The issues will be considered in the order presented by the trial memoranda of the parties, beginning first with Plaintiff's memorandum.

**Whether the policy was voided by concealment of a material fact**

Plaintiff contends that the general maritime doctrine of *uberrimae fidei* is

applicable to this policy of insurance.

> It is well-settled that the marine insurance doctrine of *uberrimae fidei* is the
> controlling law of this circuit. *See Steelmet, Inc. v. Caribe Towing Corp.*,
> 747 F.2d 689, 695 (11th Cir. 1984); *Certain Underwriters*, 27 F.Supp.2d at
> 1312;[6] *International Ship Repair and Marine Serv., Inc. v. St. Paul Fire &
> Marine Ins. Co.*, 922 F.Supp. 577, 580 (M.D. Fla.1996). *Uberrimae fidei*
> requires that an insured fully and voluntarily disclose to the insurer all facts
> material to a calculation of the insurance risk. *See Steelmet*, 747 F.2d at
> 695; *see also Fireman's Fund Ins. Co. v. Wilburn Boat Co.,* 300 F.2d 631,
> 646 (5th Cir. 1962) (discussing the duty to disclose in marine insurance
> law); G. GILMORE & C. BLACK, THE LAW OF ADMIRALTY 62 (2d ed. 1975)
> ("[T]he highest degree of good faith is exacted of those entering [a marine
> insurance contract], for the underwriter often has no practicable means of
> checking on either the accuracy or the sufficiency of the facts furnished
> him by the assured before the risk is accepted and the premium and
> conditions set."). The duty to disclose extends to those material facts not
> directly inquired into by the insurer. *See Jackson v. Leads Diamond Corp.*,
> 767 F.Supp. 268, 271 (S.D. Fla.1991); *see also Cigna Property & Cas.
> Ins., Co. v. Polaris Pictures Corp.,* 159 F.3d 412, 420 (9th Cir. 1998)
> ("Whether or not asked, an applicant for marine insurance is bound to
> reveal every fact within his knowledge that is material to the risk.").
>
> Under *uberrimae fidei*, a material misrepresentation on an application for
> marine insurance is grounds for voiding the policy. *See Steelmet*, 747
> F.2d at 695 (a misrepresentation, even if it is a result of "mistake,
> accident, or forgetfulness, is attended with the rigorous consequences that
> the policy never attaches and is void" (*quoting Wilburn Boat Co.*, 300 F.2d
> at 646)). A misrepresentation is material if "it might have a bearing on the
> risk to be assumed by the insurer." *Northfield Ins. Co. v. Barlow*, 983
> F.Supp. 1376, 1380 (N.D. Fla. 1997); *see also Kilpatrick Marine Piling v.
> Fireman's Fund Ins. Co.*, 795 F.2d 940, 942-43 (11th Cir. 1986)
> (materiality is "that which could possibly influence the mind of a prudent
> and intelligent insurer in determining whether he would accept the risk").

HIH Marine Services, Inc. v. Fraser, 211 F.3d 1359, 1362-1363 (11th Cir. 2000)

(footnote omitted).

---

[6] Certain Underwriters v. Giroire, 27 F.Supp.2d 1306, 1310 (S.D. Fla.1998).

The importance of the utmost good faith doctrine is that a failure to disclose a material fact due to mistake or accident will void the policy. James Henley and Elizabeth Henley had a duty to disclose that this vessel was advertised for offshore charter fishing trips. They had that duty on March 2, 2007, when the policy became effective, and they had a continuing duty to make disclosure until the loss occurred. They did not disclose that the vessel was advertised for commercial charter before the loss occurred.

The existence of the website advertising the vessel for commercial charter was a fact that was material to Plaintiff's decision to issue the policy to Defendant. Commercial use would expose Plaintiff to greater risks than pleasure boat use. Plaintiff does not insure such risks and would not have issued this policy had it known that the vessel was advertised for charter use. There is no contrary evidence on this point. The policy plainly states that it covers "private pleasure use only." P. Ex. 1, p. 4 (Part B, subparagraph 1). That heading sets the standard. It is true that the text of the paragraph limits the exclusion to a period "while" the vessel is used for commercial purposes, unless prior written consent is obtained in writing. But Musgrove convincingly testified that Plaintiff simply does not write charter coverage and cannot be expected to go into the field to inspect to the actual use of a vessel by an insured. Musgrove also said that Plaintiff would never give such written prior permission, and this also is without factual dispute. The contract quite plainly was intended to cover only private pleasure use and such use was material to the issuance of the contract. It was not a contract allowing commercial use at the whim of the insured, whether prior permission had been obtained in writing or not. If this doctrine of utmost good faith were to be applicable

here, the policy would be voided by the failure to disclose that the vessel was advertised

for charter use.

The parties to a marine insurance contract, however, are free to contract out of

the utmost faith duty even without mentioning that duty.  <u>King v. Allstate Ins. Co.</u>, 906

F.2d 1537, 1540-1542 (11th Cir. 1990); <u>Green v. Life & Health of America</u>, 704 So. 2d

1386, 1390 (Fla. 1998) (the parties are free to contract around state or federal law).[7]

*Contra*, <u>New Hampshire Ins. Co. v. C'Est Moi, Inc.</u>, 519 F.3d 937, 939 (9th Cir.), *cert.*

*denied*, 129 S.Ct. 639 (2008) (discussing <u>King</u>).

Part B of this insurance contract, subparagraph 4, provides:

> **CONCEALMENT, MISREPRESENTATION OR FRAUD:**  All coverage
> provided by us will be voided from the beginning of the policy period if you
> intentionally conceal or misrepresent any material fact or circumstance
> relating to this contract of insurance, or the application for such insurance,
> whether before or after a loss.

P. Ex. 1, tab 2, p. 4.  Thus, the contract changed the general maritime rule of *uberrima*

*fidei*, and the only misrepresentation or concealment that will void this contract is an

intentional one.[8]

Though the question is a closer call than other findings, I conclude by a

preponderance of the evidence that Henley's failure to disclose that the 34 foot Fountain

was advertised for commercial purposes, and had been used on the date of the loss for

---

[7] I will not address the application of FLA. STAT. § 647.409(2) as argued by
Defendant, doc. 37, pp. 2-3, as the contract supersedes any Florida law regarding
representations to the contrary.

[8] There is no ambiguity here.  If there were, the ambiguity would be construed
against Plaintiff, who drafted the contract.  <u>King</u>, 906 F.2d at 1541-1542.

a commercial purpose, was intentional.[9]  The evidence of deception stacks against Henley.  He had this website up at all material times that the contract was in effect.  Yet he hid his interest in the vessel from Florida records by not obtaining a title and registration in Florida, and he hid his ownership interest in it through the arrangements with his 19 year old daughter and Gay.  He kept his income from charters out of the records, too, keeping no formal records of income and expenses.  He had a federal tax lien on his home, and that debt shows his motive to deceive.  He said that he needed insurance to try to sell the vessel, and would not have obtained it had he disclosed the existing website.  He used the vessel on January 19, 2008, for a charter for commercial purposes.  After telling Janke that the website existed (after the loss) and that he only used the vessel for private pleasure, a statement that was false because he had just finished a charter trip, Plaintiff quickly tried to delete the 34 foot Fountain from the website so that Plaintiff would not detect that it had been advertised for commercial purposes.  The concealment of the advertisement, from the outset through the date of the loss, was intentional.  There was also intentional concealment of the fact that the vessel had been used as a charter on the date of the loss.

Plaintiff took steps to rescind the contract for material concealment, returning the premium.  They were entitled to rescind the contract pursuant to Part B, subparagraph 4 of this contract.  Consequently I conclude as a matter of law that all coverage under this contract has been voided by intentional concealment of a material fact.

---

[9] The existence of the website, standing alone, was a sufficiently material fact standing alone, and the charter use on January 19, 2008, was likewise a sufficiently material fact.

**Whether the loss was a fortuitous accident**

I reach alternative holdings so that the record will be complete. Plaintiff contends

that the loss of the vessel was not fortuitous, and that proof of a fortuitous loss is

necessary to recover under a contract like this, an "all risk" contract.

> An all risk policy is one which provides coverage against all risks, the
> words typically being inserted in writing, covering every loss that may
> happen except by the fraudulent acts of the insured. *Morrison Grain Co.
> v. Utica Mutual Ins. Co.*, 446 F.Supp. 415, 420 (M.D. Fla. 1977), *aff'd in
> part, remanded in part*, 632 F.2d 424 (5th Cir. 1980). Accordingly, "an
> all-risk policy will be allowed for all fortuitous losses not resulting from
> misconduct or fraud, unless the policy contains a specific provision
> expressly excluding the loss from coverage." *Dow Chemical Co. v. Royal
> Indem. Co.*, 635 F.2d 379, 386 (5th Cir. 1981) (citing, among others,
> *Morrison Grain*, 632 F.2d at 424).

International Ship Repair and Marine Services, Inc. v. St. Paul Fire and Marine Ins. Co.,

944 F.Supp. 886, 891-892 (M.D. Fla. 1996). "[I]n order to recover under an all risk

policy, an insured must prove only the loss or damage to the insured's property while

the policy was in force, with the burden then shifting to the insurer to prove that the loss

arose from a cause that is excluded under the policy." *Id.*, at 892. However, the

insured must show that the loss or damage was "fortuitous." *Id.*

> The RESTATEMENT OF CONTRACTS, Section 291, comment a (1932),
> defines a fortuitous event as:

>> an event which so far as the parties to the contract are
>> aware, is dependent on chance. It may be beyond the
>> power of any human being to bring the event to pass; it may
>> be within the control of third persons; it may even be a past
>> event, such as the loss of a vessel, provided that the fact is
>> unknown to the parties.

> In contrast, "[a] loss is not considered fortuitous if it results from an
> inherent defect in the object damaged, *from ordinary wear and tear*, or
> from the intentional misconduct of the insured. However, loss due to the
> negligence of the insured or his agents has generally been held to be

fortuitous and, absent express exclusion, is covered by an all risks policy."
*Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042 (4th Cir.
1979). *See Sipowicz v. Wimble*, 370 F.Supp. 442, 446 (S.D. N.Y. 1974)
("[F]ortuitous events are accidents or casualties of the seas, unforeseen
and unexpected events, and [are not] . . . losses occasioned by the
incursion of water into a vessel's hull owing to the defective, deteriorated
or decayed condition of the hull or *ordinary wear and tear*").

*Id.*, at 892-893 (emphasis added).

This loss was not a fortuitous loss.  The water did not enter the vessel by waves

over the sides.  The proximate cause of the loss was the wear and tear of the two bilge

pumps and siphoning through the discharge hoses.  The starboard bilge pump did not

exist, the discharge hose was not capped and did not have an anti-siphon loop, and due

to the siphoning of water into the bilge through that hose.  The lack of a starboard bilge

pump is effectively the same as if the starboard pump had been "torn" from the vessel,

leaving the discharge hose as a siphon.  The port bilge pump was inoperable due to

"wear."  It did not operate on automatic (Henley had to flip manual switches while at

sea, and Smith found that the pump was inoperable on automatic), and it did not

operate manually either. The loss, therefore, was not fortuitous and is not a risk covered

by the policy.

### Whether the loss was excluded by Part D of the contract

Plaintiff contends that the loss was excluded by Part D of the contract.  The

contract excludes coverage for "wear and tear, mechanical breakdown."  P. Ex. 1, p. 6

(Part D, subparagraph 2.a.).  The loss occurred due to the wear and tear of the bilge

pumps.  It also occurred because the port pump had a mechanical breakdown.  The

loss, therefore, was caused by a risk excluded by the policy.

**Whether the vessel was seaworthy**

Whether a vessel is seaworthy is a different question from whether there has

been negligence.  Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 993,

4 L.Ed.2d 941 (1960).

> What has been said is not to suggest that the owner is obligated to furnish
> an accident-free ship.  The duty is absolute, but it is a duty only to furnish
> a vessel and appurtenances reasonably fit for their intended use. The
> standard is not perfection, but reasonable fitness; not a ship that will
> weather every conceivable storm or withstand every imaginable peril of
> the sea, but a vessel reasonably suitable for her intended service.

Id.  "[T]he insured warrants to the insurer the seaworthiness of the vessel at the

inception of the policy."  Kilpatrick Marine Piling v. Fireman's Fund Ins. Co., 795 F.2d

940, 944 (11th Cir. 1986) (citation omitted).  "Our circuit acknowledges the existence of

a federal maritime rule extending an implied warranty of seaworthiness to a maritime

hull insurance policy."  D. J. McDuffie, Inc. v. Old Reliable Fire Ins. Co., 608 F.2d 145,

147 (5th Cir. 1979), cert. denied,  449 U.S. 830 (1980).[10]  A breach of the implied

warrant of seaworthiness voids the insurance contract.  Id.

Plaintiff does not argue that the vessel was unseaworthy at the inception of this

policy, but that it was taken out in an unseaworthy condition on the date of the loss.

The warranty of seaworthiness at issue, therefore, is what is called a negative implied

warranty of seaworthiness "under which the insured promises not to knowingly send a

vessel to sea in an unseaworthy condition."  Axis Reinsurance Co. v. Resmondo, 2009

WL 1537903, *9 (M.D. Fla. Jun 02, 2009) (No. 808-CV-569-T-33TBM), citing Employers

---

[10] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit
rendered prior to October 1, 1981, and of Unit B of the former Fifth Circuit.  Bonner v.
City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981); Stein v. Reynolds, Inc., 667 F.2d
33, 34 (11th Cir. 1982).

Ins. of Wausau v. Occidental Petroleum Corp., 978 F.2d 1422, 1431 (5th Cir. 1992),

cert. denied, 510 U.S. 813 (1993).

> [U]nlike the English Rule which limits the warranty to the commencement
> of the voyage, the American Rule takes it somewhat further to extend, in
> point of time, a sort of negative, modified warranty.  It is not that the vessel
> shall continue absolutely to be kept in a seaworthy condition, or even that
> she be so at the inception of each voyage, or before departure from each
> port during the policy term.  It is, rather, stated in the negative that the
> Owner, from bad faith or neglect, will not knowingly permit the vessel to
> break ground in an unseaworthy condition.  And, unlike a breach of a
> warranty of continuing seaworthiness, express or implied, which voids the
> policy altogether, the consequence of a violation of this 'negative' burden
> is merely a denial of liability for loss or damage caused proximately by
> such unseaworthiness.

Saskatchewan Government Ins. Office v. Spot Pack, Inc., 242 F.2d 385, 388 (5th Cir.

1957).

A vessel that sinks in calm weather and calm seas is presumed to have been

unseaworthy.  Kilpatrick Marine Piling v. Fireman's Fund Ins. Co., 795 F.2d 940, 944

(11th Cir. 1986) (citation omitted); Insurance Co. of North America v. Lanasa Shrimp

Co., 726 F.2d 688, 690 (11th Cir. 1984).

> The presumption of unseaworthiness, however, may be rebutted.  Thus, if
> the insured proves that the vessel left port in a seaworthy condition, "a
> counter presumption arises that the unexplained sinking and consequent
> loss was caused by some extraordinary, although unknown and
> unascertainable, peril of the sea."  In these circumstances, then, the
> insurer bears the ultimate burden of proving unseaworthiness.

Insurance Co. of North America v. Lanasa Shrimp Co., 726 F.2d at 690 (citations

omitted).

In Underwriters at Lloyd's v. Labarca, 260 F.3d 3 (1st Cir.  2001), a vessel was

fitted with four air conditioners that were cooled by sea water pumped in by a single

pump.  260 F.3d at 6.  A mechanic removed two of the air conditioners, but failed to seal

the two intake hoses. *Id.* The remaining two air conditioners and the water pump were left on overnight, and the vessel sank "at its slip in perfectly calm waters." *Id.* The court found the vessel to be unseaworthy and found that, as a consequence, the loss was not covered under the insurance contract. *Id.*, at 7.

A vessel may be seaworthy by use of a portable bilge pump, even in the absence of a permanent bilge pump. U.S. Fire Ins. Co. v. Riverside Ventures, Inc., 1990 WL 6036, *5 (E.D. La. Jan 17, 1990), *aff'd*, 915 F.2d 692 (5th Cir. 1990) (Table). A vessel may be seaworthy without an automatic bilge pump if it has an AC pump and an engine powered pump that can remove water adequately from the vessel. Federal Ins. Co. v. PGG Realty, LLC, 538 F.Supp.2d 680, 696 (S.D. N.Y. 2008), *aff'd*, 2009 WL 2030139 (2nd Cir. Jul 09, 2009) (not selected for publication in the Federal Reporter, No. 08-1888-CV(L), 08-2353-CV(XAP)). But a vessel with a defective bilge pump hole that lets in sea water is unseaworthy. The Edwin I. Morrison, 153 U.S. 199, 210, 14 S.Ct. 823 (1894).

Plaintiff has proven that Defendant knowingly left the vessel in the water at his dock in an unseaworthy condition. It sank in calm seas and after a rain that properly operating automatic bilge pumps could have handled. Henley knew as he motored in that the lazarette was filled with water. He knew that his bilge pumps were not operating properly on their automatic switches since he had seen the bilge area was full of water and he tried to turn on the bilge pumps using the manual switch. Henley could have had his vessel hauled out at River Haven Marina, where he left the Gipsons, and had the water removed. Henley could have inspected the bilge area to see if he had two operable bilge pumps. He could have inspected the bilge area to see if the bilge

pumps were automatically removing the water. Instead, he proceeded to his own dock

and tied up. The bilge was still full of water when it was docked. The starboard pump

was missing and the port pump did not work. The starboard bilge exit hose was not

plugged and was in a position to siphon water into the boat. Henley did not try to bail

out the bilge before he went into the house. It then rained hard, adding to the load,

especially since the scuppers were partially clogged. Had the bilge pumps been

operating properly, the water would have been automatically pumped out. A rain would

not have capsized the vessel. Henley knowingly permitted the vessel to remain in the

water in an unseaworthy condition. The implied negative warranty of seaworthiness

was breached, and Plaintiff is not responsible for the loss.

### Whether Defendant had an insurable interest

"[F]or an insurance contract to be valid, a policyholder must have an insurable

interest in the property at the time of the loss." Travelers Indem. Co. v. Duffy's Little

Tavern, Inc., 478 So.2d 1095, 1095 (Fla. 5th DCA 1985). Florida Statute § 627.405

provides:

> (1) No contract of insurance of property or of any interest in property or
> arising from property shall be enforceable as to the insurance except for
> the benefit of persons having an insurable interest in the things insured as
> at the time of the loss.
>
> (2) "Insurable interest" as used in this section means any actual, lawful,
> and substantial economic interest in the safety or preservation of the
> subject of the insurance free from loss, destruction, or pecuniary damage
> or impairment.
>
> (3) The measure of an insurable interest in property is the extent to which
> the insured might be damnified by loss, injury, or impairment thereof.

FLA. STAT. § 627.405.

"In Florida an 'insurable interest' is not determined by the concept of title, but rather whether the insured has a substantial economic interest in the property." <u>Aetna Ins. Co. v. King</u>, 265 So. 2d 716, 718 (Fla. 1st DCA 1972). A bailee or agent has an insurable interest. <u>ABB Power T & D Co., Inc. v. Gothaer Versicherungsbank VVAG</u>, 939 F.Supp. 1568, 1579 (S.D. Fla. 1996), citing, <u>Hooper v. Robinson</u>, 98 U.S. 528, 538, 8 Otto 528, 25 L.Ed. 219 (1878).

A bailment is the delivery of personal property to another for a particular purpose. <u>Dunham v. State</u>, 140 Fla. 754, 759 (Fla. 1939). "Where a bailment is for mutual benefit, the bailee is held to the exercise of ordinary care in relation to the subject-matter thereof, and is responsible only for ordinary negligence." <u>Coombs v. Rice</u>, 68 Fla. 499, 500, 67 So. 143, 144 (Fla. 1914) (involving a bailment of a boat that burned at the dock).

Defendant Henley has shown that he was the bailee and agent for Elizabeth Henley and Gay, the owners. He had full possession of the vessel. He arranged for it to be transported to a yacht yard to be advertised for sale. He arranged for it to be placed in the water at his dock. He did both for their mutual benefit. Selling the vessel would have benefitted Elizabeth Henley and Gay. After the sale was unsuccessful, Elizabeth Henley had access to use the vessel to fish when she want to do so. Henley benefitted as well. The vessel was docked at his home and he used it for commercial charters. As a bailee, Henley had a substantial economic interest in the vessel and had an insurable interest.

**Henley's counterclaim**

For all of the reasons set forth above, Plaintiff has no liability to Defendant for this loss. The counterclaim, therefore, is without merit.

**Conclusion**

For these reasons, a **DECLARATORY JUDGMENT** is entered that:

1. This contract of marine insurance is void and unenforceable due to intentional failure to disclose facts material to the contract.

2. The claim is not covered under the insurance contract because the loss was not proximately caused by a fortuitous event.

3. The claim is not covered under the insurance contract because it was proximately caused by an excluded peril, wear and tear and mechanical failure.

4. The claim is not covered under the insurance contract because Defendant breached the warranty of seaworthiness by knowingly leaving the vessel at the dock in an unseaworthy condition and unseaworthiness was the proximate cause of the loss.

It is **ORDERED** that Defendant's counterclaim is **DENIED** and the Clerk is **DIRECTED** to enter judgment accordingly and to award costs to Plaintiff.

**DONE AND ORDERED** on October 22, 2009.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**